# EXHIBIT A
# (Transcript)

Page 1

1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION
3
4   STERIGENICS U.S. LLC,
5                 Plaintiff,
                                    Civil Action No.
6        vs.
                                    1:20-cv-01382-SEG
7   COBB COUNTY, GEORGIA;
    NICHOLAS DAWE, Fire Marshal of
8   Cobb County, Georgia, in his
    Individual Capacity; and KEVIN
9   GOBBLE, Development and
    Inspections Division
10  Manager and Chief Building
    Official of Cobb County,
11  Georgia, in his Individual
    Capacity,
12
                 Defendants.
13  ~~~~~~~~~~~~~~~~~~~~~~~~~~
14
15
                 VIDEO DEPOSITION OF
16
                 GUY ROBERT COLONNA
17
18
                   July 27, 2022
19
                    10:01 a.m.
20
21
                   Suite 1600
22              100 Galleria Parkway
                 Atlanta, Georgia
23
24
25           S. Julie Friedman, CCR-B-1476

```
 1               APPEARANCES OF COUNSEL
 2   On behalf of the Plaintiff:
 3         ALSTON & BIRD LLP
           THOMAS P. GRANTHAM, ESQ.
 4         W. CLAY MASSEY, ESQ.
           One Atlantic Center
 5         1201 West Peachtree Street
           Atlanta, Georgia  30309-3424
 6         404.881.4969
           404.881.7777 Fax
 7         clay.massey@alston.com
           thomas.grantham@alston.com
 8
     On behalf of the Defendants:
 9
           FREEMAN MATHIS & GARY LLP
10         SUN S. CHOY, ESQ.
           Suite 1600
11         100 Galleria Parkway
           Atlanta, Georgia  30339-594
12         770.818.0000
           770.937.9960 Fax
13         schoy@fmglaw.com
     AND
14         BENTLEY BENTLEY & BENTLEY
           JAMIE WINGLER FRED D. BENTLEY JR., ESQ.
15         241 Washington Avenue
           Marietta, Georgia  30060
16         770.422.2300, Extn. 230
           770.424.5820 Fax
17         jamie@thebentleyfirm.com
     AND
18         COBB COUNTY ATTORNEY'S OFFICE
           BRIAN S. JOHNSON, ESQ.
19         Suite 350
           100 Cherokee Street
20         Marietta, Georgia  30090
           770.528.8088
21         brian.johnson@cobbcounty.org
22
     Also Present:
23         Nicholas Dawe, Fire Marshal
           Kevin Gobble, Chief Building Official
24         Jason Silling, Videographer
25
```

```
 1                    INDEX OF EXAMINATIONS
 2    WITNESS:
      Guy Robert Colonna
 3                                                    Page
 4     CROSS-EXAMINATION                                 6
       By Mr. Grantham
 5
 6                    INDEX TO EXHIBITS
 7    Plaintiff's
        Exhibit          Description          Page
 8
```

```
       Exhibit 371   7-18-22 Notice of Deposition of      7
 9                   Guy Colonna
10     Exhibit 372   6-27-22 Expert Report of Guy         29
                     Colonna, P.E. Pursuant to
11                   Federal Rule of Civil Procedure
                     26(a)(2)(B)
12
       Exhibit 373   4-30-21 Letter, to Colonna, from     84
13                   Bentley, RE: Sterigenics v. Cobb
                     County, Georgia, et al. (Page 1
14                   of Engagement Letter)
15     Exhibit 374   Composite Exhibit of Cover           87
                     Letters and Invoices Beginning
16                   with 6-3-22 Letter, to Johnson,
                     from Colonna, RE: Sterigenics v.
17                   Cobb County, Georgia, et al.
18     Exhibit 375   Contents of Witness's Two Yellow     91
                     Folders
19
       Exhibit 376   Composite Exhibit of Handwritten     99
20                   Notes by Colonna During
                     Telephone Calls with Defendants
21                   and Their Counsel
```

```
22
23
24
25
```

1            INDEX TO PREVIOUSLY MARKED EXHIBITS

2    Plaintiff's

         Exhibit          Description          Page

3

     Exhibit 47   9-8-15 HAZARD EVALUATION REPORT,    82

4                 Revision 1 by SSOE

5

        (Original Plaintiff's Exhibits 371 through 376

6    and a photocopy of previously marked Plaintiff's

     Exhibit 47 have been attached to the original

7    transcript.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1              (Plaintiff's Exhibit 371 was marked for

2        identification.)

3              THE VIDEOGRAPHER:  We are going on the

4        record at 10:01 on July 27th, 2022.  This is the

5        Media Unit 1 of the video-recorded deposition of

6        Guy Colonna taken by Counsel Thomas Grantham, In

7        the Matter of Sterigenics U.S., LLC versus Cobb

8        County, Georgia.

9              This deposition is being held at Freeman

10       Mathis & Gary located at 100 Galleria Parkway,

11       Atlanta, Georgia.

12             My name is Jason Silling.  I am the

13       videographer from Veritext.  The court reporter

14       is Julie Friedman from the firm Veritext.

15             Counsel and all present in the room will

16       now state their appearances and affiliations for

17       the record.

18             If there are any objections to proceeding,

19       please state them at the time of your

20       appearance, beginning with the noticing

21       attorney.

22             MR. GRANTHAM:  Thomas Grantham with

23       Alston & Bird on behalf of Sterigenics.

24             MR. MASSEY:  Clay Massey for Sterigenics.

25             MR. CHOY:  Sun Choy on behalf of

Page 6

1       Defendants.

2               MR. JOHNSON:  Brian Johnson on behalf of

3       Defendants.

4               MR. WINGLER:  Jamie Wingler on behalf of

5       Defendants.

6               THE VIDEOGRAPHER:  And will the court

7       reporter please swear in the witness.

8               GUY ROBERT COLONNA, having been first duly

9       sworn, was examined and testified as follows:

10      CROSS-EXAMINATION

11      BY MR. GRANTHAM:

12      Q.    Mr. Colonna, good morning.

13      A.    Good morning, sir.

14      Q.    I'm Thomas Grantham.  I'm going to be

15   taking your deposition today.  Very nice to meet you.

16              You've been deposed before, right?

17      A.    Only once, sir.

18      Q.    One time.  So let's --  There's a couple

19   ground rules we'll go over just to make sure we get a

20   good, clean record here.

21              First of all, if I ask a question you

22   don't understand, please just let me know; and I'll

23   clarify.

24              And then the second thing -- and this is

25   important so that Julie here can get a good record --

1   is that we don't speak over each other, so I'll do my

2   best to let you finish your answer, if you'll do your

3   best to -- to let me finish my question.

4              Does that sound fair?

5        A.    Yes, sir.

6        Q.    For the purpose of the record, we've

7   marked Plaintiff's Exhibit 371, which is a copy of

8   the deposition notice for you.  Is that correct?

9        A.    Yes, sir.

10       Q.    You've seen that document before?

11       A.    I have.

12       Q.    And you're here today pursuant to that

13  notice?

14       A.    Yes.

15       Q.    You're a chemical engineer, correct?

16       A.    Yes, sir.

17       Q.    Are you a fire protection engineer?

18       A.    I am not.

19       Q.    Are you a certified fire protection

20  specialist?

21       A.    I am not.

22       Q.    Are you a licensed engineer in the state

23  of Georgia?

24       A.    I am not.

25       Q.    So you're an expert in code compliance; is

1    that fair?

2         A.    That's one of the things.  Yes, sir.

3         Q.    What are some of the other things?

4         A.    Characterization and classification of

5    hazardous materials, as -- as it goes, because that's

6    where you need to start when you're dealing with

7    codes that are going to involve storage, handling,

8    and use of hazardous materials, so you have to

9    understand basically the characteristics and

10   properties, so that's also part of my background, I

11   believe.

12        Q.    Okay.  So apart from classifying hazardous

13   materials and determining whether a building

14   complies -- complies with, you know, with

15   prescriptive code requirements, have you ever been

16   asked to assess whether an H occupancy facility is

17   actually safe?

18        A.    No.  I have not.

19        Q.    And that's not part of something you did

20   in your work for the NFPA?

21        A.    No.  As --  As staff, we didn't do

22   compliance.  We talked about what the content was,

23   assisted stakeholders and users of the codes and

24   standards in what those requirements would look like

25   in practice; but NFPA staff didn't determine

1   compliance.  That's role of the AHJ.

2        Q.    And it's --  The advice that you get on

3   the code application, that's the prescriptive code

4   application to a facility, correct?

5        A.    It is in most instances, unless there are

6   some documents that have performance-based design

7   chapters in the codes; and a number of the codes and

8   standards that I was responsible for did, indeed,

9   through the latter '90s, into the early 2000s begin

10  to add performance-based chapters to them so that

11  there were alternatives to the prescriptive.

12             But, otherwise, most of the work would be

13  related to prescriptive requirements.  Yes, sir.

14       Q.    Right.  And the performance-based code

15  provisions, that -- that's different from actually

16  determining whether performance-based fire protection

17  safety measures actually create a safe environment,

18  right?

19       A.    I don't understand what you're asking

20  there.

21       Q.    So applying it to a -- a specific

22  facility, it's different to say what the code says

23  about performance-based measures and actually

24  determining whether recommended performance-based

25  measures at a facility actually achieve safety.

1        A.      In order to go through performance-based,

2    if that's what you're attempting to do, or even

3    determine equivalencies, you need to understand what

4    the prescriptive objective is trying to achieve in

5    terms of fire or life safety.

6              If you understand what that basis is and

7    then you try to -- if you're then --  If your goal is

8    then to go through and do performance-based or -- or

9    alternative or equivalent design, you need -- because

10   you now know what that objective is, what it's trying

11   to achieve in terms of fire and life safety, you can

12   try to determine whether these alternative strategies

13   are creating equivalencies.

14              So whether you're using the equivalency

15   clauses, which many of the NFPA codes and standards

16   have in them, or you're actually doing a full

17   performance-based chapter in a specific document,

18   that would be the way you would be able to match

19   pointers basically, is I know what I achieved here.

20   The alternative strategies that I've come up with

21   achieve it or don't achieve it, and you can line

22   those up.

23        Q.     Okay.  Let me ask it this way.

24              You're not asked to determine whether

25   performance-based measures installed at a facility

1    provide adequate safety and protection.

2         A.    Me personally, I'm not?

3         Q.    Yes.

4         A.    No.  I'm not normally.

5         Q.    Okay.  You have worked at the NFPA for

6    about 34 years; is that right?

7         A.    Correct.

8         Q.    And in 2000, I believe you became the

9    division manager for industrial and chemical

10   engineering.

11        A.    That's correct.

12        Q.    What were your primary duties and

13   responsibilities in that role?

14        A.    At the time --  Okay.  That's just a title

15   change actually.  In 1990 I became the chief of the

16   industrial chemical team.  In 2000, the title

17   changed.

18             So actually, my time as the manager of the

19   team that was responsible for the inventory of NFPA

20   codes and standards dealing with either industrial

21   processes or specific hazardous materials actually

22   started in October of 1990; and my title then was

23   chief chemical and marine engineer.

24             It eventually became division manager, as

25   you point out; and if the date is 2000, based on my

1    resume, then that's what it would have been; but that

2    was just a title change.

3              So do you want me to answer now what my

4    roles and responsibilities would have been?

5         Q.    Yeah.

6         A.    Okay.

7         Q.    So going back to 1990, what were

8    your roles --

9         A.    Yeah.

10        Q.    -- and responsibilities?

11        A.    So I became a personnel manager.  The

12   department at the time had three other engineers.

13   Two were chemical engineers like myself.  One was a

14   chemist, and that was a team of four.

15             We were -- were responsible for somewhere

16   on the order of probably 80 or 90 of NFPA's 300 codes

17   and standards.  I was personally responsible for then

18   as, just like my team, staffing specific committees.

19             And so, again, with my maritime

20   background, I still had the marine fire protection

21   documents that I started with in 1986 when I joined

22   NFPA; and then I began assuming responsibility for

23   specific documents within the chemical portfolio or

24   the industrial portfolio.

25             When I say industrial, some of the

Page 13

1    industrial documents are facilities that are involved

2    or -- or processes that are involved with hazardous

3    materials, like spray finishing, for example.

4    Typically, when you're doing spray finishing, whether

5    it's automotive or pleasure boats or whatever, you're

6    using flammable material, flammable liquids, and

7    things like that.

8              So while that wasn't a unique chemical

9    material like flammable gasses or flammable liquids

10   or combustible dust, it was -- it -- it involved

11   industrial processes that had use of, again,

12   hazardous materials of various natures, whether

13   solids, liquids, or gases.

14             So I began taking on more and more

15   responsibilities for specific chemical documents or

16   industrial documents, the first one of them being the

17   classification document that deals with the --  I've

18   forgotten the title.  It's NFPA 704.  It's a document

19   that describes the criteria for specifying.

20             And I believe you're aware, because the

21   Sterigenics facilities has some of these placards,

22   the square on point.  People describe it as a

23   diamond.  It's the blue, red, yellow field with the

24   white at the bottom.  I was responsible for the

25   committee that dealt with that document.

1          Q.    When you say you were responsible for the

2    committee that dealt with the document, does that

3    mean that you are overseeing the drafting of that

4    document?

5          A.    I am the staff supporting the committee,

6    so I have both kind of a technical role and an

7    administrative role.

8                Administratively, the committee is

9    volunteer stakeholders.  The -- They have to go

10   through the steps necessary for developing either a

11   brand new document or revised documents on the

12   frequency that the NFPA process goes through, usually

13   every three to five years.

14               So I administer procedurally what they do.

15   Make sure that they --  If somebody submitted a

16   proposed change, they can't ignore that.  They have

17   to act on it, things like that that kept them in

18   bounds with the standards procedural.

19               And then I also, because of my background,

20   would contribute technical information that I might

21   be aware of or I could help interpret and make sure

22   that the committee was --  If they were trying to go

23   in a direction and they were having trouble getting

24   in the direction, maybe I could offer that.

25               I don't vote.  I don't get --  I'm not

1  actually the one creating the words.  I am taking the

2  words that the committee comes up with based on

3  either the input from the process or that they

4  develop their own, and then making sure that those

5  are captured.

6          So part of my administrative duty was then

7  to capture and make sure that all went in, so that it

8  got into the NFPA process, so we could publish it and

9  say to the public here's what we're thinking of

10  doing.  You go through the steps; and eventually, you

11  get an adopted new edition of the document.

12      Q.    So is it fair to say that you provided

13  substantive advice on the contents of NFPA 704?

14      A.    Yes.

15      Q.    Yeah.

16      A.    Yes.

17      Q.    Another document you worked on, I believe,

18  was --

19          You served as the technical staff for the

20  NFPA committee on hazardous materials.

21      A.    NFPA 400.

22      Q.    NFPA 400, that's --

23      A.    Yes, sir.

24      Q.    -- right.  And that was first enacted in

25  2010, I believe?

1       A.    Yes.

2       Q.    In your experience, do you believe that

3    the NFPA committee on hazardous materials carefully

4    assessed the potential risk associated with using

5    hazardous materials in an industrial setting?

6       A.    They --

7             Ask that question again, please.

8       Q.    Yeah.  Do you believe that the NFPA

9    committee on hazardous materials carefully assessed

10   the risk associated with using those hazardous

11   materials?

12      A.    They did not factor in risk necessarily

13   all the time.  They looked at the hazards of the

14   materials.  They looked at the operations.

15            Part of 400 was an effort, at the time, to

16   amalgamate the -- some existing hazardous

17   material-specific documents.  NFPA used to have a

18   separate document on pesticides.  I think it was NFPA

19   434.  They had a separate document on oxidizers, NFPA

20   430.  They had a separate document on organic

21   peroxides, NFPA 432.  The --

22            One of the intents of the hazardous

23   materials, the creation of NFPA 400, that process,

24   was to grab those three existing documents on

25   specific hazards that had existed for a number of

1    years -- I think some of those documents went back --
2    again, I don't remember exactly -- but maybe into the
3    '40s and '50s in terms of their origins as separate
4    documents -- and take those documents and put them in
5    the framework that was then going to enable NFPA 400
6    to have some generally applicable sections at the
7    front that covered and applied to all materials in
8    terms of their classification and characterization,
9    the -- how they would get incorporated into the
10   concept of like the occupancy.  Only the NFPA
11   process, based on the building code, NFPA 5000, which
12   existed at that time, was to use protection levels.

13              So if you had a specific type of hazard,
14   one of those classifications of either physical or
15   health hazards, you then got driven -- and you had in
16   excess of the threshold quantity, the MAQ, then that
17   would drive you into one of those protection levels
18   to have certain precautions that would be added to
19   just the generic requirements.

20              Then the subsequent chapters in NFPA 400
21   was then to take explicit chemical classes -- the
22   oxidizers, the peroxides, the flammable solids, the
23   unstable reactives, the water reactives, those types
24   of things.

25              Also, NFPA 400 incorporated NFPA 490,

1    which is the ammonium nitrate document that existed;

2    and it was, again, aggregated into NFPA 400.

3              So they took those requirements, but they

4    weren't looking necessarily at --  They weren't using

5    a strict risk protocol to do that.

6              But the -- the fire and life safety

7    strategy around hazardous materials for decades has

8    been around looking at the quantity, the container,

9    the operation that you're involved in, in terms of

10   whether you are using it in open containers of --

11   particularly, if it's a flammable liquid, whether

12   you're using it in open containers or closed

13   containers; the separation to -- within the facility,

14   as well as the separation to other nonindustrial

15   process-type areas, so take those kinds of -- of

16   precautions.

17             So there was an aspect of risk in terms of

18   managing the hazard side of things and the likelihood

19   of that hazard manifesting itself, 'cause risk is two

20   things.  Risk is the likelihood or probability of an

21   event, and then it's the consequences.

22             The sense was that the consequences could

23   be mitigated if you did some of those things that

24   the -- those various documents exist -- already had

25   when they got brought into 400 such as managing

1    quantities, such as managing the types of

2    construction that they were in, the buildings that

3    they were in, whether they were separate buildings,

4    whether they were separated buildings, or whether

5    they were on one footprint all inside the area.

6              So they used a variety of those things,

7    but they didn't call it risk.

8              So when you ask about risk, I don't know

9    that it's the strict risk protocol, 'cause not all

10   committees are necessarily schooled in -- in pure

11   risk analysis that you would get into if you were in

12   the process -- if you were actually a process safety

13   expert.

14        Q.    So there's a lot in that answer.  And

15   I just --

16        A.    Yeah.

17        Q.    -- want to kind of go back to --

18              The question I asked was whether they

19   carefully assessed risk when determining the

20   potential risk of those hazards and the use of those

21   hazards, and I believe you agreed with that --

22        A.    Yeah.  They --

23        Q.    -- as part of the answer.

24        A.    Sorry.  I didn't mean to talk over.

25              Based on what had come to them either from

1  their own expertise, 'cause, again, as I said, our

2  committees are made up -- our --  The NFPA committees

3  are made up of stakeholders from all the different

4  interest categories, and that includes users.

5          So if it was a hazardous material or a

6  process involving that, it was the people that were

7  doing the manufacturing and the people that made the

8  individual product.  They came with their own

9  knowledge and expertise about those things, along

10  with researchers, so it could have been people in --

11  in testing laboratories and all.  They all come

12  together to form the -- the committee and within the

13  boundaries of the process, and so they would bring

14  their own knowledge of risk and sit that around the

15  table.

16          And, also, they could be informed by

17  incidents that would occur; and examples of that

18  would be if there was an incident that occurred and

19  a -- a group like the Chemical Safety Board or OSHA

20  or EPA, they would -- if they didn't sit on a

21  committee --  And they sit on many of our committees,

22  if you look at the --  Particularly, in the

23  industrial chemical area, it is not uncommon to have

24  OSHA sitting on a number of those committees.  The

25  Chemical Safety Board sits on some of those

1   committees.

2          So it is not uncommon for them to have

3   brought that information and shared it with the

4   committee and said here's something for you to

5   consider, as you are either developing something new

6   or if you're looking at developing a -- a -- revising

7   an existing document.

8      Q.    You brought up the fact that NFPA 400, in

9   part, was an amalgamation of other more specific

10  standards that relate to specific hazards --

11     A.    Yes, sir.

12     Q.    -- right?

13         When the NFPA 400 committee was developing

14  the code or the standards in NFPA 400, they didn't

15  just accept that whatever was in the codes for those

16  specific materials was adequate, right?

17     A.    That's correct.

18     Q.    And they did their own independent

19  analyses to determine whether those specific

20  provisions were still adequate?

21     A.    Correct.

22     Q.    Okay.  And as we -- we mentioned, the

23  committee considered risk associated with specific

24  hazards when enacting NFPA 400?

25     A.    (Witness nods head affirmatively.)

1       Q.      Is that a yes?

2       A.      I believe so.  Yes.

3       Q.      Do you believe that the standards under

4   NFPA 400 adequately protect the public from risks

5   associated with using hazardous materials?

6       A.      So you -- you asked if the standards under

7   400.  400 is the only --  It's the code, so if you

8   use 400, it doesn't have standards under it.

9       Q.      NFPA 400 has code provisions that apply to

10  the use --

11      A.      Okay.

12      Q.      -- of hazardous materials, correct?

13      A.      Yes.

14      Q.      All right.  So I'm asking you whether you

15  believe those code provisions under NFPA 400

16  adequately protect the public from the risk

17  associated with using the hazardous materials covered

18  by the NFPA 400?

19      A.      Yes.

20      Q.      You agree with that?

21      A.      Yes.

22      Q.      You retired from the NFPA in 2020 --

23      A.      Correct.

24      Q.      -- is that correct?

25              And you now have your own consulting

 1   business?

 2        A.    Yes.

 3        Q.    FSL Consulting?

 4        A.    Yes.

 5        Q.    What kind of projects does FSL Consulting

 6   do?

 7        A.    I've had some work for individuals in the

 8   petroleum industry in looking at fire protection at

 9   fracking sites, hydraulic frack -- fracking sites.

10             I've had work involving training,

11   reviewing training materials, developing training

12   materials, and then delivering training.

13             And then this project.

14             So, again, I have only been doing this

15   since the beginning of 2021 basically.  Didn't engage

16   in a lot of things with the pandemic right after I

17   retired at the end of August of 2020, so there

18   weren't --  And, again, I'm not out soliciting a

19   bunch of work necessarily, so I'm content to be

20   retired at times.

21        Q.    Oh, good.  The --  The fracking sites

22   project, can you tell me a little bit about that and

23   what that involves.

24        A.    That was referred to me by a former

25   colleague at NFPA.  They --  The company operated --

1   operates a number of fracking sites in Colorado

2   and -- and the Western U.S., and they had experienced

3   some situations where some fires occurred.

4           What it amounts to is it is not part of

5   the drilling process, so it's not involving the oil

6   or gas that is being produced out of the -- once they

7   do the hydraulic fracturing.  It is the equipment

8   that goes into that process, so it is --

9           The way they lay out the facilities is

10  normally to have a number of trucks all aligned

11  together and --  And then they manifold together.

12  Those trucks have both their engines, but they are

13  also running generators.

14          And what had occurred was that they have

15  diesel-powered generators, and they would end up with

16  either fuel line ruptures or things like that that

17  would release either hydraulic fluid or if diesel

18  fuel.  It would impinge on a hot surface; and because

19  it would be under pressure coming from those lines

20  that is carrying it to the engine, to the generator,

21  to the motor, whatever, it would be atomized.

22          And so even though diesel is a higher

23  flash point material, it would be more easily ignited

24  on a hot engine surface -- surface; and they would

25  end up with a fire; and because of the -- the way

1    they lay out those facilities, the fire would spread

2    very quickly; and they would run the risk of losing

3    all their equipment.

4              So what they were asking me to do was to

5    examine that situation and see about what kinds of

6    recommendations I could make in terms of both

7    detection and possible suppression methodologies that

8    they can employ.

9              The trouble that they have is it more

10   likely they are --  Because they are temporary,

11   they're only at a fracturing site for a couple of

12   weeks, they can't go to a typical fixed system that

13   they would use, so they're probably looking at a -- a

14   portable trailer with a foam monitor or something

15   like that.

16             And the big issue is not so much the

17   suppression, the suppressant.  The bigger issue was

18   probably the detection, because it's important that

19   they detect it very quickly, because, otherwise, it

20   spreads very rapidly.

21             So that was the nature of the problem, and

22   I gave them --  I did some analysis and gave them a

23   report that said, you know, here's what you might

24   look at; and that's the end of that one.

25        Q.    And so that project is unrelated to code

1    compliance?

2         A.    Yes.  Yeah.  'Cause there was nothing you

3    could find in any code that would drive you, other

4    than when you looked at, for example, the code -- the

5    NFPA 11, the foam monitor or foam standard.  You

6    could get information about applying foam to similar

7    hazards.  Like flame over combustible liquids, you

8    could get information about application rates and

9    things like that; but it was not a code compliance.

10             I was trying to take the bases out of some

11   codes and then say here's how you might apply this.

12        Q.    When you say there's nothing in the code

13   that you could find that would drive you, do you mean

14   there's nothing in the code that dictated how to

15   handle that situation?

16        A.    You couldn't look in a chapter in the code

17   and say fire protection for hydraulic fracturing

18   sites.  That's what I meant, sir.

19        Q.    The facility we're here to talk about

20   today is the Sterigenics facility that sterilizes

21   medical equipment in Smyrna, Georgia, correct?

22        A.    Yes, sir.

23        Q.    Have you ever been to that facility?

24        A.    I have not.

25        Q.    Have you ever driven by the facility?

1        A.    I have not.

2        Q.    Do you know what other businesses are near

3   the facility?

4        A.    I've forgotten what they are specifically,

5   but I've read in the documentation that's been

6   provided as part of this process.  I know that it is

7   attached to other businesses.  The --  The facility

8   is attached to other businesses.

9        Q.    Do you know what -- what a zoning in that

10  area is?

11       A.    I do not.

12       Q.    And I think we said this earlier.  But

13  you're not a licensed engineer in the state of

14  Georgia?

15       A.    I am not.

16       Q.    Have you ever been to the state of

17  Georgia?

18       A.    Many times.

19       Q.    Yeah.  For work?

20       A.    Work and pleasure.  Went to a Braves games

21  years ago when they were still at Fulton County

22  Stadium.  Haven't been to the new stadiums, but I --

23             I've been here in the state for business a

24  number of times, both attending conferences at

25  Georgia World Congress and presenting at the Chemical

 1    Engineers Conference a number of times over the

 2    years, attending committee meetings hosted by --

 3    either that we held here or that were hosted by some

 4    of the companies that were on the committees.

 5             And NFPA had its -- both its fall and

 6    annual conference.  When they used to have two

 7    conferences a year, NFPA had their conference in

 8    Atlanta a couple of times so --

 9             And I've transferred through.  I've --

10    almost always a Delta flyer, so I've transferred at

11    Hartsfield Jackson any number of times.

12        Q.    Yeah.  My apologies.

13             Is it fair to say that one of your

14    opinions in this case is that under today's code, the

15    Sterigenics facility would be classified as an H

16    Occupancy?

17        A.    Yes.

18        Q.    And by today's code, I mean the codes that

19    were adopted in the state of Georgia as of August

20    2019.

21        A.    Yes.

22        Q.    One of the resources you looked at to

23    reach that determination is Table 307.1 of Chapter 3

24    of the International Building Code; is that correct?

25        A.    Yes, sir.

1       Q.     And under that -- those tables, what is
2    the maximum allowable quantity of ethylene oxide?
3       A.     May I look.
4       Q.     Sure.
5       A.     Yeah.  'Cause I don't remember the number
6    for --  The numbers are a little bit different, but
7    it's small.  I've forgotten, so if you don't mind.
8              (Plaintiff's Exhibit 372 was marked for
9         identification.)
10      Q.     (By Mr. Grantham)  I've marked Exhibit
11   372, and that is a copy of your report.
12      A.     Yes, sir.
13             Oh, let's see.  Unstable reactive gas
14   liquified Class 4 or Class 3 detonable Group H-1 or
15   H-2 in storage, the MAQ is 5 pounds.  In use, closed
16   systems, the MAQ is 1 pound; and in use open systems,
17   the MAQ is 1 pound.  That is from Table 307.1, paren,
18   (1) of the IBC.
19      Q.     Okay.  And I believe you also discuss some
20   of the limitations, like flammable gas from Table
21   307.1 where Group H-2, the MAQ would be 150 pounds --
22      A.     That's correct.
23      Q.     -- in storage, correct?
24      A.     That's at the beginning of that.  Yes.
25      Q.     Oh.

1          A.     Because --  I'm sorry.

2          Q.     No.  Go ahead.

3          A.     Because when you start at the

4     classification process for ethylene oxide, it is a

5     flammable gas.  However, from the standpoint of the

6     Sterigenics facility's use of the product, it is

7     stored in those drums as a liquified flammable gas,

8     so you would also have to look at the liquified

9     flammable gas requirement.

10               So I didn't make determinations until I

11    had looked at all the different pieces that could

12    apply to the properties of ethylene oxide, so that's

13    why I did it that way.

14         Q.     Well, it's fair to say that according to

15    your review of those tables, the -- the maximum

16    allowable quantity of ethylene oxide is 150 -- 50

17    pounds at -- at most, right?

18         A.     Yes.  That's correct.

19         Q.     And you mentioned the drums that store

20    ethylene oxide at Sterigenics facility.  Do you know

21    how much ethylene oxide is in one drum?

22         A.     They're 55-gallon drums; and when you

23    convert based on the vapor density -- I'm sorry -- on

24    the specific gravity, you end up with about --  It's

25    7.21 pounds per gallon, so you end up with something

1    under 400 -- 400 pounds.

2        Q.    Okay.  So --  So one drum of ethylene

3    oxide at Sterigenics' facility is approximately 400

4    pounds, correct?

5        A.    Yeah.  Yeah.

6        Q.    So having one drum of ethylene oxide at

7    the facility would make it an H Occupancy under

8    today's code --

9        A.    Yes.

10       Q.    -- correct?

11       A.    Yes.

12       Q.    Would you agree that for any time that

13   Sterigenics' facility used at least one drum of

14   ethylene oxide, it would have been classified as an H

15   Occupancy under today's code?

16       A.    Yes.

17       Q.    Are you aware of any time in the

18   facility's history that it used less than one drum of

19   ethylene oxide?

20       A.    Nothing that I've -- I haven't --  I

21   haven't seen anything other than --

22       Q.    You're not aware of any time --

23       A.    No.  I'm not aware.  No, sir.

24       Q.    You're not aware of any time that the

25   Sterigenics facility used less than one drop of

1    ethylene oxide, correct?

2         A.    No.

3         Q.    And this facility has been using ethylene

4    oxide to sterilize medical equipment for decades; is

5    that correct?

6         A.    As I understand things, yes.

7         Q.    And so the facility's occupancy throughout

8    that period would always have been classified as an H

9    Occupancy under today's code?

10        A.    Yes.

11        Q.    As part of your work in this case, did you

12   study what fire protection safety measures have been

13   enacted at the facility?

14        A.    Only what is written in other reports such

15   as the SSOE document from Richard Stehr, I believe,

16   which was in --  I think he had a revision, which was

17   September of 2015.

18             Also, in the Q-Dot reports that were done

19   in '19; and the final one being in 2020.

20             I'm trying to think if there was other --

21   any other documents that I read about fire

22   protection.

23             There was an analysis of, I think, the

24   sprinkler protection that was a separate report that

25   someone produced.  I've forgotten who, where that

1    was; but I remember seeing there was another one that

2    was specifically on the sprinkler and commodity

3    classification.

4         Q.    Sitting here today, can you tell me what

5    kind of sprinkler systems are installed at the

6    facility?

7         A.    Not my area of expertise, so I wouldn't

8    get them all right.

9         Q.    And sitting here today, can you tell me

10   the various gas detection measures that are in place

11   at the facility?

12        A.    I know from what I've read, it was

13   referenced.  I think it was --  I think I read

14   somewhere that -- whether it was in the SSOE report

15   or something like that.  It was Perkin Elmer, but I

16   don't know if that's still what is being used, and I

17   don't know if that was for that application or

18   whether that's also for the 25 percent LFL and

19   detections and alerts and alarm systems that are in

20   place.

21             So I don't know --  If you're talking

22   about manufacture, I don't know who the manufacturers

23   are.  No, sir.

24        Q.    Well, and you haven't studied the

25   effectiveness of any gas-monitoring system?

1        A.      I have not.

2        Q.      You haven't studied the effectiveness of

3   any sprinkler system at the facility?

4        A.      I have not.

5        Q.      So you can't say sitting here today

6   whether the facility has adequate safety measures in

7   place --

8        A.      Nope.

9        Q.      -- to protect --

10       A.      Without --  I would never say that without

11  actually being at the facility to begin with, and

12  then some of those areas are not areas in which I am

13  an expert, so wouldn't be in my purview.  No.

14       Q.      You mentioned the Q-dot reports just a

15  moment ago.  As part of your work in this case, you

16  reviewed a couple of Q-Dot reports, correct?

17       A.      I did, sir.

18       Q.      And I believe your report specifically

19  mentioned one from December 2019 and another from

20  March 2020; is that --

21       A.      Correct.

22              THE COURT REPORTER:  And please.  Let him

23       finish.  Okay?  'Cause I'm trying to get this

24       down.

25              THE WITNESS:  Sorry.  I thought I had --

1          THE COURT REPORTER:  I appreciate it.

2          THE WITNESS:  -- let him finish.  I'm

3     sorry.

4          THE COURT REPORTER:  Yeah.  We're kind of

5     treading on each other a little bit.

6          THE WITNESS:  Okay.

7          THE COURT REPORTER:  So I appreciate the

8     help.

9     Q.    (By Mr. Grantham)  And I believe you

10    mentioned in the Q-Dot reports, those included an

11    assessment of certain of the facility's fire safety

12    protection measures, correct?

13    A.    Yes.

14    Q.    And Q-Dot also recommended several

15    additional safety protection measures to be installed

16    at the facility, correct?

17    A.    Yes.

18    Q.    You're not giving an opinion in this case

19    about whether the recommendations in those Q-Dot

20    reports are appropriate, are you?

21    A.    Explain appropriate.

22    Q.    You're not giving an opinion in this case

23    on whether the recommendations in the Q-Dot report

24    provide adequate safety protection from fire

25    incidents or explosions at the facility, correct?

1          A.     No.

2          Q.     Okay.  In your report, you state that,

3     "Classification as an F-1 (Factory Industrial)

4     occupancy would not adequately protect the Facility,

5     workers, or the community in the event of an incident

6     involving a release of sterilization chemicals."

7                 Did I read that correctly?

8          A.     Yes.

9          Q.     And that's an opinion you have in this

10     case?

11          A.     That is based on the definition of what

12     F-1 is intended to address, which, as part of the F-1

13     definition, it specifically excludes facilities that

14     have quantities of hazardous chemicals.

15          Q.     But with respect to the Sterigenics

16     facility, we've agreed that you haven't done an

17     assessment of the fire safety protection measures

18     that are in place at the facility, correct?

19          A.     Correct.

20          Q.     So your opinion with respect to

21     classification as an F-1 facility, it's just that

22     that -- the measures of protection under that

23     classification and the code are not as robust as they

24     are under an H Occupancy classification under today's

25     code, correct?

1     A.     That's correct.

2     Q.     It's not an opinion as to whether the

3  Sterigenics facility itself protects the public from

4  fire incidents or explosion; is that correct?

5     A.     That's correct.

6     Q.     And do you know who classifies a facility

7  in this jurisdiction, in Cobb County, who classifies

8  the facility as a particular occupancy?

9     A.     I assume it's the building official as

10  part of the permitting process.

11     Q.     All right.  And the classification of a

12  facility as we've discussed, it -- it's unrelated to

13  what safety measures are in the building, correct?

14     A.     Yes.  Because the definitions lay out that

15  if this is what's being done in there, then this

16  aligns with F or S.  When you put hazardous materials

17  in there, that drives you to the H, so yes.

18     Q.     Right.  The presence of hazardous

19  materials is what drives you to the H.

20     A.     Correct.

21     Q.     It's -- it's not --  It's not what safety

22  measures are actually installed at the facility,

23  correct?

24     A.     Correct.

25            But I would say that the identification of

1    this -- the types of additional protections that

2    would be essential for fire and life safety in

3    facilities operating, storing, handling, using

4    hazardous materials would be more clearly driven from

5    the H Occupancy classification, as opposed to a

6    situation where you're starting with an F occupancy

7    definition or a classification, which wouldn't

8    normally impose those additional safeguards.

9            MR. GRANTHAM:  All right.  Well, I -- I

10        object to the nonresponsiveness of the answer

11        for the record.

12       Q.    (By Mr. Grantham)  On Page 24 of your

13   report, you -- you state that you were asked to

14   determine what code requirements would be applicable

15   to the Sterigenics facility under Georgia law; is

16   that right?

17       A.    That's where I started.  Yes.

18       Q.    And I just want to be clear about what you

19   mean by that, Georgia law.  Do you mean the fire and

20   building codes that Georgia law -- excuse me -- that

21   Georgia has adopted?

22       A.    Yes, sir.

23       Q.    Okay.  You're not a legal expert here to

24   give an opinion on whether Sterigenics has a vested

25   right, for example, to operate a sterilization

1    facility under Georgia law, correct?

2        A.    No, sir.

3        Q.    Okay.  Now you reviewed NFPA 55 in

4    connection with your report; is that right?

5        A.    Yes, sir.

6        Q.    And you also reviewed NFPA 400, correct?

7        A.    Yes, sir.

8        Q.    And NFPA 400 references NFPA 55 as part of

9    it, doesn't it?

10       A.    Yes, sir.

11       Q.    And NFPA 55 applies to certain facilities

12   that use compressed gases or cryogenic fluids; is

13   that correct?

14       A.    Correct.

15       Q.    And it specifically applies to facilities

16   that use ethylene oxide to sterilize; is that

17   correct?

18       A.    Correct.

19       Q.    And that is Chapter 14 of NFPA 55, right?

20       A.    Correct.

21       Q.    And your report, I believe it cites to one

22   provision of the NFPA 55, Chapter 14, stating that

23   the maximum quantity of ethylene oxide in

24   sterilization buildings shall be 10,000 pounds; is

25   that correct?

1       A.    Yes.

2       Q.    So looking at Chapter 1 of NFPA 55,

3    Section 1.4 states that, "The provisions of the code

4    reflect a consensus of what is necessary to provide

5    an acceptable degree of protection from the hazards

6    addressed in this code...."

7             Correct?

8       A.    Right.

9       Q.    We discussed this earlier.  But that

10   consensus is the NFPA committee reaching an agreement

11   on what level of protection is necessary under the

12   code for certain hazards, correct?

13      A.    Correct.

14      Q.    And so is it fair to say that the NFPA

15   committee drafting these provisions, they assess the

16   risk associated with certain types of hazards; and

17   one of those hazards is the use of ethylene oxide in

18   sterilization purposes, correct?

19      A.    Yes.

20      Q.    Your report also discusses Section 1.41 of

21   NFPA 55, which states that the provision of the code

22   shall not apply to existing facilities as a general

23   rule, correct?

24      A.    Correct.

25      Q.    But there are two exceptions to that

Page 41

1   general rule, right?

2              And, first, there's Section 1.41 that

3   states that a certain code provision can specifically

4   state that it applies retroactively, correct?

5        A.    Yes.

6        Q.    And the NFPA has, in fact, enacted certain

7   provisions that do apply retroactively, correct?

8        A.    You mean in other documents?

9        Q.    In other documents.

10       A.    That's correct.

11       Q.    Okay.

12       A.    They have not chosen to; and I laid that

13   out in my report, gave examples of instances when

14   that has -- has occurred.

15       Q.    Right.  And I believe your report talks

16   about combustible dust standards as an example of an

17   area where the NFPA enacted retroactive codes.

18       A.    Correct.

19       Q.    If we look at the provision we just

20   discussed in NFPA 55, Chapter 14, the provision that

21   limits ethylene oxide in the sterilization building

22   to 10,000 pounds, that provision does not

23   specifically state that it applies retroactively,

24   correct?

25       A.    That's correct.

1      Q.    And none of the provisions in Chapter 14

2   of the NFPA 55 apply retroactively, correct?

3      A.    That is correct.

4      Q.    All right.  So as a general rule, a

5   sterilization facility that existed before NFPA 55

6   was enacted was allowed to store more than 10,000

7   pounds of ethylene oxide; is that correct?

8      A.    Ask that agwen (ph.) -- again.

9      Q.    Yeah.  As a general rule, a sterilization

10  facility that existed before NFPA 55 was enacted was

11  allowed to store more than 10,000 pounds of ethylene

12  oxide?

13     A.    I would say that's incorrect, because NFPA

14  560 existed before, so 55 only has Chapter 14.

15            Because in the 2010 edition NFPA 55,

16  again, like I -- we talked about earlier with NFPA

17  400 aggregating existing documents, NFPA 55, through

18  the process of consensus and the committee decisions

19  and all that, took NFPA 560, which was first

20  published in 1995, underwent revisions in 2002 and

21  2007, and moved all of 560 into Chapter 14 of NFPA

22  55.

23            If you go back to those earlier editions,

24  I believe even the '95 edition -- I could check it; I

25  have it here -- even the '95 edition had that same

1    10,000-pound limitation for ethylene oxide; and I

2    think in the '95 edition, it said sterilization

3    buildings and special -- special sterile --

4    sterilization buildings and special sterilization

5    rooms.

6                That terminology was changed in the 2007

7    edition of 560 to just sterilization buildings, and

8    that's what then moved into the Chapter 14 provision

9    that you are asking me about.

10    Q.    Okay.  So that's a fair point.

11                NFPA 560 just related to sterilization

12    buildings in 1995, correct?

13    A.    (Witness nods head affirmatively.)

14    Q.    And then NFPA 50 --

15                THE COURT REPORTER:  And I'm sorry.  Were

16        you nodding your head?

17                THE WITNESS:  I'm sorry.  Yes.

18                MR. GRANTHAM:  Yeah.

19                THE COURT REPORTER:  Is that a yes --

20                MR. GRANTHAM:  I'm sorry.

21                THE COURT REPORTER.  -- sir?

22                THE WITNESS:  Yes.  Yes.

23                MR. GRANTHAM:  Yes.

24                THE WITNESS:  I wasn't --  I didn't want

25        to open my mouth, 'cause I thought he was going

1      to continue; but I'm sorry.

2              THE COURT REPORTER:  I understand.

3              THE WITNESS:  The answer was yes.

4         Q.    (By Mr. Grantham)  And then NFPA 55

5      incorporated the standards that were in NFPA 560,

6      correct?

7         A.    Yes.

8              And when you say standards, you actually

9      mean the requirements.

10        Q.    I do.

11        A.    'Cause every time I hear standards, I

12     think separate documents.  We're only talking a

13     single document.  It's the requirements in that

14     document, so yes.

15        Q.    Okay.  So going back to my original

16     question.  Let me rephrase it this way.  A

17     sterilization facility that existed before 1995 when

18     NFPA 560 was enacted, that sterilization facility was

19     allowed to store more than 10,000 pounds of ethylene

20     oxide in the facility, correct?

21        A.    I would say that's not correct, because

22     you would have had the MAQs that existed in the

23     various building -- building or fire codes that dated

24     back, as I pointed out in my report, back into the

25     '80s.  You would have had --  They wouldn't have been

1   called MAQs.  They would have been called exempt

2   amounts.

3             But those exempt amounts, if you look at

4   unstable reactives and in that Fluer report that I

5   highlighted in my report, the actual historical

6   transition document for kind of tracing the origins

7   of MAQs and exempt amounts, there was a table in --

8   in that report where for unstable reactives, the

9   amount was -- there was zero for an exempt amount,

10  which meant that you would have always required a

11  permit in order to be able to use any amount of

12  ethylene oxide as opposed to 10 pounds, 1 pound, 50

13  pounds, 150 pounds.  It wasn't until you got to the

14  formalization of the IFC and IBC that the current

15  MAQs that we talked about earlier actually emerged.

16            So I would suggest that the 10,000 pounds

17  wouldn't have been a limit that would have been in

18  place.  It could have been as little as 0 pounds that

19  would have required from a building or a fire

20  official to get permitting in order to use EO in --

21  in those kinds of occupancies.

22       Q.    But an MAQ isn't a limitation on the

23  amount of ethylene oxide you can have in a building,

24  correct?

25       A.    That's correct.  It is a trigger for

1    additional fire protection.

2         Q.    Right.  So if you had more than 10,000

3    pounds of ethylene oxide in a sterilization facility

4    prior to 1995 and the AHJ had allowed you to have

5    that in there, you could then still have over 10,000

6    pounds of ethylene oxide after the enactment of NFPA

7    560 in 1995, correct?

8         A.    That would be up to the AHJ to decide, but

9    it's possibly true.  Yes.

10        Q.    Well, but it's not --

11              The --  The provision that says you can

12   only have 10,000 pounds, again, we said that does not

13   apply retroactively as a general rule, correct?

14        A.    Correct.

15        Q.    And so that provision would not be applied

16   to a facility that existed before 1995, correct?

17        A.    Correct.

18        Q.    Okay.  So that's the first example we

19   talked about.  The other example that your report

20   discusses is in Section 1.4.2, correct?

21              And that's in both NFPA 400 and NFPA 55.

22   And it states that if the AHJ determines that an

23   existing situation prevent -- excuse me -- presents

24   an unacceptable degree of risk, the AHJ can apply

25   portions of the code retroactively, correct?

 1        A.    Yes.

 2        Q.    And just to clarify, when we're talking

 3   about the AHJ with respect to the Sterigenics

 4   facility, we are talking about the Cobb County Fire

 5   Marshal's Office, correct?

 6        A.    Yes.

 7        Q.    And the Fire Marshal's Office is

 8   ultimately who determines whether a situation at an

 9   existing facility creates an unacceptable degree of

10   risk, correct?

11        A.    Yes.

12        Q.    Okay.  With regard to the quantity of

13   ethylene oxide stored at a facility, you would agree

14   that a facility storing over 10,000 pounds of

15   ethylene oxide does not necessarily constitute an

16   unacceptable degree of risk?

17        A.    Ask that again.

18        Q.    Yeah.  With regard to the quantity of

19   ethylene oxide present at a facility, you would agree

20   that a facility storing over 10,000 pounds of

21   ethylene oxide standing alone does not necessarily

22   constitute an unacceptable degree of risk?

23        A.    The requirement, though, is no more than

24   10,000, so if it's over 10,000, it's not compliant

25   with the requirement that is in -- whether it's the

1   '95 and subsequent revisions of 560 or 55.  It says

2   the max is 10,000, so anything over that, to me, is

3   not compliant with that provision.

4              I am permitted, as a facility operating

5   within either 560 or 55, to have up to 10,000.  The

6   max is 10,000.

7              If I am a facility operating with more

8   than 10,000, then I don't know whether that's -- that

9   isn't compliant with that code specification, so

10  therefore, I don't know if that means it's safe or

11  not safe.

12       Q.    We discussed a moment ago that that code

13  provision does not apply retroactively?

14       A.    Correct.

15       Q.    Okay.  And so in a situation where the

16  facility existed before 1995 and was permitted to

17  have, say, 11,000 pounds of ethylene oxide, that

18  facility was then allowed to continue using 11,000

19  pounds of ethylene oxide after 1995, correct?

20       A.    I guess so.  Yes.

21       Q.    And so if having 11,000 pounds of ethylene

22  oxide presented an unacceptable degree of risk in all

23  circumstances, you would expect that the NFPA 55

24  would have applied that provision retroactively,

25  correct?

1          A.    That would be a way they could have done

2     that.  Yes.

3               Again, I don't know what the committee --

4     what they knew about those considerations, but they

5     didn't act.

6               So yes.  It's possible if they thought it

7     was unacceptable, they could have changed that.

8          Q.    Well, you say you didn't know.  But you

9     were involved with the creation of NFPA 400, correct?

10         A.    Yes.

11         Q.    And NFPA 400 is an amalgamation, as you

12    said -- that was your word -- of the code

13    requirements applicable to certain hazardous

14    materials, right?

15         A.    Yes.

16         Q.    And one of those hazardous materials is

17    ethylene oxide for sterilization purposes?

18         A.    Yes.

19         Q.    And you agree that that committee

20    carefully assessed the risk associated with the use

21    of hazardous materials?

22         A.    Yes.

23         Q.    And that committee decided not to apply

24    the 10,000 limitation we just talked about

25    retroactively, correct?

1      A.    Yes.

2            But one other piece.  If you look at NFPA

3   400, Chapter 21 is extracted from 55.  That means 400

4   can't change the requirements in Chapter 21.  That is

5   the purview of the 55 Committee, so NFPA 400 would

6   not have been the committee that would have modified

7   things like that.  They would have had --  That would

8   have had to happen in the NFPA 55 Committee --

9      Q.    Okay.

10     A.    -- because the ethylene oxide requirements

11  are in Chapter 14 of the NFPA 55.

12           MR. GRANTHAM:  All right.  I --  I object

13      to the nonresponsiveness of the answer for the

14      record.

15     Q.    (By Mr. Grantham)  But the NFPA 400, we've

16  already discussed references and refers to NFPA 55,

17  does it not?

18     A.    It extracts Chapter 21 and -- NF -- NF --

19           Chapter 21 of NFPA 400 is word for word

20  extracted text from NFPA 55, so in order for NFPA 400

21  to be complete, rather than reinvent content on

22  cryogenic fluids and compressed gases, it took from

23  55 what becomes Chapter 21.

24     Q.    So is it fair to say that the NFPA 400

25  Committee adopted that Chapter 14 --

1      A.      That's correct.

2      Q.      -- for the NFPA 55 work?

3      A.      That's correct.

4      Q.      And by adopting that, they determined that

5  existing facilities could have over 10,000 pounds of

6  ethylene oxide and not present an unacceptable degree

7  of risk; is that correct?

8      A.      I --

9              Yes.

10     Q.      Your report also discusses the

11  International Fire Code, correct?

12     A.      (Witness nods head affirmatively.)

13     Q.      And it discusses Section 104, I believe.

14              The International Fire Codes is another

15  set of codes that deals with flammable gases.  I

16  believe Chapter 58 deals with flammable gases,

17  correct?

18     A.      Yes.

19     Q.      And that chapter would be applicable to

20  the Sterigenics facility?

21     A.      Correct.

22     Q.      And just like with the NFPA, there are

23  certain provisions under the IFC that specifically

24  state they apply retroactively, correct?

25     A.      Say that again --

1      Q.    Yes.

2      A.    -- please.

3      Q.    We discussed previously that the NFPA has

4   certain requirements that specifically state they are

5   to be applied retroactively, correct?

6      A.    (Witness nods head affirmatively.)

7      Q.    The IFC also has specific requirements

8   that state they should be applied retroactively,

9   correct?

10     A.    Yes.

11     Q.    But nothing in IFC 58, Chapter 58 states

12  that the requirements of that code should be applied

13  retroactively, correct?

14     A.    Correct.

15     Q.    And the same is true in IFC 50.  That

16  deals with hazardous materials, correct?

17     A.    Correct.

18     Q.    So if ethylene oxide presented a distinct

19  hazard to life, the IFC Council would have made those

20  provisions apply retroactively, correct?

21     A.    Again, I would --  That's based on them

22  becoming aware of those kinds of hazards, so it --

23           I would say that they haven't done those

24  kind of things, because they're not aware of those

25  hazards; and until they are, they're not making --

1    taking those actions.

2         Q.    What do you mean when you say they're not

3    aware of those kinds of hazards?

4              What hazards?

5         A.    The --  The hazards that are associated

6    with the material that exhibits the characteristics

7    of something like an ethylene oxide, that it is

8    flammable, that it is -- it is explosible to -- up to

9    the point of even being detonatable, and that it is a

10   health hazard.  It's toxic.

11             So it has a series of hazard associated

12   with it at very, very small -- in very, very small

13   quantities; and those kinds of materials may warrant

14   additional attention.

15        Q.    When you say that they were not aware of

16   those kinds of hazards, who is they?

17        A.    Like the NFPA process, it is the committee

18   that writes the fire code, so it's the Fire Code

19   Committee.

20        Q.    It's the committee that writes the

21   International Fire Code?

22        A.    Yes.

23        Q.    And that's the ICC?

24        A.    Well, ICC is the --  ICC is like NFPA.

25   They are the organization that establishes the

1    standards, development, procedures, and processes;

2    and then within them, they have committees that write

3    their documents, so they have a fire code committee.

4    They have a building code committee, like NFPA has

5    committees for each of its numbered documents.

6         Q.    Okay.

7         A.    So that's the parallel that I can offer

8    there.

9         Q.    And you said that they weren't aware of

10   certain kinds of hazards associated with ethylene

11   oxide, which is flammable in small amounts, correct?

12        A.    Yes.

13        Q.    Do you know when --

14             Well, let's take the NFPA since you're

15   experienced in the NFPA and, obviously, have worked

16   there for a long time.

17             When did the NFPA become aware that

18   ethylene oxide was a flammable gas?

19        A.    Well, NFPA wouldn't have to.  If I used

20   ethylene oxide in the '40s or '50s --  And I don't

21   know the history of ethylene oxide, but it's a -- a

22   material that's been around for a long time.  It's

23   used to make things like ethylene glycol and stuff

24   like that, which is an antifreeze and so on.

25             So any time I would have been using

1   ethylene oxide as part -- independent of

2   sterilization or -- or things like that, in whatever

3   context, its hazards are its hazards, because it's

4   inherent in its chemical makeup; and its chemical

5   makeup is such that it has certain characteristics.

6           And some of those characteristics are that

7   it exhibits hazardous outcomes, in that it is easily

8   ignitable, because it has a flash point that is low;

9   and, therefore, it is readily giving off vapors.  Its

10  boiling point is close to room temperature, so as a

11  liquid, it immediately goes to a gas.  Gases are what

12  burns, not liquids, so you have to have those vapors

13  concentrate.

14          Its --  Its flammable range is wide.  It's

15  2 percent or 2.6 percent to a hundred, so it

16  basically means I only need 2 percent of the air in

17  this room to be ethylene oxide in order to achieve a

18  mixture that is capable of being ignited if an

19  ignition source appears.

20          And in combustion reactions, it is

21  potential that it is going to react in an explosible

22  way and not just have simple combustion, but have

23  energetic combustion; and it's also toxic, so it has

24  in -- impacts that are associated with my inhalation

25  of the material.

1         Those properties existed for however long

2    ethylene oxide has been around, so it has nothing to

3    do with whether NFPA or ICC would have determined

4    that it was.  It is.

5              So however I would have gotten that

6    property information, I would have under -- if I was

7    then looking at using it in a way, I would have

8    understood that it -- use comes with these kinds of

9    concerns if I use it incorrectly.

10        Q.    Okay.  That --  That wasn't my question.

11              You're an expert in hazardous material

12    classifications, correct?

13        A.    (Witness nods head affirmatively.)

14        Q.    Okay.  When were people --

15              THE COURT REPORTER:  Now I'm sorry.

16              THE WITNESS:  I'm sorry.

17              MR. GRANTHAM:  Yeah.  I'm sorry.

18              THE WITNESS:  Yes.

19              MR. GRANTHAM:  I'm sorry.  Yeah.

20              THE WITNESS:  Yes.

21        Q.    (By Mr. Grantham)  When were people

22    generally aware that ethylene oxide was a flammable

23    gas?

24        A.    I -- again, I -- it -- it --

25              I couldn't tell you a specific date.  I

1    would say it's been for a considerable amount of

2    time --

3          Q.    So for --

4          A.    -- '20s, '30s, '40s, '50s.

5          Q.    So in the 1920s or the 1930s, in that

6    timeframe, people generally knew that ethylene oxide

7    was a flammable hazard, correct?

8          A.    As I said, in terms of making the material

9    and its composition, they would have understood that

10   it behaved that way.  Yes.  Whether it's 1920, I

11   don't know.

12         Q.    Don't need an exact date.

13         A.    Okay.  But --

14         Q.    But --

15         A.    -- something of that order.

16         Q.    -- decades --

17         A.    Yes.

18         Q.    -- in the past?

19         A.    Yes.

20         Q.    When did people enact the International

21   Fire Code, Chapters 50 and 58?

22         A.    That would be in --

23               When did they go through that whole

24   process?

25               Officially, the actual ICC version was

1    somewhere in the early 2000s.  I think the first

2    edition was 2003 of the I -- IFC and IBC after ICC

3    formed in the late 90's, but there were precursor

4    documents to those existing document --

5              The ones we refer to today, IFC and IBC,

6    there were regional precursor documents that go back

7    to the 1970s and 1980s, including the Uniform Fire

8    Code and Article 80 of the Uniform Fire Code, which

9    was the hazardous material stuff.  That document knew

10   that ethylene oxide was a flammable gas.

11             So certainly in 1980, I would be pretty

12   certain that the Article 80 of the Uniform Fire Code

13   knew that ethylene oxide was an unstable reactive and

14   was a flammable gas and -- from a code standpoint.

15       Q.    So when you said earlier --  And let me

16   just get this straight.

17             You testified earlier that the ICC was

18   unaware of the hazards associated with ethylene oxide

19   when they enacted the provisions of the IFC; is that

20   correct?

21       A.    I --  When you say unaware of the hazards,

22   I -- again, I don't -- they were unaware of any --

23             I guess that's what I said.  That's not

24   how I meant that.

25       Q.    Okay.  Please clarify what you meant.

1      A.    Again, from the standpoint of being

2   justification for changing, which is what you were

3   asking about at the time, there was nothing coming to

4   them saying that the provisions that are in there at

5   this threshold now need to be reexamined because

6   they're not protective.  That information wasn't --

7   didn't come to their attention to make any changes

8   about quantities, which I think is what you were

9   asking about at the time.

10     Q.    And when you say that information, what

11  information are you talking about?

12     A.    Anything that would -- would have

13  suggested to them that a threshold of 10,000 pounds

14  wasn't protective.  I don't know what that could be,

15  but it was -- they -- they --

16            As you said and as the documents show,

17  10,000 pounds has been in place; but nobody has

18  suggested changing it.

19     Q.    Okay.  But that information, whatever it

20  is --  And you don't know what it is.  Fine.

21            But that information, the ICC knows that

22  now, right?

23     A.    Knows what now?

24     Q.    The information that you suggested was

25  necessary to create a limitation on ethylene oxide.

1      A.      I don't understand what you just asked me.

2      Q.      Let me back up.  The -- the IFC has

3   enacted -- excuse me --

4              The ICC has promulgated different versions

5   of the IFC Chapter 50 within the past 20 years,

6   correct?

7      A.      Yes.

8      Q.      And during that timeframe, the ICC was

9   aware of the hazardous materials of ethylene oxide.

10  You would agree, correct?

11     A.      You mean the hazardous properties or

12  characteristics?

13     Q.      I do.

14     A.      Yes.

15     Q.      Correct.

16             And throughout that time period, the ICC

17  has never enacted codes in IFC 50 or 58 that apply

18  retroactively, as a general rule, to the use of

19  ethylene oxide, correct?

20     A.      Correct.

21     Q.      So the ICC does not believe that the use

22  of ethylene oxide constitutes a unique hazard to life

23  in all situations, correct?

24     A.      I don't know what the ICC believes or

25  knows.

1        Q.    If the ICC believed that ethylene oxide

2    presented a unique hazard to life, then they would

3    have applied those provisions -- excuse me -- they

4    would have drafted those provisions to apply

5    retroactively, wouldn't they?

6        A.    That is a possibility of how they could

7    proceed.  That's correct.

8        Q.    It's not just a possibility.  You would

9    expect they would draft those provisions to apply

10   retroactively, correct?

11       A.    Yes.

12            MR. GRANTHAM:  Okay.  We've been going a

13        little bit over an hour.  I think now would be a

14        good time to take a break.

15            THE WITNESS:  Okay.

16            MR. GRANTHAM:  Okay?

17            THE WITNESS:  Yep.

18            MR. GRANTHAM:  All right.  We can go off

19        the record.

20            THE VIDEOGRAPHER:  Off record at 11:10.

21            (Recess from 11:10 a.m. to 11:26 a.m.)

22            THE VIDEOGRAPHER:  All right.  Back on the

23        record at 11:26.

24       Q.    (By Mr. Grantham)  Mr. Colonna, before the

25   break, we discussed how a -- a sterilization facility

1    that existed before 1995 may have been required to

2    obtain a permit to use more than 10,000 pounds of

3    ethylene oxide; is that correct?

4         A.    I believe so.  Yes.

5         Q.    Can you point me to any provision in the

6    code that requires a sterilization facility to obtain

7    a permit to use more than 10,000 pounds of ethylene

8    oxide?

9         A.    No -- I -- My reason for that answer

10   would be that it would be consistent with the exempt

11   amount concept that said that you -- when you used an

12   unstable reactive, which ethylene oxide has those

13   characteristics, that you would have at the -- the

14   exempt amount that I identified in one of those

15   tables for ethylene -- or for unstable reactives, not

16   specifically ethylene oxide, but unstable reactives

17   was a zero amount.

18             So that would have meant that any amount

19   of ethylene oxide would have required a permit to use

20   it in -- store, use, or handle it in any -- in any

21   quantity.

22        Q.    But you're unaware of a specific code

23   provision that requires a permit for a sterilization

24   facility to use more than 10,000 pounds of ethylene

25   oxide --

1        A.      I --

2        Q.      -- right?

3        A.      -- am not aware of anything.  That's

4   correct.

5        Q.      I believe you're aware that Sterigenics

6   submitted a building permit application to Cobb

7   County in August of 2019.

8        A.      Yes.  I am.

9        Q.      Do you know what that building permit was

10  for?

11       A.      I believe that was for the modifications

12  to the emissions control system.

13       Q.      Do you know what those modifications to

14  the emission control system were?

15       A.      I --  I believe they were described as

16  upgrades.  I don't know specifically.

17       Q.      Upgrades.  But you don't know what

18  specific measures were installed to upgrade the

19  emission control system?

20       A.      No.

21       Q.      Do you know what a negative pressure

22  system is?

23       A.      I --  In general, yes.

24       Q.      But you don't know specifically what a

25  negative pressure system does or how it moves air, do

1    you?

2         A.    Well, negative pressure usually means that

3    it is pulling a vacuum; and when you're controlling

4    contaminants that are flammable, but certainly toxic,

5    it is common from a ventilation control perspective

6    in terms of industrial hygiene and things like that

7    to use capture and collection, so negative pressure

8    methods, as opposed to positive pressure.

9         Q.    Okay.  So just to clarify, a negative

10   pressure system then is a common ventilation control

11   system?

12        A.    Yes.

13        Q.    And you've heard of it and know generally

14   what it means?

15        A.    Yes.

16        Q.    What about a dry bed?  Do you know what a

17   dry bed is?

18        A.    Yes.  It's a --  It's a scrubber, and it

19   pulls air through it, and it --  The contaminates

20   will be absorbed in that, and then you can capture

21   those and -- and not have that emitted into a -- an

22   area.

23        Q.    Do you know if scrubbers, the word you

24   just used, do you know if the facility at

25   Sterigenics' facility had scrubbers in place before

1    August of 2019?

2        A.    I believe so.  Based on what I've read, I

3    believe they had scrubbers in there before the --

4    that permit request.  Yes.

5        Q.    And the emissions control modification

6    work added some dry beds or scrubbers, as you call

7    them?

8        A.    I believe so.  Yes.

9        Q.    Have you done any analyses of the

10   emissions control upgrades that Sterigenics actually

11   installed under the August 2019 permit?

12       A.    I have not.

13       Q.    So you do not have any specific knowledge

14   of how that system works, correct?

15       A.    None.  No.

16       Q.    Have you done any sort of analyses to

17   determine whether the emission control upgrades

18   installed under that building permit increased the

19   risk of a fire incident at the facility?

20       A.    I have not.

21       Q.    So you don't have an opinion here today

22   whether the installation of those emissions control

23   upgrades increased the risk of a fire incident at the

24   Sterigenics facility?

25       A.    Since I haven't visited the facility and

1   haven't studied any of the plans or documentation or

2   processes, I'm unable to make any determination on

3   that.  Yes.

4         Q.    And you haven't studied the emissions

5   control upgrades to know whether the ethylene oxide

6   that is in the air of that system ever reaches a

7   flammable concentration, correct?

8         A.    Ask that again.  I want to get

9   specifically what your point of reference is.

10        Q.    You haven't studied the negative pressure

11  system installed at the facility to know whether the

12  level of ethylene oxide passing through that system

13  reaches a flammable concentration, correct?

14        A.    That is correct.  I have not.

15        Q.    Going back to some of your testimony

16  earlier today, you said that risk has two prongs to

17  it; is that correct?

18        A.    Yes.  That is a generally accepted and

19  most commonly practiced definition for risk is it has

20  two components.  Yes, sir.

21        Q.    And when you say generally accepted and

22  commonly practiced, by who?

23        A.    Process safety personnel.  Risk

24  management.  Any of those areas that are involved in

25  terms of using risk-based methodologies.  You start

1    with understanding what risk is.

2              And so the hazard is an ability to cause

3    harm, and then what risk is doing is making

4    determinations on how you manage that hazard, and

5    risk requires those two elements.  One is you have

6    some understanding of the frequency, likelihood,

7    probability that the -- the hazard is going to

8    manifest itself, and then the second component is the

9    consequence or severity of that hazard when it does

10   manifest itself.

11             And what risk management does is after

12   you've quantified those two elements, probability and

13   severity, you're able to make determinations on which

14   way you're going to go in terms of investing in risk

15   management.

16       Q.    Okay.  So there's a couple things I want

17   to talk about there.  The first is that I believe

18   you're making a distinction between the presence of a

19   hazard and the risk that are associated with that

20   hazard, correct?

21       A.    That is correct.

22       Q.    Okay.  And you've also said that there are

23   these publicly accepted or generally accepted methods

24   for assessing risk, correct?

25       A.    Correct.

1          Q.     And that would include a -- a fire hazard

2     assessment of some sort, right?

3          A.     A fire hazard -- hazard assessment.  Yes.

4          Q.     And in conducting an assessment to

5     determine the risk of a particular fire incident, you

6     should assess the probability of that incident

7     occurring, correct?

8          A.     If you're doing risk, then yes.  You --

9     Probability should be one of the features.  Yes.

10         Q.     And the other feature or another key

11    feature should be assessing potential consequences of

12    a risk?

13         A.     Correct.

14         Q.     And in the case of Sterigenics' facility,

15    that would include assessing the potential

16    consequences of a fire incident, correct?

17         A.     Fire.  Explosion.  Toxic releases.

18                Again, when you go back to the

19    characteristics of ethylene oxide, you would want to

20    look at all those characteristics that are inherent

21    with that -- its chemical nature.

22         Q.     You haven't performed any risk assessment

23    in this case about the chances of a fire incident --

24         A.     I have not.

25         Q.     -- in the Sterigenics facility, correct?

1          A.     Sorry.

2                 I have not.

3          Q.     And you also haven't performed any

4     assessment of the risk associated with an explosion

5     at the Sterigenics facility, correct?

6          A.     I have not.

7          Q.     And you also have not done any sort of

8     analysis or assessment of risk associated with the

9     release of hazardous material -- of hazardous

10    chemicals into the atmosphere at the Sterigenics

11    facility, correct?

12         A.     That is correct.

13         Q.     Are you aware of any fire risk assessment

14    regarding the Sterigenics facility performed by the

15    AHJ in the summer or fall of 2019?

16         A.     I --  I guess that's the title of the

17    Q-Dot report is something to do with fire -- fire

18    hazard analysis or -- or fire -- a fire --

19                I've forgotten the name of that Q-Dot

20    report, but it's something like that.

21                So if that's what you're asking about,

22    then that is --

23         Q.     Well, that wasn't my question.

24         A.     Okay.  Then --

25         Q.     Are you aware of any risk assessment

1    regarding the Sterigenics facility performed by the

2    Cobb County Fire Marshal's Office in the summer or

3    fall of 2019?

4        A.    I am not.

5        Q.    Okay.  And are you aware of any risk

6    assessment regarding the Sterigenics facility

7    performed by the a -- excuse me -- by the Cobb

8    Building Official in the summer or fall of 2019?

9        A.    I am not.

10       Q.    And you're not here today to give an

11   opinion that any unsafe condition actually exists at

12   the facility, correct?

13       A.    I am not.

14       Q.    Earlier today, you mentioned, I believe,

15   the 2015 SSOE report --

16       A.    Yes.

17       Q.    -- is that correct?

18             And you reviewed that report in connection

19   with your -- your work on this case?

20       A.    I read that document.  Yes.

21       Q.    Yeah.  Are you familiar with the author of

22   that report?

23       A.    First time I ever heard his name was

24   reading his name on the signed report.

25       Q.    Are you familiar with the SSOE firm?

1      A.    I am not.

2      Q.    One of your report's opinions in this case

3   is that the Cobb County officials -- I use the term

4   "the AHJ" -- was permitted to apply certain code

5   provisions retroactively to the Sterigenics facility

6   because it determined there was an unacceptable

7   degree of risk; is that correct?

8      A.    Yes.

9      Q.    And we just discussed that you're not

10  aware of any risk assessment performed by either the

11  Fire Marshal's Office or the Cobb County Building

12  Official in the summer or fall of 2019, correct?

13     A.    Correct.

14     Q.    So what is your basis for the opinion that

15  the Cobb County Fire Marshal or Building Official

16  determined there was an unacceptable degree of risk

17  at the facility?

18     A.    The series of documents, whether --  That

19  includes the various permits where the certificate of

20  occupancy goes back and forth between classifications

21  of -- of the facility; and as we talked about

22  earlier, the -- my opinion is that that facility

23  using ethylene oxide for sterilization in the

24  quantities that it's using it should have always been

25  an H Occupancy; and, therefore, should have come with

1    protections that are consistent with that.

2              That's probably the starting place for my

3    opinion being that an AHJ might use that lack of

4    consistency in terms of that documentation around a

5    property that has those kinds of -- has that

6    potential hazard there to raise questions and ask

7    questions about that from the standpoint of

8    considering applying codes and standards requirements

9    retroactively.

10       Q.    Is it your testimony that a series of

11   certificate of occupancies with conflicting

12   information constitutes an unacceptable degree of

13   risk?

14       A.    I think it questions whether or not the

15   property is -- the facility has been -- is fully

16   understood in terms of what activities are going on;

17   and, therefore, until those are looked at, it enables

18   an AHJ to raise questions.

19       Q.    But my -- my question was different.  It

20   was that what is the basis for your opinion that the

21   AHJ determined there was an unacceptable degree of

22   risk at the facility?

23             MR. CHOY:  Object to form.

24       Q.    (By Mr. Grantham)  And the basis of that

25   cannot be conflicting certificates of occupancy,

1    right?

2              MR. CHOY:  Object to form.

3              THE WITNESS:  I have experienced

4         situations where AHJs have made decisions about

5         the requirements in codes and standards for any

6         number of reasons; and not being an AHJ, what I

7         usually found myself in the middle of was the

8         stakeholder asking NFPA for an understanding of

9         what staff thought the code requirement said,

10        while the AHJs were saying but they thought it

11        meant something else; and in my experience,

12        usually the AHJ trumped in those cases at least

13        to have further discussions around those issues.

14             And that's what I've observed in reading

15        the documentation that has been provided to me

16        here, is that the inconsistent way in which

17        the -- what -- what, to me, should be the

18        correct occupancy as an H Occupancy and any of

19        the provisions that come with that through

20        either the Fire Code or through the fact that in

21        Georgia, in addition, they also brought in

22        either 560 or 55, that all of those features

23        should have been looked at; and the question

24        would be were they all looked at because of the

25        inconsistency with -- with the -- the occupancy

Page 74

1          classification in those COs.

2          Q.     (By Mr. Grantham)  I think I've asked this

3     before.

4                 But do you know who issues the

5     certificates of occupancy to the Sterigenics

6     facility?

7          A.     I -- The CO., I think, because that's a

8     occupant.  That would come from the Building

9     Official.

10         Q.     All right.  And -- And there is nothing

11    in the certificates of occupancy that you've reviewed

12    in this case that identified a hazard or dangerous

13    situation at the facility, correct?

14         A.     Not that I read.  No.

15         Q.     Is there any documentation you've reviewed

16    in connection with your work in this case where a

17    specific dangerous situation at the facility was

18    identified?

19         A.     Not that I've read.  No.

20         Q.     And it's your opinion --  Scratch that.

21                It's not your opinion that an unacceptable

22    degree of risk existed at facility in August of 2019,

23    correct?

24         A.     Ask that again.  I --  The double

25    negatives got me there maybe.

1          Q.      You're not giving an opinion in this case

2     that an unacceptable degree of risk existed at the

3     facility in August 2019, correct?  You don't --

4          A.      That's correct.

5          Q.      Your opinion is that the AHJ determined an

6     unacceptable degree of risk existed at the facility

7     in August '19, correct?

8          A.      That's what I've read.  Yes.

9          Q.      Well, it's not what you've read.  I mean,

10    you submitted an expert report in this case, correct?

11         A.      Yes.

12         Q.      And in that report, you list the

13    determinations that you made, right?

14         A.      Yep.

15         Q.      And one of those determinations is that

16    the AHJ was permitted to retroactively apply the

17    codes to the Sterigenic (sic) facility because the

18    AHJ determined that there was an unacceptable degree

19    of risk at the facility, correct?

20         A.      Yes.

21         Q.      And you can't point to any documentation

22    in this case that you've reviewed where the AHJ

23    identified a specific unsafe situation at the

24    facility, correct?

25         A.      Correct.

1      Q.    So is your opinion that the AHJ made that

2    determination based on conversations with the

3    defendants?

4              MR. CHOY:  Object to form.

5              THE WITNESS:  Ask that again.  I'm --

6    I'm --

7      Q.    (By Mr. Grantham)  Is your opinion in this

8    case that the AHJ determined that an unacceptable

9    degree of risk existed, is that opinion based on

10   conversations you've had with the Defendants?

11     A.    No.  I -- it --

12             So is my opinion based on my talking with

13   the defendants?  That's what you're asking me?

14     Q.    That's not my exact question.  It's how do

15   you know that the AHJ determined there was an

16   unacceptable degree of risk?

17     A.    That's my assumption based on what I've

18   read where the questions are about retroactively --

19   retroactive application of code requirements.

20             And, again, in talking with the Defendants

21   through their -- their -- the attorneys, one of the

22   questions they asked me to engage in was specifically

23   under what circumstances are you permitted to apply

24   codes and standards retroactively?

25             And one of those provisions, as we already

1    went through before the break, was that there's a

2    determination of an unacceptable degree of risk; and

3    a similar language exists in the IBC and IFC, so

4    whether it's the NFPA documents with which I'm more

5    familiar or the IBC, IFC, that same type of provision

6    exists; and so my conclusion is that they are

7    permitted to apply retroactively, if they have made

8    that determination.

9        Q.    Okay.  That's very different than what's

10   in your report.  Your --  Your report states that

11   they did determine there was an unacceptable degree

12   of risk, but here you're stating that it's an

13   assumption in your report that they determined there

14   was an unacceptable degree of risk, correct?

15       A.    Yes.

16       Q.    So you do not have an opinion as to

17   whether the AHJ determined in August of 2019 or any

18   time thereafter that an unacceptable degree of risk

19   existed at the facility?

20       A.    I have --

21             MR. CHOY:  Object to form.

22             THE WITNESS:  I have found nothing that

23       shows me what they use as that basis.

24       Q.    (By Mr. Grantham)  One thing your report

25   states on Page 35 is that AHJs do not always become

1    aware of changes that can occur within a high hazard

2    occupancy; is that correct?

3           A.    Yes.

4           Q.    Is it your opinion that there was any

5    change that occurred within the Sterigenics facility

6    in terms of Sterigenics' use of ethylene oxide that

7    Defendants were not aware about?

8           A.    I don't know what they were aware of.  I

9    know I've seen -- and I don't know the --  I don't

10   know the timing or sequence; but I believe there

11   was --  Whether it was in conjunction with the SSOE

12   report or even -- or the development of the Q-Dot

13   reports -- again, I don't remember the timing --

14   where there was correspondence -- I believe it was

15   from Mr. Massey -- where the quantity of EO had been

16   increased by 30 percent.  I don't remember what -- it

17   was 30 percent above what, but there was --  There

18   was correspondence where I believe the EO was going

19   to be or had been increased or was going to be.

20                So that would be an example where I'm not

21   sure whether -- when that occurred and whether the

22   typical scenario for an AHJ would be that they would

23   have gotten that information communicated by a

24   facility that stores, handles, or uses hazardous

25   materials.

1              My experience with other investigations

2       that I've been privy to through like the Chemical

3       Safety Board, the U.S. Chemical Safety Board, there

4       was an incident north of Boston in -- I think it was

5       2009 or '11 or something like that -- in Danvers.  It

6       involved an explosion at a facility.

7              And what was determined there was that

8       that facility was using materials that were not in

9       the records in the local fire department; and they

10      were using them in quantities and in a manner that

11      wasn't consistent, so things like Tier 2 reports and

12      other exchange of information between owner/operators

13      of facilities that store, handle, and use hazardous

14      materials, that link between the two or -- the two

15      entities, the enforcing official and the operating

16      company, were not being maintained.

17             So that is the nature of my comment there

18      is that I have observed in more than one instance

19      that AHJs are not necessarily kept up to date on

20      that.  They don't always have the staff perhaps to do

21      the inspections of those facilities to get updated

22      things, and that information doesn't come freely.

23             So if that is the case, then that's a

24      situation where an AHJ could decide that, you know,

25      if they learn that things have changed, they could

1   become concerned or become interested in what else is

2   going on, so that's the background to that kind of a

3   comment.

4            MR. GRANTHAM:  Okay.  I object to the

5        nonresponsiveness of the -- the answer.

6        Q.    (By Mr. Grantham)  One thing you mention

7   is that you may be -- you're not sure but -- but you

8   think that the AHJ may have become aware of an

9   increased quantity of EO used at the facility at some

10  unknown time, right?

11       A.    Yes.

12       Q.    We discussed earlier that you're not aware

13  of any time that the facility has used less than one

14  drum of ethylene oxide, right?

15       A.    Correct.

16       Q.    And then that's over 400 pounds or

17  approximately 400 pounds?

18       A.    Correct.

19       Q.    So even if the facility did increase

20  ethylene oxide usage at some point, it wouldn't have

21  changed the occupancy classification of the building

22  under current codes, right?

23       A.    Correct.

24       Q.    It would still be an H Occupancy?

25       A.    Correct.

1      Q.    You also mentioned the timing of --  And I
2    believe you threw in the SSOE report.  Do you know
3    what year the SSOE report was dated?
4      A.    I think the --  There were two versions.
5    I think the second one was September 15th of 20 -- or
6    September something of 2015.
7      Q.    And in that report, it states that
8    Sterigenics' facility stores up to 40 drums of
9    ethylene oxide; is that correct?
10     A.    Yes.
11     Q.    And that is equivalent of approximately
12   16,000 pounds, correct?
13     A.    Correct.
14     Q.    And that report was given to the Cobb
15   County Fire Marshal's Office, correct?
16     A.    I believe so.  Yes.
17     Q.    And, in fact, there's a stamp on that
18   report that says reviewed by the Cobb County Fire
19   Marshal's Office, correct?
20     A.    I --  There are stamps on there.  I
21   thought they were the two authors of it.  I don't --
22   I don't remember whether there was.
23     Q.    Well, I'll show you this.  This has
24   previously been marked as Plaintiff's Exhibit 47.
25     A.    Oh, okay.

1      Q.    And if you look on the first page of that

2   report, Mr. Colonna --

3            And, again, you've reviewed this report in

4   connection with your report?

5      A.    I have.  Yes.

6      Q.    Okay.  And if you look on the first page,

7   it has a stamp on there that says "REVIEWED BY THE

8   Cobb County Fire Marshall's Office," correct?

9      A.    Correct.

10     Q.    Okay.  So as of 2015, September of 2015,

11  the Cobb County Fire Marshal's Office was aware that

12  the Sterigenics facility stored up to 16,000 pounds

13  of ethylene oxide at the facility, correct?

14     A.    Correct.

15     Q.    Do you know how much ethylene oxide is

16  currently stored at the facility?

17     A.    I -- I saw --  I saw a value from --  I

18  think it was in the Q-Dot report -- might have been

19  one or two other sources -- that came out to be 28

20  55-gallon drums, which would be 11,200 pounds.

21     Q.    So significantly less than 16,000 pounds.

22     A.    Yes.

23     Q.    You'd agree?

24            So from 2015 to the present, there hasn't

25  been a change in the use of ethylene oxide that would

1  constitute a new risk associated with the facility,

2  correct?

3       A.    If that's the only information that I

4  have, then I -- the answer is yes.

5       Q.    And it is the only information --

6       A.    Okay.

7       Q.    -- you have, right?

8       A.    Yep.  Yes.

9       Q.    You also mention that -- in your report

10  that NFPA 400 requires the completion of a -- a

11  hazardous materials inventory statement, right?

12       A.    Yes.

13       Q.    And the AHJ would want that kind of

14  inventory statement to know what hazardous materials

15  are present at a facility, correct?

16       A.    Yes.

17       Q.    And they would want that to know the

18  quantities of those hazardous materials present at

19  the facility, correct?

20       A.    Yes.

21       Q.    And they would want that to know where

22  within the facility those hazardous materials are

23  stored, correct?

24       A.    Yes.

25       Q.    Do you know whether a hazard management

1    report was prepared and given to Q-Dot as part of

2    their analysis in this case?

3        A.    I thought that was one of those open items

4    that --  And, again, I may be confusing either the

5    December 2019 versus the -- the March 2020 reports,

6    whether that was reconciled; but I --

7              In --  In one of them, I believe that was

8    an open item by the authors of the report, that that

9    was to be completed by Sterigenics and would be an

10   element of the conclusions and findings of -- of the

11   Q-Dot report.

12             So I don't know whether one was actually

13   completed and delivered.

14             (Plaintiff's Exhibit 373 was marked for

15        identification.)

16        Q.    (By Mr. Grantham)  Okay.  I'm handing you

17   what's being marked as Plaintiff's Exhibit 373.

18             Have you seen this document before?

19        A.    Yes.  I have.

20        Q.    And is that document your engagement

21   letter in this case?

22        A.    It is Page 1 of the engagement letter.

23   Yes.

24        Q.    There's a back to it, I believe or --  Or

25   is there not?

1      A.     No.  There isn't.  I think that's the only

2  piece.

3      Q.     There's more to it.  Okay.  Well,

4  that's -- that's my fault.

5      A.     I can provide the additional page --

6      Q.     No, no.  That's okay.

7      A.     -- if I may.

8      Q.     Have you --  It's your only engagement

9  letter in this case --

10     A.     Yes.

11     Q.     -- correct?

12            Yeah.  And how were you selected for this

13  project; do you know?

14     A.     I believe the initial conversation

15  occurred in the fall of 2020 shortly after -- well, a

16  couple of months after my retirement from NFPA.

17            A colleague of mine, a former engineering

18  staff person at NFPA that -- with whom I had worked

19  for probably over 30 years, reached out to me and

20  asked if I would be -- if I was entertaining project

21  opportunities in -- in -- as -- in my retirement

22  and -- and --  And the contact ultimately led me to a

23  conversation with Mr. Dawe.

24            And, also, and I believe you and I talked

25  in October, November of 2020, and then --

1        Q.      And for the record, who are you --

2        A.      I'm sorry.  Mr. Dawe and --

3        Q.      You spoke with Mr. Dawe in October of

4    2020?

5        A.      I believe it was October.

6                And, also --  And I was directed that I --

7    if I was inclined to have a conversation or perhaps

8    be engaged in this, I was to talk to a David

9    McCollum.  I think it's McCollum, and he is an

10   attorney with Mr. Choy's firm, and I didn't talk to

11   him in the fall of 2020.  The next contact was,

12   again, with -- through Mr. McCollum either through

13   e-mail or phone call, whichever proceeded in about

14   April of 2021.

15               And that led to a conversation with Mr.

16   Bentley and --  And that -- that followed with the

17   letter of engagement.

18       Q.      Did you know Mr. Dawe before this

19   engagement?

20       A.      We did.  I'm not sure how many times that

21   we would have encountered in his role; but, again, I

22   did training in Georgia in the wake of the sugar

23   refinery explosion in 2008 for the fire officials in

24   the state, so it could have been there.

25               He's on a number of NFPA committees, and

1    so I could have encountered him at NFPA committees,

2    or I could have encountered him at the NFPA

3    conferences and things like that.  So I don't

4    remember explicitly when we would have met.

5               He also could have called me in his role

6    as fire marshal asking questions to me about the

7    standard -- codes and standards that I used, and I

8    could have just been performing the technical

9    advisory assistance that I would apply to -- or what

10   I would provide to anyone.

11              So I don't remember exactly where we met

12   and how -- for how long we've known each other but --

13        Q.    What about Mr. Gobble?  How long have you

14   known Mr. Gobble?

15        A.    Only since becoming engaged, from the time

16   of this engagement letter, so our first conversations

17   would have been only by video, Teams or Zoom

18   meetings; and that probably would --  Our first one

19   would have been, I think, Mayish maybe.  I think

20   that's when we first had our meeting coordinated

21   through -- through Mr. Bentley's team.

22              (Plaintiff's Exhibit 374 was marked for

23         identification.)

24        Q.    (By Mr. Grantham)  Okay.  I'm going to

25   hand you what's being marked as Plaintiff's Exhibit

Page 88

1    374.

2              These are copies of the invoices that you

3    have submitted for your work in this case; is that

4    correct?

5         A.    Yes, sir.

6         Q.    And you submitted one on June 3rd, 2020,

7    right?

8         A.    You mean 2022, sir?

9         Q.    Excuse me.  2022.  Yes.

10             And that was for $11,000 -- $11,050, --

11        A.    Yes.

12        Q.    -- correct?

13             And that was for all of the work that you

14   performed between the engagement start through

15   December of 2021, it looks like.  Is that correct?

16        A.    Yes, sir.

17        Q.    And that was a total of 110 hours or

18   just --

19        A.    Yes, sir.

20        Q.    -- over.

21             And then the second invoice is July 20th,

22   2022, correct?

23        A.    Yes, sir.

24        Q.    And that's for all your services from

25   January 1st, 2022 through June 30th, 2022?

1      A.     Yes, sir.

2      Q.     For a total of $3,450?

3      A.     Yes, sir.

4      Q.     So the total you've been paid on these --

5   on this case, assuming my math is correct, is

6   $14,500; is that correct?

7      A.     I've actually not been paid for any of it

8   yet.  It -- the -- the -- The billing is in and is

9   being processed, so officially, I have not received

10  any money yet.

11     Q.     And that amount does not include this

12  deposition, correct?

13     A.     That's correct.

14     Q.     It does not include any amount you would

15  be paid to prepare for trial, correct?

16     A.     Correct.

17            MR. GRANTHAM:  Can we go off record for a

18        second.

19            THE VIDEOGRAPHER:  Off record at 12:03.

20            (Lunch recess from 12:03 p.m. to

21        p.m.)

22            THE VIDEOGRAPHER:  We are back on the

23        record at 12:39.

24     Q.     (By Mr. Grantham)  Mr. Colonna, real

25  quick, during the break, did you talk to counsel

1    about your testimony today?

2         A.    No.  I did not.

3         Q.    You brought a couple file folders with you

4    to the deposition today.  I'd like to mark that as

5    Plaintiff's Exhibit 375.

6         A.    Both folders?

7         Q.    Yeah.  We can just do one for now.

8         A.    Okay.

9         Q.    Can we just walk through what you've

10   brought.

11        A.    Can I take that out of there?

12        Q.    Yeah, yeah, yeah.

13        A.    That's --

14        Q.    Okay.

15        A.    That's got nothing on it.

16        Q.    Yep.

17        A.    Okay.  So what I brought was --

18             THE COURT REPORTER:  If I could just put

19        this on there --

20             THE WITNESS:  Oh, sorry.

21             THE COURT REPORTER:  -- first.

22             THE WITNESS:  Yes.

23             THE COURT REPORTER:  Or you put it on the

24        front for us.

25             THE WITNESS:  Yeah.

1          THE COURT REPORTER:  There we go.

2          (Plaintiff's Exhibit 375 was marked for

3      identification.)

4          THE WITNESS:  Okay.

5          THE COURT REPORTER:  Yeah.

6          THE WITNESS:  So I just handwrote notes to

7      myself as I was kind of reminding myself and

8      going through.

9          You need --  You want to see those?

10         MR. CHOY:  Yeah.  Please let us.

11     Q.    (By Mr. Grantham)  These are notes that

12  you prepared for today?

13     A.    Yes.  Anticipating perhaps what questions

14  you might ask and stuff like that.

15         MR. GRANTHAM:  You want to mark it?

16         MR. MASSEY:  Well, I think it's already

17      marked.

18         MR. GRANTHAM:  Okay.  Yeah.

19     Q.    (By Mr. Grantham)  Okay.  Yes.  Please

20  continue.

21     A.    That's the subpoena with Attachment A

22  so --

23     Q.    That we served on you?

24     A.    That you served on.  Yes.  That's your

25  signature, I believe.

1        Q.    Yeah.

2        A.    I think you were the one that --  Yeah.

3              And then just copy of my report, so that's

4    that.  That's what's in that folder.

5              And this folder was notes from --

6    handwritten notes from one of the -- of my review.  I

7    think it was November of 2021.  I think that's what

8    this was for, and this was related to me preparing my

9    report.

10       Q.    And you produced some notes to us --

11       A.    Yes.

12       Q.    -- in response to --

13       A.    Yeah.

14       Q.    -- the subpoena, correct?

15       A.    Yep.  Yeah.  I think --

16       Q.    Are those notes included in what you

17   produced to us?

18       A.    I don't know whether these got copied in

19   there or not.  I'm not sure.

20             So this was a --  Early on, this was a

21   timeline of all the documents that had been, I guess,

22   obtained during discovery.  That was provided to me

23   by the Bentley law firm.

24       Q.    And the Bentley law firm created that

25   timeline?

1         A.     I believe so.  I think this might have
2    came from Jamie.
3              THE WITNESS:  I'm not sure if this came
4         from you or not.  I'm not sure.
5              Document provided to me, which was on what
6         should go in the Rule 26 report.  That's, I
7         think, off a website.
8         Q.    (By Mr. Grantham)  Who provided that to
9    you?
10        A.     I think they gave me the link that I
11   should go get, so I printed it out, so I don't think
12   they actually gave it to me.  I think I had to --
13   I --
14             They gave me a link and said go to this
15   link and get the information on what the contents for
16   a Rule 26 report should be.
17             This is the engagement letter.  As I said,
18   there were more pages than what I included; and the
19   envelope and my confidentiality order, signature,
20   this was all part of that.  This was what came in
21   that mailing to me.
22        Q.    Got it.
23        A.     This is one of the items that I referenced
24   in terms of getting hazardous materials information,
25   so this is from the HMIX -- or HMEx website that

1    gives kind of like safety data sheet, only this is

2    specifically their -- the --

3              As I explain in my report, the purpose of

4    the HMEx is to assist code officials with hazardous

5    classification information, so this is on ethylene

6    oxide which, you know, is also the same as oxirane;

7    so that's what that is.

8         Q.    May I see that.

9         A.    Yes.

10        Q.    You can continue.

11        A.    Yeah.  The next items are the '95, '90 --

12   2002, and -- and 2007 editions of NFPA 560.

13        Q.    Yep.

14        A.    So those are my copies, 'cause I got -- I

15   bought those from NFPA.

16              One of the questions that came up during

17   some of our discussions with the -- the team for the

18   Defendants was about --  They were asking me what

19   layer protection analysis was, because it had been

20   referenced in some of the materials that a LOPA,

21   layer protection analysis, had been performed for the

22   facility so --

23        Q.    Have you seen the LOPA analysis that was

24   prepared in connection with this --

25        A.    I had.

 1      Q.    -- facility?

 2      A.    And that was me going back and digging

 3   things up, so I could better explain it.  I was

 4   familiar with it.  I'm not an expert in doing those

 5   kinds of things, but I was familiar with it from

 6   various applications and then taking a seminar or

 7   something like that on it at one point in time.

 8            This was just so I could explain it to the

 9   Defendants' team.

10      Q.    And what's the name of that document?  I'm

11   sorry.

12      A.    This document is from SIS-TECH.  It's just

13   a -- a -- web-based stuff that I just pulled up in

14   terms of outlining kind of what the purposes of LOPA

15   are and what you might go through in terms of steps

16   and how you document things and so on.

17      Q.    Okay.

18      A.    This is a -- a LOPA tutorial.  Again, a

19   similar document that I just pulled off a website, so

20   it's similar information about LOPA.

21            The ethylene oxide safety data sheet.

22      Q.    And that's from Airgas?

23      A.    Yes.

24            This is an article about -- that was in a

25   publication in 2013.  This was a --  This was a

1  published article on the investigation.  The --

2           This article goes in and does a case study

3  on the Ontario, California explosion that the

4  Chemical Safety Board investigated at the Sterigenics

5  facility in California, so that's what that -- that

6  paper is.

7      Q.    Okay.

8      A.    This is discussion from --  This is an

9  e-mail from Mr. Massey, to Mr. Munger and several

10 others about -- and one of this --

11          One of the things listed for me early on

12 in my time trying to go through all this was it gave

13 me the quantities that were -- that -- specified in

14 terms of ethylene glycol, ethylene oxide, propylene

15 oxide, sulfuric acid.

16     Q.    What's the date of that e-mail?

17     A.    That date is October 30th, 2019, from Mr.

18 Massey, to Mr. Munger and Mr. Walker, with a number

19 of folks copied.

20     Q.    Okay.

21     A.    If you want --

22     Q.    No.

23     A.    I mean, it's going to be in here.  Yeah.

24     Q.    Yeah.

25     A.    This is one of the documents you asked

1   for, is the FM global property loss prevention data

2   sheet on ethylene oxide.

3       Q.    Yeah.

4       A.    This was actually taken out of

5   Warnick's -- Miss Warnick's deposition.  It was

6   Exhibit 7 from her deposition, and this was a note

7   from her to the partners about the status of things,

8   and so there was information in this document that

9   helped me, again, tie together things that I was

10  either chasing in multiple sources and stuff like

11  that.

12      Q.    Yeah.  Could we see that.

13      A.    Yes, sir.

14      Q.    And you reviewed this document in

15  preparation of your report?

16      A.    Yes.

17            And then this is the SSOE Hazard

18  Evaluation Report.  I got it out of Exhibit 48 from

19  Miss Warnick's deposition, the one you showed me here

20  is I think Exhibit 47, so mine doesn't have the Cobb

21  County stamp on it.

22            So that's why, when you asked that, I

23  remembered this one only for these seals

24  (indicating).  I didn't remember the one but --

25      Q.    Got it.

 1        A.    Okay.  And then these are pages from

 2    the -- one of the other references that I had

 3    mentioned.

 4              These are pages from one of the other

 5    documents I mentioned in my report, "The Fire

 6    Protection Guide to Hazardous Materials."  It's --

 7    The printout's not very well, 'cause the book is hard

 8    to copy; but it's printouts from the ethylene oxide

 9    page, the propylene oxide page, and the sulfuric acid

10    page, so as just references for further documenting

11    kind of the hazardous characteristics of those

12    materials.

13        Q.    Did you bring any other materials with you

14    today?

15        A.    No.  Did not.

16              Are you finished with those things?

17        Q.    I am.

18        A.    Okay.

19        Q.    There's no other folder, right?

20              Those are --

21        A.    No.

22        Q.    -- the two --

23        A.    They're just the two folders.

24        Q.    -- file folders?

25        A.    That's it.

Page 99

1     Q.     Okay.

2     A.     Yeah.

3     Q.     Yeah.

4            MR. GRANTHAM:  Okay.  I'm going to

5     introduce an exhibit into the record.

6            Which number is it?  Sorry.  376, I

7     believe.

8            (Plaintiff's Exhibit 376 was marked for

9     identification.)

10           THE COURT REPORTER:  Okay.

11           THE WITNESS:  Yes.  It would be 376.

12    Q.     (By Mr. Grantham)  This is Plaintiff's

13    Exhibit 376.  And these are your notes that you

14    produced to us in response to the subpoena, correct?

15    A.     Yes, sir.

16    Q.     And those notes were taken in connection

17    with certain telephone calls you had with Defendants

18    and their counsel?

19    A.     Yes.  Those are starting back in April of

20    2021 through whatever I said.

21    Q.     Okay.

22    A.     The last one we had was --  I forget the

23    date, but it was sometime into this year.

24           MR. GRANTHAM:  No further questions.

25           THE WITNESS:  Okay.

1          MR. CHOY:  Okay.  No questions.  We'll

2      reserve.

3          THE VIDEOGRAPHER:  Off the record at

4      12:50.

5          MR. GRANTHAM:  The usual.

6          THE COURT REPORTER:  Sun, your usual?

7          MR. CHOY:  Yes.

8          (Whereupon, the deposition was concluded

9      at 12:50 p.m.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 101

1                    C E R T I F I C A T E

2

3

4     STATE OF GEORGIA:

5     COUNTY OF FULTON:

6

7              I hereby certify the foregoing transcript

8          was taken down, as stated in the caption, and

9          the questions and answers thereto were reduced

10         to typewriting under my direction; that the

11         foregoing pages 1 through 100 represent a true,

12         complete, and correct transcript of the evidence

13         given upon said hearing, and I further certify

14         that I am not of kin or counsel to the parties

15         in the case; am not in the regular employ of

16         counsel for any of said parties; nor am I in

17         anywise interested in the result of said case.

18              This, the 8th day of August, 2022.

19

20

              S. JULIE FRIEDMAN, CCR-B-1476

21

22

23

24

25

Page 102

1                    LEGAL SOLUTIONS
2
               FIRM CERTIFICATE AND DISCLOSURE
3
4
     Veritext represents that the foregoing transcript as
5    produced by our Production Coordinators, Georgia
     Certified Notaries, is a true, correct and complete
6    transcript of the colloquies, questions and answers
     as submitted by the certified court reporter in this
7    case.  Veritext further represents that the attached
     exhibits, if any, are true, correct and complete
8    copy as submitted by the certified reporter,
     attorneys or witness in this case; and that the
9    exhibits were handled and produced exclusively
     through our Production Coordinators, Georgia
10   Certified Notaries.  Copies of notarized production
     certificates related to this proceeding are available
11   upon request to litsup-ga@veritext.com.
12   Veritext is not taking this deposition
     under any relationship that is prohibited by
13   OCGA 15-14-37(a)and(b).  Case-specific discounts are
     automatically applied to all parties, at such time as
14   any party receives a discount.  Ancillary services
     such as calendar and financial reports are available
15   to all parties upon request.
16
17
18
19
20
21
22
23
24
25

Page 103

1    TO:  Sun S. Choy, Esq., schoy@fmglaw.com

2    Signature of Deponent Guy Robert Colonna

3    Date Errata due back at our offices: 30 Days

4

5    Greetings:

6    The deponent has reserved the right to read and sign.
     Please have the deponent review the attached PDF

7    transcript, noting any changes or corrections on the
     attached PDF Errata.  The deponent may fill out the

8    Errata electronically or print and fill out manually.

9

     Once the Errata is signed by the deponent and

10   notarized, please mail it to the offices of Veritext
     (below).

11

12   When the signed Errata is returned to us, we will seal
     and forward it to the taking attorney to file with the

13   original transcript.  We will also send copies of the
     Errata to all ordering parties.

14

     If the signed Errata is not returned within the time

15   above, the original transcript may be filed with the
     Court without the signature of the deponent.

16

17   Please send completed Errata to: Litsup-ga@veritext.com

18   Veritext Production Facility

19   20 Mansell Court

20   Suite 300

21   Roswell, GA 30076

22   770-343-9696

23

24

25

Page 104

```
 1   ERRATA
 2   I, the undersigned, do hereby certify that I have read
     the transcript of my testimony, and that
 3
 4   ___ There are no changes noted.
 5   ___ The following changes are noted:
 6
     Pursuant to Rule 30(7)(e) of the Federal Rules of Civil
 7   Procedure and/or OCGA 9-11-30(e), any changes in form or
     substance which you desire to make to your testimony shall
 8   be entered upon the deposition with a statement of the
     reasons given for making them.  To assist you in making any
 9   such corrections, please use the form below.  If additional
     pages are necessary, please furnish same and attach.
10
11   Page _____ Line _____ Change_____
12   _____
13   Reason for change_____
14   Page _____ Line _____ Change_____
15   _____
16   Reason for change_____
17   Page _____ Line _____ Change_____
18   _____
19   Reason for change_____
20   Page _____ Line _____ Change_____
21   _____
22   Reason for change_____
23   Page _____ Line _____ Change_____
24   _____
25   Reason for change_____
```

1    Page _____ Line _____ Change_____

2    _____

3    Reason for change_____

4    Page _____ Line _____ Change_____

5    _____

6    Reason for change_____

7    Page _____ Line _____ Change_____

8    _____

9    Reason for change_____

10   Page _____ Line _____ Change_____

11   _____

12   Reason for change_____

13   Page _____ Line _____ Change_____

14   _____

15   Reason for change_____

16   Page _____ Line _____ Change_____

17   _____

18   Reason for change_____

19

20             _____
            DEPONENT'S SIGNATURE

21

     Sworn to and subscribed before me this ____ day of

22   _____, _____.

23

     _____

24   NOTARY PUBLIC

25   My Commission Expires:_____

**&**

**&** 2:3,9,14 5:10
5:23

**0**

**0** 45:18
**01382** 1:6

**1**

**1** 3:13 4:4 5:5
29:14,16,17,18
36:3,12,12,21
40:2 45:12
84:22 101:11
**1.4** 40:3
**1.4.2** 46:20
**1.41** 40:20 41:2
**10** 45:12
**10,000** 39:24
41:22 42:6,11
43:1 44:19
45:16 46:2,5,12
47:14,20,24,24
48:2,5,6,8 49:24
51:5 59:13,17
62:2,7,24
**100** 1:22 2:11,19
5:10 101:11
**104** 51:13
**10:01** 1:19 5:4
**11** 26:5 79:5
**11,000** 48:17,18
48:21 88:10
**11,050** 88:10
**11,200** 82:20
**110** 88:17
**11:10** 61:20,21
**11:26** 61:21,23

**1201** 2:5
**12:03** 89:19,20
**12:39** 89:23
**12:50** 100:4,9
**14** 39:19,22
41:20 42:1,14,21
43:8 50:11,25
**14,500** 89:6
**1476** 1:25 101:20
**15-14-37** 102:13
**150** 29:21 30:16
45:13
**15th** 81:5
**16,000** 81:12
82:12,21
**1600** 1:21 2:10
**16417** 101:20
**19** 32:19 75:7
**1920** 57:10
**1920s** 57:5
**1930s** 57:5
**1970s** 58:7
**1980** 58:11
**1980s** 58:7
**1986** 12:21
**1990** 11:15,22
12:7
**1995** 42:20 43:12
44:17 46:4,7,16
48:16,19 62:1
**1:20** 1:6
**1st** 88:25

**2**

**2** 3:11 29:15,21
55:15,16 79:11
**2.6** 55:15

**20** 60:5 81:5
103:19
**2000** 11:8,16,25
**2000s** 9:9 58:1
**2002** 42:20 94:12
**2003** 58:2
**2007** 42:21 43:6
94:12
**2008** 86:23
**2009** 79:5
**2010** 15:25 42:15
**2013** 95:25
**2015** 32:17 70:15
81:6 82:10,10,24
**2019** 28:20 34:19
63:7 65:1,11
69:15 70:3,8
71:12 74:22
75:3 77:17 84:5
96:17
**2020** 22:22 23:17
32:19 34:20
84:5 85:15,25
86:4,11 88:6
**2021** 23:15 86:14
88:15 92:7
99:20
**2022** 1:18 5:4
88:8,9,22,25,25
101:18
**20s** 57:4
**20th** 88:21
**21** 50:3,4,18,19
50:23
**230** 2:16
**24** 38:12
**241** 2:15

**25** 33:18
**26** 3:11 93:6,16
**27** 1:18
**27th** 5:4
**28** 82:19
**29** 3:10

**3**

**3** 28:23 29:14
**3,450** 89:2
**30** 78:16,17
85:19 103:3
104:6
**300** 12:16 103:20
**30060** 2:15
**30076** 103:21
**30090** 2:20
**30309-3424** 2:5
**30339-594** 2:11
**307.1** 28:23
29:17,21
**30s** 57:4
**30th** 88:25 96:17
**34** 11:6
**35** 77:25
**350** 2:19
**371** 3:8 4:5 5:1
7:7
**372** 3:10 29:8,11
**373** 3:12 84:14
84:17
**374** 3:15 87:22
88:1
**375** 3:18 90:5
91:2
**376** 3:19 4:5
99:6,8,11,13

**3rd** 88:6

**4**

**4** 29:14
**4-30-21** 3:12
**40** 81:8
**400** 15:21,22
16:15,23 17:5,20
17:25 18:2,25
21:8,13,14,24
22:4,7,7,8,9,15
22:18 31:1,1,3
39:6,8 42:17
46:21 49:9,11
50:3,3,5,15,19
50:20,24 80:16
80:17 83:10
**404.881.4969** 2:6
**404.881.7777** 2:6
**40s** 17:3 54:20
57:4
**430** 16:20
**432** 16:21
**434** 16:19
**47** 4:3,6 81:24
97:20
**48** 97:18
**490** 17:25

**5**

**5** 29:15
**50** 30:16 43:14
45:12 52:15
57:21 60:5,17
**5000** 17:11
**50s** 17:3 54:20
57:4
**55** 30:22 39:3,8
39:11,19,22 40:2

40:21 41:20
42:2,5,10,14,15
42:17,22 44:4
46:21 48:1,5,23
50:3,5,8,11,16
50:20,23 51:2
73:22 82:20
**560** 42:14,19,21
43:7,11 44:5,18
46:7 48:1,5
73:22 94:12
**58** 51:16 52:11
52:11 57:21
60:17

**6**

**6** 3:4
**6-27-22** 3:10
**6-3-22** 3:16

**7**

**7** 3:8 97:6 104:6
**7-18-22** 3:8
**7.21** 30:25
**704** 13:18 15:13
**770-343-9696**
103:22
**770.422.2300**
2:16
**770.424.5820**
2:16
**770.528.8088**
2:20
**770.818.0000**
2:12
**770.937.9960**
2:12

**8**

**80** 12:16 58:8,12
**80s** 44:25
**82** 4:3
**84** 3:12
**87** 3:15
**8th** 101:18

**9**

**9-11-30** 104:7
**9-8-15** 4:3
**90** 12:16 94:11
**90's** 58:3
**90s** 9:9
**91** 3:18
**95** 42:24,25 43:2
48:1 94:11
**99** 3:19

**a**

**a.m.** 1:19 61:21
61:21
**ability** 67:2
**able** 10:18 45:11
67:13
**absorbed** 64:20
**accept** 21:15
**acceptable** 40:5
**accepted** 66:18
66:21 67:23,23
**achieve** 9:25
10:4,11,21,21
55:17
**achieved** 10:19
**acid** 96:15 98:9
**act** 14:17 49:5
**action** 1:5
**actions** 53:1

**activities** 72:16
**actual** 45:5
57:25
**add** 9:10
**added** 17:18
65:6
**addition** 73:21
**additional** 35:15
38:1,8 46:1
53:14 85:5
104:9
**address** 36:12
**addressed** 40:6
**adequate** 11:1
21:16,20 34:6
35:24
**adequately** 22:4
22:16 36:4
**administer**
14:14
**administrative**
14:7 15:6
**administratively**
14:8
**adopted** 15:11
28:19 38:21
50:25
**adopting** 51:4
**advice** 9:2 15:13
**advisory** 87:9
**affiliations** 5:16
**affirmatively**
21:25 43:13
51:12 52:6
56:13
**aggregated** 18:2
**aggregating**
42:17

**ago** 27:21 34:15
48:12
**agree** 22:20
31:12 47:13,19
49:19 60:10
82:23
**agreed** 19:21
36:16
**agreement** 40:10
**agwen** 42:8
**ahead** 30:2
**ahj** 9:1 46:4,8,22
46:24 47:3
69:15 71:4 72:3
72:18,21 73:6,12
75:5,16,18,22
76:1,8,15 77:17
78:22 79:24
80:8 83:13
**ahjs** 73:4,10
77:25 79:19
**air** 55:16 63:25
64:19 66:6
**airgas** 95:22
**al** 3:13,17
**alarm** 33:19
**alerts** 33:19
**aligned** 24:10
**aligns** 37:16
**allowable** 29:2
30:16
**allowed** 42:6,11
44:19 46:4
48:18
**alston** 2:3 5:23
**alston.com** 2:7,7
**alternative** 10:9
10:12,20

**alternatives** 9:11
**amalgamate**
16:16
**amalgamation**
21:9 49:11
**ammonium** 18:1
**amount** 45:9,9
45:11,23 57:1
62:11,14,17,18
89:11,14
**amounts** 24:4
45:2,3,7 54:11
**analyses** 21:19
65:9,16
**analysis** 19:11
25:22 32:23
69:8,18 84:2
94:19,21,23
**ancillary** 102:14
**annual** 28:6
**answer** 7:2 12:3
19:14,23 38:10
44:3 50:13 62:9
80:5 83:4
**answers** 101:9
102:6
**anticipating**
91:13
**antifreeze** 54:24
**anywise** 101:17
**apart** 8:12
**apologies** 28:12
**appearance** 5:20
**appearances** 2:1
5:16
**appears** 55:19
**applicable** 17:6
38:14 49:13

51:19
**application** 9:3,4
26:8 33:17 63:6
76:19
**applications**
95:6
**applied** 17:7
46:15 48:24
52:5,8,12 61:3
102:13
**applies** 39:11,15
41:4,23
**apply** 22:9 26:11
30:12 40:22
41:7 42:2 46:13
46:24 48:13
49:23 51:24
52:20 60:17
61:4,9 71:4
75:16 76:23
77:7 87:9
**applying** 9:21
26:6 72:8
**appreciate** 35:1
35:7
**appropriate**
35:20,21
**approximately**
31:3 80:17
81:11
**april** 86:14
99:19
**area** 19:5 20:23
27:10 33:7
41:17 64:22
**areas** 18:15
34:12,12 66:24

**article** 58:8,12
95:24 96:1,2
**asked** 8:16 10:24
19:18 22:6
38:13 60:1 74:2
76:22 85:20
96:25 97:22
**asking** 9:19
22:14 25:4 43:9
59:3,9 69:21
73:8 76:13 87:6
94:18
**aspect** 18:17
**assess** 8:16 40:15
68:6
**assessed** 16:4,9
19:19 49:20
**assessing** 67:24
68:11,15
**assessment**
35:11 36:17
68:2,3,4,22 69:4
69:8,13,25 70:6
71:10
**assist** 94:4 104:8
**assistance** 87:9
**assisted** 8:23
**associated** 16:4
16:10 21:23
22:5,17 40:16
49:20 53:5,11
54:10 55:24
58:18 67:19
69:4,8 83:1
**assume** 37:9
**assuming** 12:22
89:5

**assumption** 76:17 77:13
**atlanta** 1:2,22 2:5,11 5:11 28:8
**atlantic** 2:4
**atmosphere** 69:10
**atomized** 24:21
**attach** 104:9
**attached** 4:6 27:7,8 102:7 103:6,7
**attachment** 91:21
**attempting** 10:2
**attending** 27:24 28:2
**attention** 53:14 59:7
**attorney** 5:21 86:10 103:12
**attorney's** 2:18
**attorneys** 76:21 102:8
**august** 23:17 28:19 63:7 65:1 65:11 74:22 75:3,7 77:17 101:18
**author** 70:21
**authors** 81:21 84:8
**automatically** 102:13
**automotive** 13:5
**available** 102:10 102:14

**avenue** 2:15
**aware** 13:20 14:21 31:17,22 31:23,24 52:22 52:24 53:3,15 54:9,17 56:22 60:9 63:3,5 69:13,25 70:5 71:10 78:1,7,8 80:8,12 82:11

**b**

**b** 1:25 3:11 101:20 102:13
**back** 12:7 17:1 19:17 42:23 44:15,24,24 58:6 60:2 61:22 66:15 68:18 71:20 84:24 89:22 95:2 99:19 103:3
**background** 8:10 12:20 14:19 80:2
**based** 9:6,10,14 9:16,23,24 10:1 10:8,17,25 11:25 15:2 17:11 19:25 30:23 36:11 52:21 65:2 66:25 76:2 76:9,12,17 95:13
**bases** 26:10
**basically** 8:9 10:19 23:15 55:16

**basis** 10:6 71:14 72:20,24 77:23
**becoming** 52:22 87:15
**bed** 64:16,17
**beds** 65:6
**began** 12:22 13:14
**beginning** 3:15 5:20 23:15 29:24
**behalf** 2:2,8 5:23 5:25 6:2,4
**behaved** 57:10
**believe** 8:11 11:8 13:20 15:17,25 16:2,8 19:21 22:2,3,15 29:19 32:15 34:18 35:9 39:21 41:15 42:24 51:13,16 60:21 62:4 63:5,11,15 65:2,3,8 67:17 70:14 78:10,14 78:18 81:2,16 84:7,24 85:14,24 86:5 91:25 93:1 99:7
**believed** 61:1
**believes** 60:24
**bentley** 2:14,14 2:14,14 3:13 86:16 92:23,24
**bentley's** 87:21
**best** 7:2,3
**better** 95:3

**big** 25:16
**bigger** 25:17
**billing** 89:8
**bird** 2:3 5:23
**bit** 23:22 29:6 35:5 61:13
**blue** 13:23
**board** 20:19,25 79:3,3 96:4
**boats** 13:5
**boiling** 55:10
**book** 98:7
**boston** 79:4
**bottom** 13:24
**bought** 94:15
**boundaries** 20:13
**bounds** 14:18
**brand** 14:11
**braves** 27:20
**break** 61:14,25 77:1 89:25
**brian** 2:18 6:2
**brian.johnson** 2:21
**bring** 20:13 98:13
**brought** 18:25 21:3,8 73:21 90:3,10,17
**building** 1:10 2:23 8:13 17:11 28:24 37:9,13 38:20 41:21 44:23,23 45:19 45:23 54:4 63:6 63:9 65:18 70:8 71:11,15 74:8

80:21
**buildings** 19:2,3
19:4 39:24 43:3
43:4,7,12
**bunch** 23:19
**burns** 55:12
**business** 23:1
27:23
**businesses** 27:2
27:7,8

**c**

**c** 101:1,1
**calendar** 102:14
**california** 96:3,5
**call** 19:7 65:6
86:13
**called** 45:1,1
87:5
**calls** 3:20 99:17
**capable** 55:18
**capacity** 1:8,11
**caption** 101:8
**capture** 15:7
64:7,20
**captured** 15:5
**carefully** 16:3,9
19:19 49:20
**carrying** 24:20
**case** 28:14 32:11
34:15 35:18,22
36:10 68:14,23
70:19 71:2
74:12,16 75:1,10
75:22 76:8
79:23 84:2,21
85:9 88:3 89:5
96:2 101:15,17

102:7,8,13
**cases** 73:12
**categories** 20:4
**cause** 18:19 19:9
20:1 26:2 29:5
34:23 43:25
44:11 67:2
94:14 98:7
**ccr** 1:25 101:20
**center** 2:4
**certain** 17:18
35:11 39:11
40:12,16 41:3,6
49:13 51:23
52:4 54:10 55:5
58:12 71:4
99:17
**certainly** 58:11
64:4
**certificate** 71:19
72:11 102:2
**certificates**
72:25 74:5,11
102:10
**certified** 7:19
102:5,6,8,10
**certify** 101:7,13
104:2
**chances** 68:23
**change** 11:15
12:2 14:16 50:4
78:5 82:25
104:11,13,14,16
104:17,19,20,22
104:23,25 105:1
105:3,4,6,7,9,10
105:12,13,15,16
105:18

**changed** 11:17
43:6 49:7 79:25
80:21
**changes** 59:7
78:1 103:7
104:4,5,7
**changing** 59:2
59:18
**chapter** 10:17
26:16 28:23
39:19,22 40:2
41:20 42:1,14,21
43:8 50:3,4,11
50:18,19,23,25
51:16,19 52:11
60:5
**chapters** 9:7,10
17:20 57:21
**characteristics**
8:9 53:6 55:5,6
60:12 62:13
68:19,20 98:11
**characterization**
8:4 17:8
**chasing** 97:10
**check** 42:24
**chemical** 7:15
11:9,16,23 12:13
12:23 13:8,15
17:21 20:19,23
20:25 27:25
55:4,4 68:21
79:2,3 96:4
**chemicals** 36:6
36:14 69:10
**chemist** 12:14
**cherokee** 2:19

**chief** 1:10 2:23
11:15,23
**chosen** 41:12
**choy** 2:10 5:25
5:25 72:23 73:2
76:4 77:21
91:10 100:1,7
103:1
**choy's** 86:10
**circumstances**
48:23 76:23
**cites** 39:21
**civil** 1:5 3:11
104:6
**clarify** 6:23 47:2
58:25 64:9
**class** 29:14,14
**classes** 17:21
**classification** 8:4
13:17 17:8 30:4
33:3 36:3,21,23
36:24 37:11
38:5,7 74:1
80:21 94:5
**classifications**
17:14 56:12
71:20
**classified** 28:15
31:14 32:8
**classifies** 37:6,7
**classifying** 8:12
**clauses** 10:15
**clay** 2:4 5:24
**clay.massey** 2:7
**clean** 6:20
**clear** 38:18
**clearly** 38:4

close 55:10
closed 18:12
  29:15
cobb 1:7,8,10
  2:18 3:13,17 5:7
  37:7 47:4 63:6
  70:2,7 71:3,11
  71:15 81:14,18
  82:8,11 97:20
cobbcounty.org
  2:21
code 7:25 8:15
  9:3,3,14,22
  17:11 21:14
  22:7,9,15 25:25
  26:3,4,9,12,14
  26:16 28:14,18
  28:24 31:8,15
  32:9 36:23,25
  38:14 40:3,6,12
  40:21 41:3
  46:25 48:9,12
  49:12 51:11
  52:12 53:18,18
  53:21 54:3,4
  57:21 58:8,8,12
  58:14 62:6,22
  71:4 73:9,20
  76:19 94:4
codes 8:7,23 9:7
  9:7 10:15 11:20
  12:16 21:15
  26:11 28:18
  38:20 41:17
  44:23 51:14,15
  60:17 72:8 73:5
  75:17 76:24
  80:22 87:7

colleague 23:25
  85:17
collection 64:7
colloquies 102:6
colonna 1:16 3:2
  3:9,10,12,16,20
  5:6 6:8,12 61:24
  82:2 89:24
  103:2
colorado 24:1
combustible
  13:10 26:7
  41:16
combustion
  55:20,22,23
come 10:20
  19:25 20:11
  59:7 71:25
  73:19 74:8
  79:22
comes 15:2 56:8
coming 24:19
  59:3
comment 79:17
  80:3
commission
  105:25
committee 13:25
  14:2,5,8,22 15:2
  15:20 16:3,9
  20:12,21 21:4,13
  21:23 28:2
  40:10,15 42:18
  49:3,19,23 50:5
  50:6,8,25 53:17
  53:19,20 54:3,4
committees
  12:18 19:10

20:2,2,21,24
  21:1 28:4 54:2,5
  86:25 87:1
commodity 33:2
common 64:5,10
commonly 66:19
  66:22
communicated
  78:23
community 36:5
companies 28:4
company 23:25
  79:16
complete 50:21
  101:12 102:5,7
completed 84:9
  84:13 103:17
completion
  83:10
compliance 7:25
  8:22 9:1 26:1,9
compliant 47:24
  48:3,9
complies 8:14,14
component 67:8
components
  66:20
composite 3:15
  3:19
composition
  57:9
compressed
  39:12 50:22
concentrate
  55:13
concentration
  66:7,13

concept 17:10
  62:11
concerned 80:1
concerns 56:9
concluded 100:8
conclusion 77:6
conclusions
  84:10
condition 70:11
conducting 68:4
conference 28:1
  28:6,7
conferences
  27:24 28:7 87:3
confidentiality
  93:19
conflicting 72:11
  72:25
confusing 84:4
congress 27:25
conjunction
  78:11
connection 39:4
  70:18 74:16
  82:4 94:24
  99:16
consensus 40:4
  40:10 42:18
consequence
  67:9
consequences
  18:21,22 68:11
  68:16
consider 21:5
considerable
  57:1
considerations
  49:4

considered
  21:23
considering 72:8
consistency 72:4
consistent 62:10
  72:1 79:11
constitute 47:15
  47:22 83:1
constitutes 60:22
  72:12
construction
  19:2
consulting 22:25
  23:3,5
contact 85:22
  86:11
container 18:8
containers 18:10
  18:12,13
contaminants
  64:4
contaminates
  64:19
content 8:22
  23:19 50:21
contents 3:18
  15:13 93:15
context 55:3
continue 44:1
  48:18 91:20
  94:10
contribute 14:20
control 63:12,14
  63:19 64:5,10
  65:5,10,17,22
  66:5
controlling 64:3

conversation
  85:14,23 86:7,15
conversations
  76:2,10 87:16
convert 30:23
coordinated
  87:20
coordinators
  102:5,9
copied 92:18
  96:19
copies 88:2
  94:14 102:10
  103:13
copy 7:7 29:11
  92:3 98:8 102:8
correct 7:8,15
  9:4 11:7,11
  21:17,21 22:12
  22:23,24 26:21
  28:24 29:22,23
  30:18 31:4,10
  32:1,5 34:16,21
  35:12,16,25
  36:18,19,25 37:1
  37:4,5,13,20,23
  37:24 39:1,6,13
  39:14,17,18,20
  39:25 40:7,12,13
  40:18,23,24 41:4
  41:7,10,18,24,25
  42:2,3,7 43:12
  44:6,20,21 45:24
  45:25 46:7,13,14
  46:16,17,20,25
  47:5,10 48:14,19
  48:25 49:9,25
  51:1,3,7,11,17

51:21,24 52:5,9
  52:13,14,16,17
  52:20 54:11
  56:12 57:7
  58:20 60:6,10,15
  60:19,20,23 61:7
  61:10 62:3 63:4
  65:14 66:7,13,14
  66:17 67:20,21
  67:24,25 68:7,13
  68:16,25 69:5,11
  69:12 70:12,17
  71:7,12,13 73:18
  74:13,23 75:3,4
  75:7,10,19,24,25
  77:14 78:2
  80:15,18,23,25
  81:9,12,13,15,19
  82:8,9,13,14
  83:2,15,19,23
  85:11 88:4,12,15
  88:22 89:5,6,12
  89:13,15,16
  92:14 99:14
  101:12 102:5,7
corrections
  103:7 104:9
correctly 36:7
correspondence
  78:14,18
cos 74:1
council 52:19
counsel 2:1 3:21
  5:6,15 89:25
  99:18 101:14,16
county 1:7,8,10
  2:18 3:13,17 5:8
  27:21 37:7 47:4

63:7 70:2 71:3
  71:11,15 81:15
  81:18 82:8,11
  97:21 101:5
couple 6:18
  25:11 28:8
  34:16 67:16
  85:16 90:3
court 1:1 5:13
  6:6 34:22 35:1,4
  35:7 43:15,19,21
  44:2 56:15
  90:18,21,23 91:1
  91:5 99:10
  100:6 102:6
  103:15,19
cover 3:15
covered 17:7
  22:17
create 9:17
  59:25
created 92:24
creates 47:9
creating 10:13
  15:1
creation 16:23
  49:9
criteria 13:19
cross 3:4 6:10
cryogenic 39:12
  50:22
current 45:14
  80:22
currently 82:16
cv 1:6

**d**

**d** 2:14
**dangerous** 74:12
74:17
**danvers** 79:5
**data** 94:1 95:21
97:1
**date** 11:25 56:25
57:12 79:19
96:16,17 99:23
103:3
**dated** 44:23 81:3
**david** 86:8
**dawe** 1:7 2:23
85:23 86:2,3,18
**day** 101:18
105:21
**days** 103:3
**dealing** 8:6
11:20
**deals** 13:17
51:15,16 52:16
**dealt** 13:25 14:2
**decades** 18:7
32:4 57:16
**december** 34:19
84:5 88:15
**decide** 46:8
79:24
**decided** 49:23
**decisions** 42:18
73:4
**defendants** 1:12
2:8 3:20 6:1,3,5
76:3,10,13,20
78:7 94:18 95:9
99:17

**definition** 36:11
36:13 38:7
66:19
**definitions** 37:14
**degree** 40:5
46:24 47:9,16,22
48:22 51:6 71:7
71:16 72:12,21
74:22 75:2,6,18
76:9,16 77:2,11
77:14,18
**delivered** 84:13
**delivering** 23:12
**delta** 28:10
**density** 30:23
**department**
12:12 79:9
**deponent** 103:2
103:6,6,7,9,15
**deponent's**
105:20
**deposed** 6:16
**deposition** 1:15
3:8 5:5,9 6:15
7:8 89:12 90:4
97:5,6,19 100:8
102:12 104:8
**describe** 13:22
**described** 63:15
**describes** 13:19
**description** 3:7
4:2
**design** 9:6 10:9
**desire** 104:7
**detect** 25:19
**detection** 25:7
25:18 33:10

**detections** 33:19
**determination**
28:23 66:2 76:2
77:2,8
**determinations**
30:10 67:4,13
75:13,15
**determine** 8:25
10:3,12,24 21:19
38:14 65:17
68:5 77:11
**determined** 51:4
56:3 71:6,16
72:21 75:5,18
76:8,15 77:13,17
79:7
**determines**
46:22 47:8
**determining**
8:13 9:16,24
19:19
**detonable** 29:14
**detonatable** 53:9
**develop** 15:4
**developing**
14:10 21:5,6,13
23:11
**development** 1:9
54:1 78:12
**diamond** 13:23
**dictated** 26:14
**diesel** 24:15,17
24:22
**different** 9:15,22
20:3 29:6 30:11
60:4 72:19 77:9
**digging** 95:2

**directed** 86:6
**direction** 14:23
14:24 101:10
**disclosure** 102:2
**discount** 102:14
**discounts** 102:13
**discovery** 92:22
**discuss** 29:19
**discussed** 37:12
40:9 41:20
48:12 50:16
52:3 61:25 71:9
80:12
**discusses** 40:20
46:20 51:10,13
**discussion** 96:8
**discussions**
73:13 94:17
**distinct** 52:18
**distinction** 67:18
**district** 1:1,1
**division** 1:2,9
11:9,24
**document** 7:10
10:17 13:17,18
13:25 14:2,4,11
15:11,17 16:18
16:19,20 18:1
21:7 32:15
44:13,14 45:6
58:4,9 70:20
84:18,20 93:5
95:10,12,16,19
97:8,14
**documentation**
27:5 66:1 72:4
73:15 74:15
75:21

**documenting**
98:10
**documents** 9:6
12:21,23 13:1,15
13:16 14:11
16:17,24 17:1,4
17:4 18:24
32:21 41:8,9
42:17 44:12
54:3,5 58:4,6
59:16 71:18
77:4 92:21
96:25 98:5
**doing** 10:16 13:4
15:10 20:7
23:14 67:3 68:8
95:4
**dot** 32:18 34:14
34:16 35:10,14
35:19,23 69:17
69:19 78:12
82:18 84:1,11
**double** 74:24
**draft** 61:9
**drafted** 61:4
**drafting** 14:3
40:15
**drilling** 24:5
**drive** 17:17 26:3
26:13
**driven** 17:15
26:25 38:4
**drives** 37:17,19
**drop** 31:25
**drum** 30:21 31:2
31:6,13,18 80:14
**drums** 30:7,19
30:22 81:8

82:20
**dry** 64:16,17
65:6
**due** 103:3
**duly** 6:8
**dust** 13:10 41:16
**duties** 11:12
**duty** 15:6

**e**

**e** 86:13 96:9,16
101:1,1 104:6,7
**earlier** 27:12
40:9 42:16,23
45:15 58:15,17
66:16 70:14
71:22 80:12
**early** 9:9 58:1
92:20 96:11
**easily** 24:23 55:7
**edition** 15:11
42:15,24,25 43:2
43:7 58:2
**editions** 42:23
94:12
**effectiveness**
33:25 34:2
**effort** 16:15
**either** 11:20
14:10 15:3
17:14 19:25
21:5 24:16,17
28:3 48:5 71:10
73:20,22 84:4
86:12 97:10
**electronically**
103:8

**element** 84:10
**elements** 67:5,12
**elmer** 33:15
**emerged** 45:15
**emission** 63:14
63:19 65:17
**emissions** 63:12
65:5,10,22 66:4
**emitted** 64:21
**employ** 25:8
101:15
**enable** 17:5
**enables** 72:17
**enact** 57:20
**enacted** 15:24
32:13 41:6,17
42:6,10 44:18
58:19 60:3,17
**enacting** 21:24
**enactment** 46:6
**encountered**
86:21 87:1,2
**energetic** 55:23
**enforcing** 79:15
**engage** 23:15
76:22
**engaged** 86:8
87:15
**engagement**
3:14 84:20,22
85:8 86:17,19
87:16 88:14
93:17
**engine** 24:20,24
**engineer** 7:15,17
7:22 11:23
27:13

**engineering**
11:10 85:17
**engineers** 12:12
12:13 28:1
**engines** 24:12
**entered** 104:8
**entertaining**
85:20
**entities** 79:15
**envelope** 93:19
**environment**
9:17
**eo** 45:20 78:15
78:18 80:9
**epa** 20:20
**equipment** 24:7
25:3 26:21 32:4
**equivalencies**
10:3,13
**equivalency**
10:14
**equivalent** 10:9
81:11
**errata** 103:3,7,8
103:9,12,13,14
103:17 104:1
**esq** 2:3,4,10,14
2:18 103:1
**essential** 38:2
**establishes**
53:25
**et** 3:13,17
**ethylene** 29:2
30:4,12,16,20,21
31:2,6,14,19
32:1,3 39:16,23
40:17 41:21
42:7,11 43:1

44:19 45:12,23
46:3,6 47:13,15
47:19,21 48:17
48:19,21 49:17
50:10 51:6
52:18 53:7
54:10,18,20,21
54:23 55:1,17
56:2,22 57:6
58:10,13,18
59:25 60:9,19,22
61:1 62:3,7,12
62:15,16,19,24
66:5,12 68:19
71:23 78:6
80:14,20 81:9
82:13,15,25 94:5
95:21 96:14,14
97:2 98:8
**evaluation** 4:3
97:18
**event** 18:21 36:5
**eventually** 11:24
15:10
**evidence** 101:12
**exact** 57:12
76:14
**exactly** 17:2
87:11
**examination** 3:4
6:10
**examinations**
3:1
**examine** 25:5
**examined** 6:9
**example** 13:3
26:4 38:25
41:16 46:18,19

78:20
**examples** 20:17
41:13
**exceptions** 40:25
**excess** 17:16
**exchange** 79:12
**excludes** 36:13
**exclusively**
102:9
**excuse** 38:20
46:23 60:3 61:3
70:7 88:9
**exempt** 45:1,3,7
45:9 62:10,14
**exhibit** 3:7,8,10
3:12,15,15,18,19
3:19 4:2,3,6 5:1
7:7 29:8,10
81:24 84:14,17
87:22,25 90:5
91:2 97:6,18,20
99:5,8,13
**exhibits** 3:6 4:1
4:5 53:6 55:7
102:7,9
**exist** 18:24
**existed** 16:25
17:12 18:1 42:5
42:10,14 44:17
44:22 46:16
48:16 56:1 62:1
74:22 75:2,6
76:9 77:19
**existing** 16:16,24
21:7 40:22
42:17 46:23
47:9 51:5 58:4

**exists** 70:11 77:3
77:6
**expect** 48:23
61:9
**experience** 16:2
73:11 79:1
**experienced**
24:2 54:15 73:3
**expert** 3:10 7:25
19:13 34:13
38:23 56:11
75:10 95:4
**expertise** 20:1,9
33:7
**expires** 105:25
**explain** 35:21
94:3 95:3,8
**explicit** 17:21
**explicitly** 87:4
**explosible** 53:8
55:21
**explosion** 37:4
68:17 69:4 79:6
86:23 96:3
**explosions** 35:25
**extn** 2:16
**extracted** 50:3
50:20
**extracts** 50:18

**f**

**f** 36:3,12,12,21
37:16 38:6
101:1
**facilities** 13:1,21
24:9 25:1 36:13
38:3 39:11,15
40:22 51:5

79:13,21
**facility** 8:16 9:4
9:22,25 10:25
18:13 26:19,20
26:23,25 27:3,7
28:15 30:20
31:3,7,13,25
32:3,13 33:6,11
34:3,6,11 35:16
35:25 36:4,16,18
36:21 37:3,6,8
37:12,22 38:15
39:1 42:5,10
44:17,18,20 46:3
46:16 47:4,9,13
47:14,19,20 48:4
48:7,16,18 51:20
61:25 62:6,24
64:24,25 65:19
65:24,25 66:11
68:14,25 69:5,11
69:14 70:1,6,12
71:5,17,21,22
72:15,22 74:6,13
74:17,22 75:3,6
75:17,19,24
77:19 78:5,24
79:6,8 80:9,13
80:19 81:8
82:12,13,16 83:1
83:15,19,22
94:22 95:1 96:5
103:18
**facility's** 30:6
31:18 32:7
35:11
**fact** 21:8 41:6
73:20 81:17

factor 16:12
factory 36:3
fair 7:4 8:1
  15:12 28:13
  30:14 40:14
  43:10 50:24
fall 28:5 69:15
  70:3,8 71:12
  85:15 86:11
familiar 70:21
  70:25 77:5 95:4
  95:5
fault 85:4
fax 2:6,12,16
feature 68:10,11
features 68:9
  73:22
federal 3:11
  104:6
field 13:23
file 90:3 98:24
  103:12
filed 103:15
fill 103:7,8
final 32:19
financial 102:14
find 26:3,13
findings 84:10
fine 59:20
finish 7:2,3
  34:23 35:2
finished 98:16
finishing 13:3,4
fire 1:7 2:23
  7:17,19 9:16
  10:5,11 12:20
  18:6 23:8 24:25
  25:1 26:17

32:12,21 35:11
35:24 36:17
37:4 38:2,19
44:23 45:19
46:1 47:4,7
51:11,14 53:18
53:18,21 54:3
57:21 58:7,8,12
65:19,23 68:1,3
68:5,16,17,23
69:13,17,17,18
69:18 70:2
71:11,15 73:20
79:9 81:15,18
82:8,11 86:23
87:6 98:5
fires 24:3
firm 5:14 70:25
  86:10 92:23,24
  102:2
first 6:8,21
  13:16 15:24
  41:2 42:19
  46:18 58:1
  67:17 70:23
  82:1,6 87:16,18
  87:20 90:21
five 14:13
fixed 25:12
flame 26:7
flammable 13:6
  13:6,9,9 17:22
  18:11 29:20
  30:5,7,9 51:15
  51:16 53:8
  54:11,18 55:14
  56:22 57:7
  58:10,14 64:4

66:7,13
flash 24:23 55:8
fluer 45:4
fluid 24:17
fluids 39:12
  50:22
flyer 28:10
fm 97:1
fmglaw.com
  2:13 103:1
foam 25:14 26:5
  26:5,6
folder 92:4,5
  98:19
folders 3:18 90:3
  90:6 98:23,24
folks 96:19
followed 86:16
following 104:5
follows 6:9
footprint 19:5
foregoing 101:7
  101:11 102:4
forget 99:22
forgotten 13:18
  27:4 29:7 32:25
  69:19
form 20:12
  72:23 73:2 76:4
  77:21 104:7,9
formalization
  45:14
formed 58:3
former 23:24
  85:17
forth 71:20
forward 103:12

found 73:7 77:22
four 12:14
frack 23:9
fracking 23:9,9
  23:21 24:1
fracturing 24:7
  25:11 26:17
framework 17:5
fred 2:14
freely 79:22
freeman 2:9 5:9
frequency 14:12
  67:6
friedman 1:25
  5:14 101:20
front 17:7 90:24
fsl 23:3,5
fuel 24:16,18
full 10:16
fully 72:15
fulton 27:21
  101:5
furnish 104:9
further 73:13
  98:10 99:24
  101:13 102:7

g

ga 102:11 103:17
  103:21
galleria 1:22
  2:11 5:10
gallon 30:22,25
  82:20
games 27:20
gary 2:9 5:10
gas 24:6 29:13
  29:20 30:5,7,9

33:10,25 54:18
55:11 56:23
58:10,14
**gases** 13:13
39:12 50:22
51:15,16 55:11
**gasses** 13:9
**general** 40:22
41:1 42:4,9
46:13 60:18
63:23
**generally** 17:6
56:22 57:6
64:13 66:18,21
67:23
**generator** 24:20
**generators** 24:13
24:15
**generic** 17:19
**georgia** 1:1,7,8
1:11,22 2:5,11
2:15,20 3:13,17
5:8,11 7:23
26:21 27:14,17
27:25 28:19
38:15,19,20,21
39:1 73:21
86:22 101:4
102:5,9
**getting** 14:23
93:24
**give** 38:24 70:10
**given** 81:14 84:1
101:13 104:8
**gives** 94:1
**giving** 35:18,22
55:9 75:1

**global** 97:1
**glycol** 54:23
96:14
**go** 6:19 10:1,8
14:9,22 15:10
19:17 25:12
30:2 42:23
57:23 58:6
61:18 67:14
68:18 89:17
91:1 93:6,11,14
95:15 96:12
**goal** 10:7
**gobble** 1:9 2:23
87:13,14
**goes** 8:5 14:12
24:8 55:11
71:20 96:2
**going** 5:3 6:14
8:7 12:7 17:5
43:25 44:15
55:21 61:12
66:15 67:7,14
72:16 78:18,19
80:2 87:24 91:8
95:2 96:23 99:4
**good** 6:12,13,20
6:25 23:21
61:14
**gotten** 56:5
78:23
**grab** 16:24
**grantham** 2:3
3:4 5:6,22,22
6:11,14 29:10
35:9 38:9,12
43:18,20,23 44:4
50:12,15 56:17

56:19,21 61:12
61:16,18,24
72:24 74:2 76:7
77:24 80:4,6
84:16 87:24
89:17,24 91:11
91:15,18,19 93:8
99:4,12,24 100:5
**gravity** 30:24
**greetings** 103:5
**ground** 6:19
**group** 20:19
29:14,21
**guess** 48:20
58:23 69:16
92:21
**guide** 98:6
**guy** 1:16 3:2,9
3:10 5:6 6:8
103:2

## h

**h** 8:16 28:15
29:14,15,21 31:7
31:14 32:8
36:24 37:17,19
38:5 71:25
73:18 80:24
**hand** 87:25
**handing** 84:16
**handle** 26:15
62:20 79:13
**handled** 102:9
**handles** 78:24
**handling** 8:7
38:3
**handwritten**
3:19 92:6

**handwrote** 91:6
**happen** 50:8
**hard** 98:7
**harm** 67:3
**hartsfield** 28:11
**hazard** 4:3 17:13
18:18,19 52:19
53:10,11 57:7
60:22 61:2 67:2
67:4,7,9,19,20
68:1,3,3 69:18
72:6 74:12 78:1
83:25 97:17
**hazardous** 8:5,8
8:12 11:21 13:2
13:12 15:20
16:3,5,9,10,16
16:22 18:7 20:5
22:5,12,17 36:14
37:16,18 38:4
49:13,16,21
52:16 55:7
56:11 58:9 60:9
60:11 69:9,9
78:24 79:13
83:11,14,18,22
93:24 94:4 98:6
98:11
**hazards** 16:13
16:25 17:15
19:20,21 21:10
21:24 26:7 40:5
40:12,16,17
52:22,25 53:3,4
53:5,16 54:10
55:3,3 58:18,21
**head** 21:25
43:13,16 51:12

52:6 56:13
**health** 17:15
  53:10
**hear** 44:11
**heard** 64:13
  70:23
**hearing** 101:13
**held** 5:9 28:3
**help** 14:21 35:8
**helped** 97:9
**high** 78:1
**higher** 24:22
**highlighted** 45:5
**historical** 45:5
**history** 31:18
  54:21
**hmex** 93:25 94:4
**hmix** 93:25
**hosted** 28:2,3
**hot** 24:18,24
**hour** 61:13
**hours** 88:17
**hundred** 55:15
**hydraulic** 23:9
  24:7,17 26:17
**hygiene** 64:6

**i**

**ibc** 29:18 45:14
  58:2,5 77:3,5
**icc** 53:23,24,24
  56:3 57:25 58:2
  58:17 59:21
  60:4,8,16,21,24
  61:1
**identification**
  5:2 29:9 37:25
  84:15 87:23

91:3 99:9
**identified** 62:14
  74:12,18 75:23
**ifc** 45:14 51:23
  52:7,11,15,19
  58:2,5,19 60:2,5
  60:17 77:3,5
**ignitable** 55:8
**ignited** 24:23
  55:18
**ignition** 55:19
**ignore** 14:16
**immediately**
  55:11
**impacts** 55:24
**impinge** 24:18
**important** 6:25
  25:18
**impose** 38:8
**incident** 20:18
  36:5 65:19,23
  68:5,6,16,23
  79:4
**incidents** 20:17
  35:25 37:4
**inclined** 86:7
**include** 68:1,15
  89:11,14
**included** 35:10
  92:16 93:18
**includes** 20:4
  71:19
**including** 58:7
**inconsistency**
  73:25
**inconsistent**
  73:16

**incorporated**
  17:9,25 44:5
**incorrect** 42:13
**incorrectly** 56:9
**increase** 80:19
**increased** 65:18
  65:23 78:16,19
  80:9
**independent**
  21:18 55:1
**index** 3:1,6 4:1
**indicating** 97:24
**individual** 1:8
  1:11 20:8
**individuals** 23:7
**industrial** 11:9
  11:16,20 12:24
  12:25 13:1,11,16
  16:5 20:23 36:3
  64:6
**industry** 23:8
**information**
  14:20 21:3 26:6
  26:8 56:6 59:6
  59:10,11,19,21
  59:24 72:12
  78:23 79:12,22
  83:3,5 93:15,24
  94:5 95:20 97:8
**informed** 20:16
**inhalation** 55:24
**inherent** 55:4
  68:20
**initial** 85:14
**input** 15:3
**inside** 19:5
**inspections** 1:9
  79:21

**installation**
  65:22
**installed** 10:25
  33:5 35:15
  37:22 63:18
  65:11,18 66:11
**instance** 79:18
**instances** 9:5
  41:13
**intended** 36:12
**intents** 16:22
**interest** 20:4
**interested** 80:1
  101:17
**international**
  28:24 51:11,14
  53:21 57:20
**interpret** 14:21
**introduce** 99:5
**inventory** 11:19
  83:11,14
**investigated**
  96:4
**investigation**
  96:1
**investigations**
  79:1
**investing** 67:14
**invoice** 88:21
**invoices** 3:15
  88:2
**involve** 8:7
**involved** 13:1,2
  13:10 18:9 49:9
  66:24 79:6
**involves** 23:23
**involving** 20:6
  23:10 24:5 36:6

issue   25:16,17
issues   73:13 74:4
item   84:8
items   84:3 93:23
  94:11

**j**

jackson   28:11
jamie   2:14,17
  6:4 93:2
january   88:25
jason   2:24 5:12
johnson   2:18
  3:16 6:2,2
joined   12:21
jr   2:14
julie   1:25 5:14
  6:25 101:20
july   1:18 5:4
  88:21
june   88:6,25
jurisdiction   37:7
justification
  59:2

**k**

kept   14:17 79:19
kevin   1:8 2:23
key   68:10
kin   101:14
kind   14:6 19:17
  23:5 33:5 35:4
  45:6 52:24 80:2
  83:13 91:7 94:1
  95:14 98:11
kinds   18:15 25:5
  45:21 52:22
  53:3,13,16 54:10
  56:8 72:5 95:5

knew   49:4 57:6
  58:9,13
know   6:22 8:14
  10:10,19 19:8
  25:23 27:2,6,9
  30:20 33:12,16
  33:17,21,22 37:6
  48:8,10 49:3,8
  54:13,21 57:11
  59:14,20 60:24
  63:9,13,16,17,21
  63:24 64:13,16
  64:23,24 66:5,11
  74:4 76:15 78:8
  78:9,9,10 79:24
  81:2 82:15
  83:14,17,21,25
  84:12 85:13
  86:18 92:18
  94:6
knowledge   20:9
  20:14 65:13
known   87:12,14
knows   59:21,23
  60:25

**l**

laboratories
  20:11
lack   72:3
laid   41:12
language   77:3
late   58:3
law   38:15,19,20
  39:1 92:23,24
lay   24:9 25:1
  37:14

layer   94:19,21
learn   79:25
led   85:22 86:15
legal   38:23 102:1
letter   3:12,14,16
  84:21,22 85:9
  86:17 87:16
  93:17
letters   3:15
level   40:11 66:12
levels   17:12,17
lfl   33:18
licensed   7:22
  27:13
life   10:5,11 18:6
  38:2 52:19
  60:22 61:2
likelihood   18:18
  18:20 67:6
limit   45:17
limitation   43:1
  45:22 49:24
  59:25
limitations   29:20
limits   41:21
line   10:21 24:16
  104:11,14,17,20
  104:23 105:1,4,7
  105:10,13,16
lines   24:19
link   79:14 93:10
  93:14,15
liquid   18:11
  55:11
liquids   13:6,9,13
  26:7 55:12
liquified   29:14
  30:7,8

list   75:12
listed   96:11
litsup   102:11
  103:17
little   23:22 29:6
  35:5 45:18
  61:13
llc   1:4 5:7
llp   2:3,9
local   79:9
located   5:10
long   54:16,22
  56:1 87:12,13
look   8:24 20:22
  25:24 26:16
  29:3 30:8 41:19
  45:3 50:2 68:20
  82:1,6
looked   16:13,14
  26:4 28:22
  30:11 72:17
  73:23,24
looking   18:4,8
  21:6 23:8 25:13
  40:2 56:7
looks   88:15
lopa   94:20,23
  95:14,18,20
losing   25:2
loss   97:1
lot   19:14 23:16
low   55:8
lunch   89:20

**m**

mail   86:13 96:9
  96:16 103:10

mailing 93:21
maintained
79:16
makeup 55:4,5
making 15:4
52:25 57:8 67:3
67:18 104:8,8
manage 67:4
management
66:24 67:11,15
83:25
manager 1:10
11:9,18,24 12:11
managing 18:18
18:25 19:1
manifest 67:8,10
manifesting
18:19
manifold 24:11
manner 79:10
mansell 103:19
manually 103:8
manufacture
33:22
manufacturers
33:22
manufacturing
20:7
maq 17:16 29:15
29:16,17,21
45:22
maqs 44:22 45:1
45:7,15
march 34:20
84:5
marietta 2:15,20
marine 11:23
12:20

maritime 12:19
mark 90:4 91:15
marked 4:1,6
5:1 7:7 29:8,10
81:24 84:14,17
87:22,25 91:2,17
99:8
marshal 1:7 2:23
71:15 87:6
marshal's 47:5,7
70:2 71:11
81:15,19 82:11
marshall's 82:8
massey 2:4 5:24
5:24 78:15
91:16 96:9,18
match 10:18
material 13:6,9
16:17 20:5
24:23 53:6
54:22 55:25
56:11 57:8 58:9
69:9
materials 8:5,8
8:13 11:21 13:3
13:12 15:20
16:3,5,9,11,14
16:23 17:7 18:7
21:16 22:5,12,17
23:11,12 37:16
37:19 38:4
49:14,16,21
52:16 53:13
60:9 78:25 79:8
79:14 83:11,14
83:18,22 93:24
94:20 98:6,12,13

math 89:5
mathis 2:9 5:10
matter 5:7
max 48:2,6
maximum 29:2
30:15 39:23
mayish 87:19
mccollum 86:9,9
86:12
mean 14:3 19:24
26:13 28:18
38:19,19 41:8
44:9 53:2 60:11
75:9 88:8 96:23
means 48:10
50:3 55:16 64:2
64:14
meant 26:18
45:10 58:24,25
62:18 73:11
measures 9:17
9:23,25 10:25
32:12 33:10
34:6 35:12,15
36:17,22 37:13
37:22 63:18
media 5:5
medical 26:21
32:4
meet 6:15
meeting 87:20
meetings 28:2
87:18
mention 80:6
83:9
mentioned 21:22
30:19 34:14,19
35:10 70:14

81:1 98:3,5
met 87:4,11
methodologies
25:7 66:25
methods 64:8
67:23
middle 73:7
mind 29:7
mine 85:17
97:20
mitigated 18:23
mixture 55:18
modification
65:5
modifications
63:11,13
modified 50:6
moment 34:15
48:12
money 89:10
monitor 25:14
26:5
monitoring
33:25
months 85:16
morning 6:12,13
motor 24:21
mouth 43:25
moved 42:21
43:8
moves 63:25
multiple 97:10
munger 96:9,18

**n**

name 5:12 69:19
70:23,24 95:10

nature 25:21
68:21 79:17
natures 13:12
near 27:2
necessarily
16:12 18:4
19:10 23:19
47:15,21 79:19
necessary 14:10
40:4,11 59:25
104:9
need 8:6 10:3,9
55:16 57:12
59:5 91:9
negative 63:21
63:25 64:2,7,9
66:10
negatives 74:25
never 34:10
60:17
new 14:11 15:11
21:5 27:22 83:1
nf 50:18,18
nfpa 8:20,25
10:15 11:5,19
12:22 13:18
14:12 15:8,13,20
15:21,22 16:3,8
16:17,18,19,21
16:23 17:5,10,11
17:20,25,25 18:2
20:2 21:8,13,14
21:24 22:4,9,15
22:18,22 23:25
26:5 28:5,7 39:3
39:6,8,8,11,19
39:22 40:2,10,14
40:21 41:6,17,20

42:2,5,10,13,15
42:16,17,19,21
43:11,14 44:4,5
44:18 46:6,21,21
48:23 49:9,11
50:2,5,8,11,15
50:16,19,20,20
50:24 51:2,22
52:3 53:17,24
54:4,14,15,17,19
56:3 73:8 77:4
83:10 85:16,18
86:25 87:1,2
94:12,15
nfpa's 12:16
nice 6:15
nicholas 1:7 2:23
nitrate 18:1
nodding 43:16
nods 21:25 43:13
51:12 52:6
56:13
nonindustrial
18:14
nonresponsive...
38:10 50:13
80:5
nope 34:8
normally 11:4
24:10 38:8
north 79:4
northern 1:1
notaries 102:5
102:10
notarized 102:10
103:10
notary 105:24

note 97:6
noted 104:4,5
notes 3:20 91:6
91:11 92:5,6,10
92:16 99:13,16
notice 3:8 7:8,13
noticing 5:20
noting 103:7
november 85:25
92:7
number 9:7
16:25 20:24
24:1,10 27:24
28:1,11 29:5
73:6 86:25
96:18 99:6
numbered 54:5
numbers 29:6

**o**

object 38:10
50:12 72:23
73:2 76:4 77:21
80:4
objections 5:18
objective 10:4
10:10
observed 73:14
79:18
obtain 62:2,6
obtained 92:22
obviously 54:15
occupancies
45:21 72:11
occupancy 8:16
17:10 28:16
31:7,15 32:7,9
36:4,24 37:8

38:5,6 71:20,25
72:25 73:18,18
73:25 74:5,11
78:2 80:21,24
occupant 74:8
occur 20:17 78:1
occurred 20:18
24:3,14 41:14
78:5,21 85:15
occurring 68:7
ocga 102:13
104:7
october 11:22
85:25 86:3,5
96:17
offer 14:24 54:7
office 2:18 47:5
47:7 70:2 71:11
81:15,19 82:8,11
offices 103:3,10
official 1:10 2:23
37:9 45:20 70:8
71:12,15 74:9
79:15
officially 57:25
89:9
officials 71:3
86:23 94:4
oh 23:21 29:13
29:25 81:25
90:20
oil 24:5
okay 8:12 10:23
11:5,14 12:6
21:22 22:11
29:19 31:2
34:23 35:6 36:2
38:23 39:3

41:11 43:10
44:15 46:18
47:12 48:15
50:9 54:6 56:10
56:14 57:13
58:25 59:19
61:12,15,16 64:9
67:16,22 69:24
70:5 77:9 80:4
81:25 82:6,10
83:6 84:16 85:3
85:6 87:24 90:8
90:14,17 91:4,18
91:19 95:17
96:7,20 98:1,18
99:1,4,10,21,25
100:1
**once** 6:17 24:6
103:9
**ones** 58:5
**ontario** 96:3
**open** 18:10,12
29:16 43:25
84:3,8
**operate** 38:25
**operated** 23:25
**operates** 24:1
**operating** 38:3
48:4,7 79:15
**operation** 18:9
**operations** 16:14
**operators** 79:12
**opinion** 35:18,22
36:9,20 37:2
38:24 65:21
70:11 71:14,22
72:3,20 74:20,21
75:1,5 76:1,7,9

76:12 77:16
78:4
**opinions** 28:14
71:2
**opportunities**
85:21
**opposed** 38:5
45:12 64:8
**order** 10:1 12:16
45:11,20 50:20
55:17 57:15
93:19
**ordering** 103:13
**organic** 16:20
**organization**
53:25
**original** 4:5,6
44:15 103:13,15
**origins** 17:3 45:6
**osha** 20:19,24
**outcomes** 55:7
**outlining** 95:14
**overseeing** 14:3
**owner** 79:12
**oxide** 29:2 30:4
30:12,16,20,21
31:3,6,14,19
32:1,4 39:16,23
40:17 41:21
42:7,12 43:1
44:20 45:12,23
46:3,6 47:13,15
47:19,21 48:17
48:19,22 49:17
50:10 51:6
52:18 53:7
54:11,18,20,21
55:1,17 56:2,22

57:6 58:10,13,18
59:25 60:9,19,22
61:1 62:3,8,12
62:16,19,25 66:5
66:12 68:19
71:23 78:6
80:14,20 81:9
82:13,15,25 94:6
95:21 96:14,15
97:2 98:8,9
**oxidizers** 16:19
17:22
**oxirane** 94:6

## p

**p** 2:3
**p.e.** 3:10
**p.m.** 89:20,21
100:9
**page** 3:3,7,13 4:2
38:12 77:25
82:1,6 84:22
85:5 98:9,9,10
104:11,14,17,20
104:23 105:1,4,7
105:10,13,16
**pages** 93:18 98:1
98:4 101:11
104:9
**paid** 89:4,7,15
**pandemic** 23:16
**paper** 96:6
**parallel** 54:7
**paren** 29:17
**parkway** 1:22
2:11 5:10
**part** 8:10,19
15:6 16:15

19:23 21:9 24:4
27:6 32:11
34:15 36:12
37:10 39:8 55:1
84:1 93:20
**particular** 37:8
68:5
**particularly**
18:11 20:22
**parties** 101:14
101:16 102:13
102:15 103:13
**partners** 97:7
**party** 102:14
**passing** 66:12
**pdf** 103:6,7
**peachtree** 2:5
**people** 13:22
20:6,7,10 56:14
56:21 57:6,20
**percent** 33:18
55:15,15,16
78:16,17
**performance** 9:6
9:10,14,16,23,24
10:1,8,17,25
**performed** 68:22
69:3,14 70:1,7
71:10 88:14
94:21
**performing** 87:8
**period** 32:8
60:16
**perkin** 33:15
**permit** 45:11
62:2,7,19,23
63:6,9 65:4,11
65:18

permits 71:19
permitted 48:4
48:16 71:4
75:16 76:23
77:7
permitting 37:10
45:20
peroxides 16:21
17:22
person 85:18
personally 11:2
12:17
personnel 12:11
66:23
perspective 64:5
pesticides 16:18
petroleum 23:8
ph 42:8
phone 86:13
photocopy 4:6
physical 17:14
piece 50:2 85:2
pieces 30:11
placards 13:21
place 33:10,20
34:7 36:18
45:18 59:17
64:25 72:2
plaintiff 1:5 2:2
plaintiff's 3:7
4:2,5,6 5:1 7:7
29:8 81:24
84:14,17 87:22
87:25 90:5 91:2
99:8,12
plans 66:1
please 5:19 6:7
6:22 16:7 34:22

52:2 58:25
91:10,19 103:6
103:10,17 104:9
104:9
pleasure 13:5
27:20
point 11:25
13:22 24:23
43:10 53:9 55:8
55:10 62:5 66:9
75:21 80:20
95:7
pointed 44:24
pointers 10:19
portable 25:14
portfolio 12:23
12:24
portions 46:25
positive 64:8
possibility 61:6
61:8
possible 25:7
49:6
possibly 46:9
potential 16:4
19:20 55:21
68:11,15 72:6
pound 29:16,17
43:1 45:12
pounds 29:15,21
30:17,25 31:1,4
39:24 41:22
42:7,11 44:19
45:12,13,13,16
45:18 46:3,6,12
47:14,20 48:17
48:19,21 51:5
59:13,17 62:2,7

62:24 80:16,17
81:12 82:12,20
82:21
powered 24:15
practice 8:25
practiced 66:19
66:22
precautions
17:18 18:16
precursor 58:3,6
preparation
97:15
prepare 89:15
prepared 84:1
91:12 94:24
preparing 92:8
prescriptive
8:15 9:3,11,13
10:4
presence 37:18
67:18
present 2:22
5:15 47:19 51:6
82:24 83:15,18
presented 48:22
52:18 61:2
presenting 27:25
presents 46:23
pressure 24:19
63:21,25 64:2,7
64:8,10 66:10
pretty 58:11
prevent 46:23
prevention 97:1
previously 4:1,6
52:3 81:24
primary 11:12

print 103:8
printed 93:11
printout's 98:7
printouts 98:8
prior 46:4
privy 79:2
probability
18:20 67:7,12
68:6,9
probably 12:16
25:13,18 72:2
85:19 87:18
problem 25:21
procedural
14:18
procedurally
14:14
procedure 3:11
104:7
procedures 54:1
proceed 61:7
proceeded 86:13
proceeding 5:18
102:10
process 14:12
15:3,8 16:23
17:11 18:15
19:12,12 20:6,13
24:5,8 27:6 30:4
37:10 42:18
53:17 57:24
66:23
processed 89:9
processes 11:21
13:2,11 54:1
66:2
produced 24:6
32:25 92:10,17

99:14 102:5,9
**product** 20:8
30:6
**production**
102:5,9,10
103:18
**prohibited**
102:12
**project** 23:13,22
25:25 85:13,20
**projects** 23:5
**promulgated**
60:4
**prongs** 66:16
**properties** 8:10
30:12 56:1
60:11
**property** 56:6
72:5,15 97:1
**proposed** 14:16
**propylene** 96:14
98:9
**protect** 22:4,16
34:9 36:4
**protection** 7:17
7:19 9:16 11:1
12:20 17:12,17
23:8 26:17
32:12,22,24
35:12,15,24
36:17,22 40:5,11
46:1 94:19,21
98:6
**protections** 38:1
72:1
**protective** 59:6
59:14

**protects** 37:3
**protocol** 18:5
19:9
**provide** 11:1
35:24 40:4 85:5
87:10
**provided** 15:12
27:6 73:15
92:22 93:5,8
**provision** 39:22
40:21 41:3,19,20
41:22 43:8
46:11,15 48:3,13
48:24 62:5,23
77:5
**provisions** 9:15
21:20 22:9,15
40:3,15 41:7
42:1 51:23
52:20 58:19
59:4 61:3,4,9
71:5 73:19
76:25
**public** 15:9 22:4
22:16 37:3
105:24
**publication**
95:25
**publicly** 67:23
**publish** 15:8
**published** 42:20
96:1
**pulled** 95:13,19
**pulling** 64:3
**pulls** 64:19
**pure** 19:10
**purpose** 7:6 94:3

**purposes** 40:18
49:17 95:14
**pursuant** 3:10
7:12 104:6
**purview** 34:13
50:5
**put** 17:4 37:16
90:18,23

**q**

**quantified** 67:12
**quantities** 19:1
36:14 53:13
59:8 71:24
79:10 83:18
96:13
**quantity** 17:16
18:8 29:2 30:16
39:23 47:12,18
62:21 78:15
80:9
**question** 6:21
7:3 16:7 19:18
44:16 56:10
69:23 72:19
73:23 76:14
**questions** 72:6,7
72:14,18 76:18
76:22 87:6
91:13 94:16
99:24 100:1
101:9 102:6
**quick** 89:25
**quickly** 25:2,19

**r**

**r** 101:1
**raise** 72:6,18

**range** 55:14
**rapidly** 25:20
**rates** 26:8
**reach** 28:23
**reached** 85:19
**reaches** 66:6,13
**reaching** 40:10
**react** 55:21
**reactions** 55:20
**reactive** 29:13
58:13 62:12
**reactives** 17:23
17:23 45:4,8
62:15,16
**read** 27:5 32:21
33:12,13 36:7
65:2 70:20
74:14,19 75:8,9
76:18 103:6
104:2
**readily** 55:9
**reading** 70:24
73:14
**real** 89:24
**reason** 62:9
104:13,16,19,22
104:25 105:3,6,9
105:12,15,18
**reasons** 73:6
104:8
**received** 89:9
**receives** 102:14
**recess** 61:21
89:20
**recommendati...**
25:6 35:19,23
**recommended**
9:24 35:14

reconciled 84:6

record 5:4,17
  6:20,25 7:6
  38:11 50:14
  61:19,20,23 86:1
  89:17,19,23 99:5
  100:3

recorded 5:5

records 79:9

red 13:23

reduced 101:9

reexamined 59:5

refer 58:5

reference 66:9

referenced 33:13
  93:23 94:20

references 39:8
  50:16 98:2,10

referred 23:24

refers 50:16

refinery 86:23

reflect 40:4

regard 47:12,18

regarding 69:14
  70:1,6

regional 58:6

regular 101:15

reinvent 50:21

relate 21:10

related 9:13
  43:11 92:8
  102:10

relationship
  102:12

release 24:17
  36:6 69:9

releases 68:17

remember 17:2
  29:5 33:1 78:13
  78:16 81:22
  87:4,11 97:24

remembered
  97:23

reminding 91:7

rephrase 44:16

report 3:10 4:3
  25:23 29:11
  32:24 33:14
  34:18 35:23
  36:2 38:13 39:4
  39:21 40:20
  41:13,15 44:24
  45:4,5,8 46:19
  51:10 69:17,20
  70:15,18,22,24
  75:10,12 77:10
  77:10,13,24
  78:12 81:2,3,7
  81:14,18 82:2,3
  82:4,18 83:9
  84:1,8,11 92:3,9
  93:6,16 94:3
  97:15,18 98:5

report's 71:2

reporter 5:13
  6:7 34:22 35:1,4
  35:7 43:15,19,21
  44:2 56:15
  90:18,21,23 91:1
  91:5 99:10
  100:6 102:6,8

reports 32:14,18
  34:14,16 35:10
  35:20 78:13
  79:11 84:5

102:14

represent 101:11

represents 102:4
  102:7

request 65:4
  102:11,15

required 45:10
  45:19 62:1,19

requirement
  30:9 47:23,25
  73:9

requirements
  8:15,24 9:13
  17:19 18:3
  38:14 44:9,13
  49:13 50:4,10
  52:4,7,12 72:8
  73:5 76:19

requires 62:6,23
  67:5 83:10

researchers
  20:10

reserve 100:2

reserved 103:6

resources 28:22

respect 36:15,20
  47:3

response 92:12
  99:14

responsibilities
  11:13 12:4,10
  13:15

responsibility
  12:22

responsible 9:8
  11:19 12:15,17
  13:24 14:1

result 101:17

resume 12:1

retired 22:22
  23:17,20

retirement 85:16
  85:21

retroactive
  41:17 76:19

retroactively
  41:4,7,23 42:2
  46:13,25 48:13
  48:24 49:25
  51:24 52:5,8,13
  52:20 60:18
  61:5,10 71:5
  72:9 75:16
  76:18,24 77:7

returned 103:12
  103:14

review 30:15
  92:6 103:6

reviewed 34:16
  39:3,6 70:18
  74:11,15 75:22
  81:18 82:3,7
  97:14

reviewing 23:11

revised 14:11

revising 21:6

revision 4:4
  32:16

revisions 42:20
  48:1

richard 32:15

right 6:16 9:14
  9:18 11:6 15:24
  21:12,16 22:14
  23:16 30:17

33:8 37:11,18
38:9,16,25 39:4
39:19 40:8 41:1
41:15 42:4 46:2
49:14 50:12
59:22 61:18,22
63:2 68:2 73:1
74:10 75:13
80:10,14,22 83:7
83:11 88:7
98:19 103:6
**risk** 16:4,10,12
18:5,17,19,20
19:7,8,9,11,19
19:20 20:14
21:23 22:16
25:2 40:16
46:24 47:10,16
47:22 48:22
49:20 51:7
65:19,23 66:16
66:19,23,25 67:1
67:3,5,11,14,19
67:24 68:5,8,12
68:22 69:4,8,13
69:25 70:5 71:7
71:10,16 72:13
72:22 74:22
75:2,6,19 76:9
76:16 77:2,12,14
77:18 83:1
**risks** 22:4
**robert** 1:16 3:2
6:8 103:2
**robust** 36:23
**role** 9:1 11:13
14:6,7 86:21
87:5

**roles** 12:4,8
**room** 5:15 55:10
55:17
**rooms** 43:5
**roswell** 103:21
**rule** 3:11 40:23
41:1 42:4,9
46:13 60:18
93:6,16 104:6
**rules** 6:19 104:6
**run** 25:2
**running** 24:13
**ruptures** 24:16

**S**

**s** 1:25 2:10,18
37:16 101:20
103:1
**safe** 8:17 9:17
48:10,11
**safeguards** 38:8
**safety** 9:17,25
10:5,11 11:1
18:6 19:12
20:19,25 32:12
34:6 35:11,15,24
36:17 37:13,21
38:2 66:23 79:3
79:3 94:1 95:21
96:4
**saw** 82:17,17
**saying** 59:4
73:10
**says** 9:22 46:11
48:1 81:18 82:7
**scenario** 78:22
**schooled** 19:10

**schoy** 2:13 103:1
**scratch** 74:20
**scrubber** 64:18
**scrubbers** 64:23
64:25 65:3,6
**seal** 103:12
**seals** 97:23
**second** 6:24 67:8
81:5 88:21
89:18
**section** 40:3,20
41:2 46:20
51:13
**sections** 17:6
**see** 25:5 29:13
91:9 94:8 97:12
**seeing** 33:1
**seen** 7:10 31:21
78:9 84:18
94:23
**seg** 1:6
**selected** 85:12
**seminar** 95:6
**send** 103:13,17
**sense** 18:22
**separate** 16:18
16:19,20 17:3
19:3 32:24
44:12
**separated** 19:4
**separation** 18:13
18:14
**september** 32:17
81:5,6 82:10
**sequence** 78:10
**series** 53:11
71:18 72:10

**served** 15:19
91:23,24
**services** 88:24
102:14
**set** 51:15
**setting** 16:5
**severity** 67:9,13
**shared** 21:3
**sheet** 94:1 95:21
97:2
**shortly** 85:15
**show** 59:16
81:23
**showed** 97:19
**shows** 77:23
**sic** 75:17
**side** 18:18
**sign** 103:6
**signature** 91:25
93:19 101:20
103:2,15 105:20
**signed** 70:24
103:9,12,14
**significantly**
82:21
**silling** 2:24 5:12
**similar** 26:6 77:3
95:19,20
**simple** 55:22
**single** 44:13
**sir** 6:13,17 7:5,9
7:16 8:2 9:13
15:23 21:11
26:18,22 28:25
29:12 31:23
33:23 34:17
38:22 39:2,5,7
39:10 43:21

66:20 88:5,8,16
88:19,23 89:1,3
97:13 99:15
**sis** 95:12
**sit** 20:14,20,21
**site** 25:11
**sites** 23:9,9,21
24:1 26:18
**sits** 20:25
**sitting** 20:24
33:4,9 34:5
**situation** 25:5
26:15 38:6
46:23 47:8
48:15 74:13,17
75:23 79:24
**situations** 24:3
60:23 73:4
**small** 29:7 53:12
53:12 54:11
**smyrna** 26:21
**soliciting** 23:18
**solids** 13:13
17:22
**solutions** 102:1
**somebody** 14:15
**sorry** 19:24 30:1
30:23 34:25
35:3 43:15,17,20
44:1 56:15,16,17
56:19 69:1 86:2
90:20 95:11
99:6
**sort** 65:16 68:2
69:7
**sound** 7:4
**source** 55:19

**sources** 82:19
97:10
**speak** 7:1
**special** 43:3,3,4
**specialist** 7:20
**specific** 9:21
10:17 11:21
12:18,23 13:15
16:17,25 17:13
21:9,10,16,19,23
30:24 52:7
56:25 62:22
63:18 65:13
74:17 75:23
102:13
**specifically** 27:4
33:2 34:18
36:13 39:15
41:3,23 51:23
52:4 62:16
63:16,24 66:9
76:22 94:2
**specification**
48:9
**specified** 96:13
**specifying** 13:19
**spoke** 86:3
**spray** 13:3,4
**spread** 25:1
**spreads** 25:20
**sprinkler** 32:24
33:2,5 34:3
**square** 13:22
**ssoe** 4:4 32:15
33:14 70:15,25
78:11 81:2,3
97:17

**stadium** 27:22
**stadiums** 27:22
**staff** 8:21,25
14:5 15:19 73:9
79:20 85:18
**staffing** 12:18
**stakeholder** 73:8
**stakeholders**
8:23 14:9 20:3
**stamp** 81:17
82:7 97:21
**stamps** 81:20
**standard** 26:5
87:7
**standards** 8:24
9:8 10:15 11:20
12:17 14:18
21:10,14 22:3,6
22:8 41:16 44:5
44:8,11 54:1
72:8 73:5 76:24
87:7
**standing** 47:21
**standpoint** 30:5
58:14 59:1 72:7
**start** 8:6 30:3
66:25 88:14
**started** 11:22
12:21 38:17
**starting** 38:6
72:2 99:19
**state** 5:16,19
7:22 27:13,16,23
28:19 36:2
38:13 41:4,23
51:24 52:4,8
86:24 101:4

**stated** 101:8
**statement** 83:11
83:14 104:8
**states** 1:1 40:3
40:21 41:3
46:22 52:11
77:10,25 81:7
**stating** 39:22
77:12
**status** 97:7
**stehr** 32:15
**steps** 14:10
15:10 95:15
**sterigenic** 75:17
**sterigenics** 1:4
3:13,16 5:7,23
5:24 13:21
26:20 28:15
30:6,20 31:3,13
31:25 36:15
37:3 38:15,24
47:3 51:20 63:5
64:25 65:10,24
68:14,25 69:5,10
69:14 70:1,6
71:5 74:5 78:5,6
81:8 82:12 84:9
96:4
**sterile** 43:3
**sterilization**
36:6 38:25
39:24 40:18
41:21 42:5,9
43:2,4,4,7,11
44:17,18 46:3
49:17 55:2
61:25 62:6,23
71:23

**sterilize** 32:4
39:16
**sterilizes** 26:20
**storage** 8:7
29:15,23
**store** 30:19 42:6
42:11 44:19
62:20 79:13
**stored** 30:7
47:13 82:12,16
83:23
**stores** 78:24 81:8
**storing** 38:3
47:14,20
**straight** 58:16
**strategies** 10:12
10:20
**strategy** 18:7
**street** 2:5,19
**strict** 18:5 19:9
**studied** 33:24
34:2 66:1,4,10
**study** 32:12 96:2
**stuff** 54:23 58:9
91:14 95:13
97:10
**submitted** 14:15
63:6 75:10 88:3
88:6 102:6,8
**subpoena** 91:21
92:14 99:14
**subscribed**
105:21
**subsequent**
17:20 48:1
**substance** 104:7
**substantive**
15:13

**sugar** 86:22
**suggest** 45:16
**suggested** 59:13
59:18,24
**suite** 1:21 2:10
2:19 103:20
**sulfuric** 96:15
98:9
**summer** 69:15
70:2,8 71:12
**sun** 2:10 5:25
100:6 103:1
**supporting** 14:5
**suppressant**
25:17
**suppression** 25:7
25:17
**sure** 6:19 14:15
14:21 15:4,7
29:4 78:21 80:7
86:20 92:19
93:3,4
**surface** 24:18,24
24:24
**swear** 6:7
**sworn** 6:9
105:21
**system** 25:12
33:25 34:3
63:12,14,19,22
63:25 64:10,11
65:14 66:6,11,12
**systems** 29:16,16
33:5,19

**t**

**t** 101:1,1

**table** 20:15
28:23 29:17,20
45:7
**tables** 29:1 30:15
62:15
**take** 17:4,21
18:15 26:10
54:14 61:14
90:11
**taken** 5:6 97:4
99:16 101:8
**talk** 19:24 26:19
67:17 86:8,10
89:25
**talked** 8:22
42:16 45:15
46:19 49:24
71:21 85:24
**talking** 33:21
44:12 47:2,4
59:11 76:12,20
**talks** 41:15
**team** 11:16,19
12:14,18 87:21
94:17 95:9
**teams** 87:17
**tech** 95:12
**technical** 14:6
14:20 15:19
87:8
**telephone** 3:20
99:17
**tell** 23:22 33:4,9
56:25
**temperature**
55:10
**temporary** 25:10

**term** 71:3
**terminology**
43:6
**terms** 10:5,11
17:3,8 18:9,17
25:6 57:8 64:6
66:25 67:14
72:4,16 78:6
93:24 95:14,15
96:14
**testified** 6:9
58:17
**testimony** 66:15
72:10 90:1
104:2,7
**testing** 20:11
**text** 50:20
**thebentleyfirm...**
2:17
**thereto** 101:9
**thing** 6:24 77:24
80:6
**things** 8:2,3 13:7
14:17 17:24
18:18,20,23 19:6
20:9 23:16
24:16 26:9 32:6
50:7 52:24
54:23 55:2 64:6
67:16 79:11,22
79:25 87:3 95:3
95:5,16 96:11
97:7,9 98:16
**think** 16:18 17:1
27:12 32:16,20
32:23 33:13,13
43:2 44:12 58:1
59:8 61:13

72:14 74:2,7
79:4 80:8 81:4,5
82:18 85:1 86:9
87:19,19 91:16
92:2,7,7,15 93:1
93:7,10,11,12
97:20
**thinking** 15:9
**thomas** 2:3 5:6
5:22 6:14
**thomas.granth...**
2:7
**thought** 34:25
43:25 49:6 73:9
73:10 81:21
84:3
**three** 12:12
14:13 16:24
**threshold** 17:16
59:5,13
**threw** 81:2
**tie** 97:9
**tier** 79:11
**time** 5:19 6:18
11:14,18 12:12
16:13,15 17:12
31:12,17,22,24
44:11 54:16,22
54:25 57:2 59:3
59:9 60:16
61:14 70:23
77:18 80:10,13
87:15 95:7
96:12 102:13
103:14
**timeframe** 57:6
60:8

**timeline** 92:21
92:25
**times** 23:20
27:18,24 28:1,8
28:11 86:20
**timing** 78:10,13
81:1
**title** 11:14,16,22
12:2 13:18
69:16
**today** 6:15 7:12
26:20 33:4,9
34:5 58:5 65:21
66:16 70:10,14
90:1,4 91:12
98:14
**today's** 28:14,18
31:8,15 32:9
36:24
**total** 88:17 89:2
89:4
**toxic** 53:10
55:23 64:4
68:17
**tracing** 45:6
**trailer** 25:14
**training** 23:10
23:11,11,12
86:22
**transcript** 4:7
101:7,12 102:4,6
103:7,13,15
104:2
**transferred** 28:9
28:10
**transition** 45:6
**treading** 35:5

**trial** 89:15
**trigger** 45:25
**trouble** 14:23
25:9
**trucks** 24:10,12
**true** 46:9 52:15
101:11 102:5,7
**trumped** 73:12
**try** 10:7,12
**trying** 10:4,10
14:22 26:10
32:20 34:23
96:12
**tutorial** 95:18
**two** 3:18 12:13
18:19 28:6
40:25 66:16,20
67:5,12 79:14,14
81:4,21 82:19
98:22,23
**type** 17:13 18:15
77:5
**types** 17:23 19:1
38:1 40:16
**typewriting**
101:10
**typical** 25:12
78:22
**typically** 13:4

**u**

**u.s.** 1:4 5:7 24:2
79:3
**ultimately** 47:8
85:22
**unable** 66:2
**unacceptable**
46:24 47:9,16,22

48:22 49:7 51:6
71:6,16 72:12,21
74:21 75:2,6,18
76:8,16 77:2,11
77:14,18
**unaware** 58:18
58:21,22 62:22
**uncommon**
20:23 21:2
**undersigned**
104:2
**understand** 6:22
8:9 9:19 10:3,6
32:6 44:2 60:1
**understanding**
67:1,6 73:8
**understood** 56:8
57:9 72:16
**underwent**
42:20
**uniform** 58:7,8
58:12
**unique** 13:8
60:22 61:2
**unit** 5:5
**united** 1:1
**unknown** 80:10
**unrelated** 25:25
37:12
**unsafe** 70:11
75:23
**unstable** 17:23
29:13 45:4,8
58:13 62:12,15
62:16
**updated** 79:21
**upgrade** 63:18

**upgrades** 63:16
63:17 65:10,17
65:23 66:5
**usage** 80:20
**use** 8:8 13:11
17:12 19:20
22:8,10 25:13
29:15,16 30:6
39:12,16 40:17
45:11,20 49:20
56:8,9 60:18,21
62:2,7,19,20,24
64:7 71:3 72:3
77:23 78:6
79:13 82:25
104:9
**users** 8:23 20:4
**uses** 78:24
**usual** 100:5,6
**usually** 14:12
64:2 73:7,12

**v**

**v** 3:13,16
**vacuum** 64:3
**value** 82:17
**vapor** 30:23
**vapors** 55:9,12
**variety** 19:6
**various** 13:12
18:24 33:10
44:23 71:19
95:6
**ventilation** 64:5
64:10
**veritext** 5:13,14
102:4,7,12
103:10,18

**veritext.com**
103:17
**veritext.com.**
102:11
**version** 57:25
**versions** 60:4
81:4
**versus** 5:7 84:5
**vested** 38:24
**video** 1:15 5:5
87:17
**videographer**
2:24 5:3,13 6:6
61:20,22 89:19
89:22 100:3
**visited** 65:25
**volunteer** 14:9
**vote** 14:25
**vs** 1:6

**w**

**w** 2:4
**wake** 86:22
**walk** 90:9
**walker** 96:18
**want** 12:3 19:17
38:18 43:24
66:8 67:16
68:19 83:13,17
83:21 91:9,15
96:21
**warnick's** 97:5,5
97:19
**warrant** 53:13
**washington** 2:15
**water** 17:23
**way** 10:18,23
24:9,25 30:13

44:16 49:1
55:22 56:7
57:10 67:14
73:16
**we've** 7:6 36:16
37:12 50:15
61:12 87:12
**web** 95:13
**website** 93:7,25
95:19
**weeks** 25:12
**went** 15:7 17:1
27:20 77:1
**west** 2:5
**western** 24:2
**whichever** 86:13
**white** 13:24
**wide** 55:14
**wingler** 2:14 6:4
6:4
**witness** 3:2 6:7
21:25 34:25
35:2,6 43:13,17
43:22,24 44:3
51:12 52:6
56:13,16,18,20
61:15,17 73:3
76:5 77:22
90:20,22,25 91:4
91:6 93:3 99:11
99:25 102:8
**witness's** 3:18
**word** 49:12
50:19,19 64:23
**words** 15:1,2
**work** 8:20 9:12
23:7,10,19 27:19
27:20 32:11

34:15 51:2 65:6
70:19 74:16
88:3,13
**worked** 11:5
15:17 54:15
85:18
**workers** 36:5
**works** 65:14
**world** 27:25
**write** 54:2
**writes** 53:18,20
**written** 32:14

**y**

**yeah** 12:5,9
15:15 16:8
19:16,22 26:2
27:19 28:12
29:5 31:5,5 35:4
42:9 43:18
47:18 56:17,19
70:21 85:12
90:7,12,12,12,25
91:5,10,18 92:1
92:2,13,15 94:11
96:23,24 97:3,12
99:2,3
**year** 28:7 81:3
99:23
**years** 11:6 14:13
17:1 27:21 28:2
60:5 85:19
**yellow** 3:18
13:23
**yep** 61:17 75:14
83:8 90:16
92:15 94:13

| z |
|---|
| **zero** 45:9 62:17 |
| **zoning** 27:9 |
| **zoom** 87:17 |

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER: THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019. PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the
foregoing transcript is a true, correct and complete
transcript of the colloquies, questions and answers
as submitted by the court reporter. Veritext Legal
Solutions further represents that the attached
exhibits, if any, are true, correct and complete
documents as submitted by the court reporter and/or
attorneys in relation to this deposition and that
the documents were processed in accordance with
our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining
the confidentiality of client and witness information,
in accordance with the regulations promulgated under
the Health Insurance Portability and Accountability
Act (HIPAA), as amended with respect to protected
health information and the Gramm-Leach-Bliley Act, as
amended, with respect to Personally Identifiable
Information (PII). Physical transcripts and exhibits
are managed under strict facility and personnel access
controls. Electronic files of documents are stored
in encrypted form and are transmitted in an encrypted
fashion to authenticated parties who are permitted to
access the material. Our data is hosted in a Tier 4
SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and
State regulations with respect to the provision of
court reporting services, and maintains its neutrality
and independence regardless of relationship or the
financial outcome of any litigation. Veritext requires
adherence to the foregoing professional and ethical
standards from all of its subcontractors in their
independent contractor agreements.

Inquiries about Veritext Legal Solutions'
confidentiality and security policies and practices
should be directed to Veritext's Client Services
Associates indicated on the cover of this document or
at www.veritext.com.