UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

STERIGENICS U.S., LLC,

        Plaintiff,

    v.

COBB COUNTY, GEORGIA;
NICHOLAS DAWE, Fire Marshal of
Cobb County, Georgia, in his
individual capacity; and KEVIN
GOBBLE, Development and
Inspections Division Manager and
Chief Building Official of Cobb
County, Georgia, in his individual
capacity,

        Defendants.

CIVIL ACTION NO.

1:20-CV-1382-SEG

# O R D E R

This case is before the Court on the parties' cross-motions for summary

judgment (Docs. 141, 143). On December 7, 2022, the Court heard oral

argument on these motions. For the reasons that follow, the Court **GRANTS**

**IN PART AND DENIES IN PART** both motions. In brief, the Court decides

that Plaintiff is entitled to summary judgment on Count III of its Complaint[1]

---

[1] The operative pleading is Plaintiff's Second Amended Complaint (Doc. 91),
although this document incorporates by reference the original complaint (Doc.
1) and a prior amendment (Doc. 36). The Court cites to these documents where
necessary, with the understanding that they are relevant insofar as they have
been incorporated into the operative pleading.

(Doc. 91), and that in light of the Court's ruling on Count III, the Court has no occasion to reach Counts IV and V, which are due be dismissed. It then considers Counts I and II, which it determines are unripe for adjudication.

The Court begins by underscoring, as it has throughout this case, that the issues before it are narrow ones. This is not a toxic tort case. Questions about emissions of ethylene oxide from Sterigenics' Cobb County facility, although they contextualize the case in certain ways, are not before the court. Instead, this suit has to do with the Defendants' effort, under state law and the County's fire code, to require Sterigenics to obtain a new certificate of occupancy for its facilities in the fall and winter of 2019-2020.[2]

## I.   Background

This case concerns a discrete, roughly six-month dispute between two parties that otherwise had an uneventful, decades-long relationship.[3] Plaintiff Sterigenics is a medical products sterilization company, and Defendants Dawe

---

[2] This case was reassigned to the undersigned on April 18, 2022.

[3] The Court offers an account of the facts of most immediate relevance to the grounds of its decision on the cross-motions for summary judgment. Unless otherwise noted, the Court considers the propositions of fact set forth in this section to be matters of undisputed fact. If there are arguments to the contrary about a particular fact in the parties' respective Statements of Undisputed Fact (Docs. 142-1, 143-2), the Court has determined that they do not amount to genuine disputes under Fed. R. Civ. P. 56, or that the facts have not been properly disputed pursuant to LR 56.1(B), NDGa.

and Gobble are officials of Defendant Cobb County, Georgia.  Sterigenics operates a sterilization facility in Cobb County.  The basics of the dispute can be briefly summarized.   In 2019 Defendants Dawe and Gobble were, respectively, the Fire Marshal and the Chief Building Official of Cobb County. Over the summer—one of local controversy over the Sterigenics plant—Dawe and Gobble had noticed a discrepancy in a building permit submitted by Sterigenics, and they requested additional documentation.   In October, unsatisfied by what they had received from Sterigenics, they informed the company that it must temporarily halt its sterilization operations because it lacked a valid certificate of occupancy ("CO") for its facilities.  Defendants contended that Sterigenics needed to apply for a new CO, and further that this CO should reflect a "high-hazard" occupancy classification, given Sterigenics' storage of large quantities of ethylene oxide ("EO") at the facility.  (Doc. 143-13 at 141-44.)  Efforts at cooperation between the parties over subsequent months did not lead Defendants to grant or deny a CO, and thus Sterigenics remained unable to resume operations.  In late March 2020, with the onset of the COVID-19 pandemic lending added urgency to the situation, Sterigenics filed this suit seeking declaratory relief on issues of state and constitutional

law.[4]  In particular, Sterigenics seeks a declaration that it cannot be required to obtain a new CO under Georgia's vested rights (Count I) and estoppel (Count II) doctrines; that Defendants Dawe and Gobble lack the authority to require a new CO under Section 54-51(c) of the Cobb County Code (Count III); that Section 54-51(c) runs afoul of the Fifth and Fourteenth Amendments because it is unconstitutionally vague as well as arbitrary and capricious (Count IV); and that Sections 54-51(c) and 54-51(i) are ineffective because they were not promulgated according to certain procedures set forth under Georgia law (Count V).  (Docs. 1, 36, 91.)

That is the short version.  But details and context are important to understanding the parties' positions.  Sterigenics has been operating its facility in Cobb County since the early 1970s, and its basic use of the facility—ethylene oxide sterilization—has not changed over that period.  (Doc. 143-2 ¶ 80.)  Cobb County officials were aware that Sterigenics used EO at the facility at least since 1992, when the County approved the construction of a new sterilization unit.  (Doc. 143-40, ¶ 16.)  The record contains a half-century's worth of business licenses, permit applications, plan reviews, approvals, fire safety compliance records, certificates of occupancy, and various other documentation

---

[4] Sterigenics also sought preliminary injunctive relief pending the issuance of a declaratory judgment, which this Court granted on April 8, 2020.  (Doc. 16.)

of interactions between Cobb County and Sterigenics or its predecessors in interest. (*See generally* Doc. 1-1.) These documents accumulated as Sterigenics developed and expanded its facility over the decades. Some of them reflect inspections for portions of the facility where the sterilization operations take place and/or where EO is stored, while others pertain to warehouse or office space. (*Compare, e.g.*, Doc. 1-1 at 23, 26, 27, 34, *with id.* at 47, 94, 102.) The occupancy classification listed on the past certificates of occupancy varies across these records, generally depending on the portion of Sterigenics' facility to which it applies. Some are for "storage" (*e.g., id.* at 92, 102), some for "office" (*e.g., id.* at 47), some for "factory-industrial" (*e.g., id.* at 27), and some for "lite industrial" (*e.g., id.* at 29). It is clear, in any event, that Cobb County has known for quite some time what Sterigenics' business is and that its facility uses ethylene oxide.

But more recent history witnessed an increase in attention on EO sterilization operations generally, and, in turn, on Sterigenics' Cobb County facility specifically. The attention has come from many quarters: federal, state, and local officials, as well as activist groups and litigators. So far as the Court can tell from the record, the spur was a 2016 determination by the U.S. Environmental Protection Agency ("EPA") that EO is carcinogenic, followed by the release in 2018 of the EPA's "2014 National Air Toxics Assessment," which,

according to a consent order entered into by Sterigenics, "identified some census tracts in Georgia . . . with potentially elevated cancer risks due to ethylene oxide omissions," two of which were located near Sterigenics' Cobb County facility.  (Doc. 143-3 at 14.)  The Georgia Department of Natural Resources Environmental Protection Division ("EPD") took notice.  It conducted a study that indicated that the "risk from ethylene oxide concentrations in residential areas near the Facility does not exceed 100-in-1 million (1 in 10,000)," but it nevertheless "requested additional reductions in ethylene oxide emissions at the Facility to occur as expeditiously as possible." (*Id.*)

On August 7, 2019, the EPD and Sterigenics thus entered into a consent order, under which Sterigenics agreed to "to take further voluntary measures at the Facility" to reduce its EO emissions.  (*Id.*; *see generally* Doc. 143-3 at 13-20.)  In practice this meant making certain renovations to the facility designed to enhance its emissions control system, primarily (if not exclusively) involving the installation of what the parties call a "negative pressure system."  (*See* Doc. 143-3 at 15; Doc. 143-2 ¶ 27; Doc. 159 at 23.)  The implementation of this system required the addition of "mechanical equipment and ductwork inside and on the roof of the building," the installation of "a wall and rollup door,"

performing an "infill of an existing opening in an interior wall," and installing "additional dry bed equipment."  (Doc. 143-2 ¶ 29.)

These renovations, although initiated at the state rather than the local level, are the starting point of this dispute.  For, to add this negative pressure system, Sterigenics required a building permit from Cobb County.  The County issued one on August 15, 2019.  (Doc. 143-2 ¶ 30; Doc. 143-12 at 114-15.) Sterigenics' permit application, and the permit subsequently issued by the County, listed the facility's "Occupancy Type" as "Industrial-High Hazard"— an occupancy classification out of step with (and stricter than) those classifications previously assigned to the facility.[5]  (Doc. 1-1 at 220-21; Doc. 149 ¶¶ 3-4.)  Sterigenics and its engineering firm subsequently stated that they made a mistake in classifying their occupancy in this way.  (Doc. 143-12 at 114-15; Doc. 149 ¶ 5.)  But in any event, Sterigenics then began work on its modifications, building permit in hand.  Sterigenics shut down its sterilization operations while the work was taking place.  (Doc. 1 ¶ 71.)

---

[5] Here it is important to observe that when the Court and the parties talk about "high-hazard" classifications, the hazards in question do not necessarily relate to air quality issues.  The International Building Code's ("IBC") hazard classifications are concerned with, *inter alia*, things like combustibility, flammability, and "health hazards."  *See* I.C.C. Int'l Building Code § 307 (2018); *see also* O.C.G.A. §§ 8-2-20(9)(B)(i)(I); 8-2-25 (adopting the International Building Code as a statewide minimum standard).

In September 2019, Defendants Dawe and Gobble began to impose additional scrutiny on Sterigenics' facility.  On September 3, Defendants Dawe and Gobble met with representatives of Sterigenics and a representative of the contractor who was performing the facility modifications for Sterigenics.  (*See* Doc. 1 ¶ 72; Doc. 136-1 at 70:6-70:25.)  Dawe deposed that this meeting was primarily intended to inform himself and Gobble about the nature of the modifications being made at the facility, but that what he heard led him to believe that revised plan submissions would be needed for the project.  (*Id.* at 73:5-73:24.)  In the subsequent weeks, Sterigenics' contractor submitted more documents at Defendants' request.  According to Defendants, they then became concerned about the discrepancy between the "high-hazard" occupancy designation on the building permit and Sterigenics' subsequent submissions and the existing permits and COs on file with the county.  (*See, e.g.*, Doc. 135-1 at 88:14-89:17.)

Sterigenics' view is that Defendants were driven—during this period and hereafter—not by any interest in enforcing compliance with the applicable codes, but by mounting political pressure following news stories linking Sterigenics' plant to increased cancer risks in the area.  (*See, e.g.*, Doc. 159 at 27:16-31:16; Doc. 1 ¶ 84.)  There is no doubt at all that Sterigenics' operations were an issue of widespread local concern at this time, and that Dawe, Gobble,

and other County officials were aware of this.  (*See, e.g.*, Doc. 143-14; Doc. 135-1 at 83:15-85:16.)  To what extent this shaped the parties' decision-making is a matter of dispute, but it is at any rate not a material one.[6]

On September 23, 2019, Defendant Gobble informed Sterigenics that its building permit was "locked," and that work on the modifications should cease. (Doc. 1 ¶ 80.)  Then, on October 1, 2019, in a meeting between representatives of Sterigenics and Cobb County where the permitting issues were to be discussed, the County delivered a letter to Sterigenics' counsel.  (Doc. 143-13 at 140.)  The letter informed Sterigenics that its permit to perform the Consent Order modifications "remains on hold," for certain submissions and revisions to the construction plan had "not yet been approved."  (*Id.*)  It further stated that:

> In the interim, the County Fire Marshal and the Chief Building Official have determined that, based upon the sterilization operations occurring on site, Sterigenics' Cobb County facility falls within a "High Hazard" occupancy classification; yet, Sterigenics currently maintains a Certificate of Occupancy for only "Storage." For this reason, and because of the substantial renovations

---

[6] While this case involves a dispute over the legal authority of county officials in certain areas, the Court finds no indication in the record that Defendants Dawe or Gobble acted other than in good faith and in keeping with their professional responsibilities.

occurring on the premises, Sterigenics must acquire a new Certificate of Occupancy to operate.[7]

(*Id.*)  The letter went on to state that the County would "secure review by a third-party technical expert," and that "[u]ntil review by the selected technical expert and County officials is complete, Sterigenics is <u>not</u> permitted to engage in construction or sterilization operations at its Cobb County facility."  (*Id.* at 141) (emphasis in original).

A subsequent letter, sent on October 11 to Sterigenics' counsel by Defendants Dawe and Gobble, stated that Sterigenics' building permit was revoked and that "any related submittals" had been "fail[ed]."  (Doc. 143-13 at 143.)  The letter further stated that "Sterigenics <u>must</u> obtain a new accurate Certificate of Occupancy," and it provided a list of materials that Sterigenics was required to produce "[f]or the County to begin processing a new C.O."  (*Id.*) (emphasis in original).  What was needed, according to Dawe and Gobble, was a new "holistic C.O. for this consolidated tenant space."  (*Id.* at n.1)  (As noted, past COs had been issued piecemeal for different parts of the facility as it was developed over the preceding decades.)  (*See* Doc. 1-1 at 18, 21, 27, 29, 31, 47,

---

[7] It was incorrect that Sterigenics possessed only a CO bearing a "storage" occupancy classification, as Defendants have since admitted.  (Doc. 136-1 at 162:1-19; Doc. 135-1 at 100:20-25.)  Various COs for different parts of the facility bore different occupancy classifications, as noted above and below.

92, 102.)  The letter reiterated that the County would submit the requested information to a third-party technical expert, and it concluded that once an updated CO was secured, "Sterigenics and Cobb County will be able to move forward cooperatively knowing that all currently-adopted safety standards (enforced at the local level) have been satisfied."  (Doc. 143-13 at 144.)  On the same day, a letter was sent to non-party Pond Constructors Inc., Sterigenics' contractor for the modification work, informing it that the building permit had been revoked, in part because a "current, accurate, cumulative Certificate of Occupancy" was lacking.[8]  (*Id.* at 145.)

The details about the subsequent process involving the review of the facility by a "third-party technical expert" are subject some dispute.  A firm called Q-Dot Engineering ("Q-Dot") was selected to conduct the review.  (Doc. 143-2 at 57.)  Two different Q-Dot experts, Dr. James Munger and Patsy Warnick, worked on the review.  In mid-December, Munger circulated a draft report that listed himself and Warnick as authors.  (Doc. 143-2 ¶ 66; Doc. 131-2 at 154-89.)  A revised report was issued on December 23, 2019.  (Doc. 143-2

---

[8] The revocation of the building permit is, at least at this point, not material to any of Plaintiff's claims.  The modifications required by the EPD consent order were completed before the lawsuit was filed, and Sterigenics has "disclaimed any reliance on [the revocation of the building permit] as a basis for any of its claims."  (Doc. 150 at 4; Doc. 149 ¶ 7.)

¶ 71.)  In between the issuance of the draft report and the revised report, Munger had "walked away" from the project, evidently as a result of disagreements with Warnick over the way the project was being handled between the two of them.[9]  (Doc. 131-1 at 123:12-15, 162:10-163:2; Doc. 129-1 at 176:12-177:14.)  Both the December 12 draft report and the December 23 revised report provide a list of recommendations for upgrades to Sterigenics' facilities to comply with relevant code provisions.  (Doc. 131-2 at 180-84; Doc. 129-2 at 176-79.)  The draft report provides that, following the implementation of their recommendations, the County "may issue the facility a new full Certificate of Occupancy for the entire space of Sterigenics' facility, identifying the occupancy classifications for each area of the facility under the 2012 IBC," while the revised report provides that, following the implementation of the recommendations, "the County should issue the facility a new Certificate of Occupancy for the entire space of Sterigenics' facility, identifying the

---

[9] Sterigenics insinuates that Munger's departure was the result of his dissatisfaction with alleged County meddling in the review process, but the evidence it points to cannot support this version of events, at least as a spur to Munger's departure.  (Doc. 143-2 ¶¶ 67, 70).  Asked if "the rug had been pulled out from under [him] on this project," Munger deposed: "Not by the County or Sterigenics, but by Ms. Warnick, yes."  (Doc. 131-1 at 131:4-8.)  In any event, the cause of Munger's departure is not material to the Court's decision.

occupancy as separated mixed use, S-1/H-1 in accordance with the 2012 IBC." (Doc. 131-2 at 184; Doc 129-2 at 178.)

On March 23, 2020, Warnick issued a supplemental report. (Doc. 143-2 ¶ 73; Doc. 129-2 at 21.) That report observed, among other things, that "a unified Certificate of Occupancy for the facility is appropriate. The certificate should reflect the chamber room area as H-1 and the remainder of the facility as S-2 in accordance with the 2018 International Building Code use and occupancy classifications." (Doc. 129-2 at 31.) It also observed that, "[s]ince the facility has taken adequate measures to mitigate the risks presented by storing and handling EO, issuing the new certificate of occupancy to reflect the existing facility's operations should be an administrative matter." (*Id.*)

In internal emails, County officials expressed a dim view of this supplemental report, which Defendant Gobble said was missing certain items the County believed should have been included. (Doc. 143-34 at 2.) The County had, in the meantime, retained a new third-party engineering firm on March 20, 2020, and it seems to have sought to move forward with this firm in place of Q-Dot. (Doc. 9-4 ¶ 11.) An affidavit from an expert with this firm, Daniel Arnold, states that he began working with County staff in late March "to develop a strategy under which Sterigenics could address" his firm's "concerns"

13

with the reports generated by Q-Dot. (*Id.* ¶ 15.)  On March 30, Sterigenics filed suit. (Doc. 1.)

A final bit of context is needed.  As these dates suggest, the early stages of the litigation unfolded against the onset of the COVID-19 pandemic. Because Sterigenics' business is the sterilization of medical devices, including personal protective equipment and ventilator components, the pandemic rightly colored the parties' arguments over, and the Court's consideration of the public interest implications of, the temporary restraining order ("TRO") granted against Defendants Dawe and Gobble on April 1, 2020.  (*See* Docs. 4, 9, 12, 13.)  That TRO enjoined Dawe and Gobble from "precluding Sterigenics' operations at its facility in Cobb County, Georgia" and provided that "Sterigenics shall be free to conduct its normal operations at the facility[.]" (Doc. 13 at 1.)  The parties then stipulated to a preliminary injunction that would extend the TRO's terms to the time that the Court rendered final judgment in the case, and the Court granted the preliminary injunction, which remains in place.  (Doc. 16.)  The recourse to federal court and the granting of the TRO, all taken in the uncertain early days of the pandemic, halted the parties' negotiations and calcified the suit's factual background.  Nearly three years have now passed since the end of the pre-litigation development of the parties' original dispute.

## II.   Legal Standard

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  "[T]he Court must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  "An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).  A factual dispute "is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.*

The moving party has the burden of showing the absence of a genuine issue as to any material fact under Rule 56(c).  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).  If the movant satisfies that initial burden, it then falls to the nonmovant to "come forward with specific facts showing that there is a genuine issue for trial," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)), or in other words to "demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Allen*, 121 F.3d at 646. "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Miranda v. B & B Cash Grocery Store, Inc.*, 975 F.2d 1518, 1534 (11th Cir. 1992). If, however, "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587.

## III.   Discussion

### A. Ripeness Standard

Defendants argue, first, that Sterigenics' claims are not ripe for our review.[10] "Both standing and ripeness originate from the Constitution's Article III requirement that the jurisdiction of the federal courts be limited to actual

---

[10] A footnote in Defendants' Motion for Summary Judgment states that "Defendants continue to believe that Sterigenics lacks standing for all the reasons asserted in their motion to dismiss," and that therefore "the Court should reconsider its February 25, 2021 order denying defendants' motion to dismiss on this basis[.]" (Doc. 141-1 at 14 n.3.) Generally speaking, the Court has been shown no law or facts that would lead it to depart from its earlier rulings on the standing arguments raised in Defendants' motion to dismiss. (*See* Doc. 65 at 21-24.) To the extent that Defendants' arguments addressed the Plaintiff's suit of Defendants Dawe and Gobble in their individual capacities, the Court addresses those arguments in more detail below. *See* Part III(B)(2) below.

cases and controversies." *Elend v. Basham*, 471 F.3d 1199, 1204-05 (11th Cir. 2006) (citing *Flast v. Cohen*, 392 U.S. 83, 94-101 (1968); *Abbott Labs. v. Gardner*, 387 U.S. 136, 148-49 (1967)).   Because ripeness, like standing, implicates this Court's jurisdiction, we must consider it as a threshold question.   *See id.* at 1204.   Because "decisions on ripeness issues are fact-sensitive," *Eide v. Sarasota County*, 908 F.2d 716, 727 (11th Cir. 1990), and ripeness is assessed on a claim-by-claim basis, *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1380 (11th Cir. 2019), the Court evaluates the ripeness of each claim in turn.   Here the Court provides the general standard.

Under Article III, the power of the federal courts is limited to "cases" and "controversies."   U.S. Const. art III, § 2; *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 559-60 (1992).   "This jurisdictional limitation "defines with respect to the Judicial Branch the idea of separation of powers on which the Federal Government is founded."   *Elend*, 471 F.3d at 1205.   Standing, for its part, requires a party to show that it has suffered an "'injury in fact,' that the party's injury is fairly traceable to the challenged action of the defendant, and that the injury would 'likely' be 'redressed by a favorable decision.'"   *Club Madonna*, 924 F.3d at 1379.   Ripeness, by contrast, "relates to the timing of the suit."   *Elend*, 471 F.3d at 1205.   The ripeness inquiry therefore asks "whether it is appropriate for this case to be litigated in a federal court by these parties at

this time." *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1339 (11th Cir. 2005).  That inquiry is motivated by "prudential limitations on the kinds of cases that a court has power to decide," limitations that "counsel judicial restraint" and "prevent courts from rendering impermissible advisory opinions and wasting resources through review of potential or abstract disputes." *Club Madonna*, 924 F.3d at 1379-80 (internal quotations omitted).

Ripeness is determined "by evaluating (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration." *Id.* at 1380 (internal quotation marks omitted).

> Concerning fitness for judicial decision, we ask whether the parties raise an issue that we can decide without further factual development and whether the institutional interests of the court and agency favor immediate review.  As for "hardship," litigants must show that they are forced to choose between foregoing lawful activity and risking substantial legal sanctions.  If a claim is fit for judicial decision, that is end of the inquiry, and the matter is ripe, given that the absence of a "hardship" cannot tip the balance against judicial review under those circumstances.

*Id.* (citations and internal quotation marks omitted).

Defendants argue that, "to the extent that Sterigenics' claims are based on the requirement" that it obtain a new CO, its claims are unripe because the record shows that Defendants have made no decision about whether a new CO should be issued to Sterigenics or what the occupancy classification of that CO should be.  (Doc. 141-1 at 17-18.)  Plaintiff responds that this argument is a

"red herring," for it does not seek review of the denial of any specific permit or certificate of occupancy, but rather a declaration that Defendants Dawe and Gobble have no authority to preclude its operations on the grounds that it must first obtain a new Certificate of Occupancy.

Ultimately, the Court concludes that Counts III, IV, and V are ripe for judicial decision, while the vested rights and estoppel claims are unripe.  It discusses the claims in this order, addressing Counts III to V—all of which are directed at Section 54-51 of the Cobb County Code—before it proceeds to Counts I and II, the vested rights and estoppel claims, which seek significantly broader declaratory relief.  The reasons for this ordering, which relate to the different conclusions on the ripeness question, bear brief preliminary explanation.  Consider Plaintiff's own description of the "subject of [its] claims" as "Defendants' unlawful preclusion of Sterigenics' longstanding operations at the Facility on the false ground that Sterigenics had to obtain a new certificate of occupancy from them to operate."  (Doc. 148 at 3.)  Really, two distinct legal questions are presented here.  The first is whether Defendants attempted to preclude Sterigenics' operations on a "false ground": whether the legal authorities actually relied on by the Defendants authorized them to require Sterigenics to acquire a new CO under the circumstances out of which the dispute arose.  These are questions about the applicability and validity of

Section 54-51 of the Cobb County Code.  The second question, the one raised by the vested rights and estoppel claims, asks whether Sterigenics has a right to continue its "longstanding operations at the Facility" because of prior permits and approvals.  Counts I and II, in other words, ask the Court to declare not just that Defendants had no right to preclude Sterigenics' operations for the reasons, and in the circumstances, in which they actually did do so.  Instead, they ask the Court to declare that "Sterigenics has a vested right to continue its longstanding EO sterilization operations at the Facility" without a new CO—a declaration that would reach far beyond the factual development of the parties' dispute.  (Doc. 1 ¶ 142.)

## B. Claims Pertaining to Section 54-51 of the Cobb County Code

### 1. Ripeness

Counts III, IV, and V of Plaintiff's complaint concern whether Section 54-51(c) of the Cobb County Code could have authorized Defendants to require Sterigenics' to obtain a new CO to continue its operations.  Count III asks the Court to declare that Defendants Dawe and Gobble lack the authority under Section 54-51(c) to require a new CO under the circumstances of the case.  (Doc. 1 at 42.)   Count IV asks the Court to declare that Section 54-51(c) is unconstitutionally vague and arbitrary and capricious.  (Doc. 91 at 8.)  Count V asks the Court to declare that Section 54-51(c) and 54-51(i) are ineffective

because they were not promulgated in accordance with procedures set forth under Georgia law.  (Doc. 91 at 10.)

These issues are ripe for adjudication.  They are "fit" for decision because no "further factual development" is required to make the "issues sufficiently defined and concrete."  *Digital Properties*, 121 F.3d at 589.   Defendants' October 1 letter to Plaintiff informed it that its building permit was revoked and that, given the "substantial renovations" (Doc. 141-3 at 141) occurring at the facility, Sterigenics was required to cease sterilization operations until it acquired a new certificate of occupancy.   Through most of this litigation, Defendants have expressly relied on Section 54-51(c) as the basis of their claim that a new CO could be required of Sterigenics and that Sterigenics' operations could not continue until the Defendants granted them one.[11]  Defendants argue

---

[11] It is notable that the Defendants have essentially abandoned any reliance on these provisions in their summary judgment briefing, but it does not change the ripeness analysis.   Defendants' opposition to Sterigenics' motion for summary judgment contains an extensive discussion of various provisions of the International Building Code as adopted by Cobb County, which they claim furnish alternative grounds for Defendants to require Sterigenics to produce a new CO.  (*See* Doc. 146 at 16-19.)   But Defendants had previously identified Sections 54-51(c) and 54-51(i) as the only legal authorities it relied on in claiming that Sterigenics required a new CO to operate.  (Docs. 143-36 ¶ 9, 143-43 ¶ 9; *see also* Doc. 143-13 at 141 (October 1 letter citing "substantial renovation" as reason new CO was required)).   Defendants even write in their own motion for summary judgment that "Dawe based his decision to require a new CO on the cost of renovations in relation to the buildings tax-assessed value"—a reference to Section 54-51(i).  (Doc. 141-1 at 31.)  To the extent that

that no final decision has yet been made because the County has not yet made a "final determination on the appropriate certificate of occupancy for the facility." (Doc. 141-1 at 3.)  But that only begs the question of whether the County was standing on valid authority when it used Section 54-51 to require Sterigenics to acquire a new CO.  On that question, it is not clear what further factual development is possible.  These claims are fit for judicial decision.

The hardship element of the ripeness analysis need not be discussed here because, if claims are fit for decision, "the absence of a hardship cannot tip the balance against judicial review."  *Club Madonna*, 924 F.3d at 1380 (internal quotation marks omitted).  The Court therefore turns to the merits of these claims.

### 2.  Count III

In Count III, Sterigenics asks the Court to construe certain provisions of the Cobb County Ordinance—those on which Defendants relied in requiring it

---

Defendants urged the Court to consider other possible grounds of County authority, the Court would be faced with justiciability problems, since these issues were not raised at the time of the original dispute, and thus present an essentially "abstract dispute," one potentially raising technical issues of code compliance for which much more factual development would (at the very least) be required.  *See Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 589 (11th Cir. 1997).

to obtain a new CO—as inapplicable to its situation.  The relevant provisions

are as follows:

> Sec. 54-51. - Life safety certificate of occupancy requirement.
> . . .
> (b) Every building, structure, or tenant space shall have a certificate of occupancy issued by the Cobb County Fire Marshal's Office before such building, structure, or tenant space may be occupied. . . .
> (c) Such certificates of occupancy shall run for the life of the building, structure or tenant space, except where there is a change in the classification of occupancy, substantial renovation, reconstruction due to fire or other hazard of serious consequence, renovation or addition.
> . . .
> (i) For the purposes of this Code section, substantial renovation means any construction project involving exits or internal features of such building, or any structure costing more than the building's or structure's assessed value according to county tax records at the time of such renovation.

Off. Code Cobb Cty. § 54-51.

"In construing a statute, we must afford the statutory text its plain and

ordinary meaning, we must view the statutory text in the context in which it

appears, and we must read the statutory text in its most natural and

reasonable way, as an ordinary speaker of the English language would." *Smith*

*v. Northside Hosp., Inc.*, 807 S.E.2d 909, 914 (Ga. 2017).  If the ordinance is

ambiguous, Georgia law requires that "any ambiguity or uncertainty in a land

regulation ordinance must be construed in favor of the free use of the land."

*DeKalb County v. Post Apt. Homes, L.P.*, 506 S.E.2d 899, 901 (Ga. Ct. App.

1998) (citing *Bd. of Com'rs of Henry County v. Welch*, 324 S.E.2d 178, 179-80 (Ga. 1985)).   Finally, because   Plaintiff also raises a facial constitutional challenge to the ordinance, the Court notes the "settled policy" of federal courts "to avoid an interpretation of a federal statute that engenders constitutional issues if a reasonable alternative interpretation poses no constitutional question." *Gomez v. United States*, 490 U.S. 858, 864 (1989).   The same principle applies to state laws that have not been construed by state courts. *See S. Utah Mines & Smelters v. Beaver Cty.*, 262 U.S. 325, 331 (1923).

Applying these principles, the Court agrees with Sterigenics that, on the undisputed facts of this case, these provisions of the Cobb County Code did not provide Defendants with authority to require Sterigenics to acquire a new CO in October 2019.  It is the "substantial renovation" provision of Section 54-51(c) on which Defendants have relied.  (*See* Doc. 143-36 ¶ 9; Doc. 143-43 ¶ 9; Doc. 141-1 at 31.)   The question is therefore whether the work performed by Sterigenics pursuant to its Consent Order was a "structure costing more than the building's or structure's assessed value according to county tax records at the time of such renovation."  Off. Code Cobb Cty. § 54-51(i).[12]  The undisputed

_____

[12] At the motion to dismiss stage, Defendants argued that the construction in question was also a "substantial renovation" because it "involv[ed] exits or internal features of such building," but they seem to have abandoned that position at this stage.

facts are that the work Sterigenics performed in the summer and fall of 2019 involved: "mechanical equipment and ductwork inside and on the roof of the building," "installation of a wall and rollup door in the facility," "infill of an existing opening in an interior wall," and "installation of additional dry bed equipment." (Doc. 143-2 ¶ 29.)

The provisions in question are not the model of clarity, but they are easily applied to these facts using ordinary techniques of statutory interpretation, especially when read in the context of Section 54-51 as a whole. The place to begin is with the observation that, regardless of the cost of any construction work, for such work to amount to a "substantial renovation," it must amount to a "structure."[13]  Regardless of the cost of the modifications described above, they do not amount to a "structure" in themselves.  It would substantially stretch that word beyond its ordinary meaning to include "ductwork," doors, and a new wall inside an existing facility as a "structure." It would also be inconsistent with the use of the word in the rest of Section 54-51. Section 54-51(b), for example, places "structures" alongside "buildings" and "tenant spaces" as things that can be "occupied"—something not very true of

---

[13] This would be so regardless of whether the Court adopted Defendants' reading of the ordinance as applying to "any construction project involving . . . any structure costing more than the building's or structure's assessed value according to county tax records at the time of such renovation."

ductwork.  *See* Off. Code Cobb Cty. § 54-51(b).  In addition, Section 54-51(j) defines "renovation"—in contrast with "substantial renovation"—as "any construction project that involves removing and/or adding walls/doors/windows, any electrical or plumbing work requiring a permit or work involving structural components."  Off. Code Cobb Cty. § 54-51(j).  If Sterigenics' facility modifications fell into the "substantial renovation" category, this provision would largely swallow the "renovation" category.  That counsels against reading "structure" so broadly.  *See Couch v. Red Roof Inns, Inc.*, 729 S.E.2d 378, 381 (Ga. 2012) (stating that the "fundamental rules of statutory construction" "require us to . . . avoid a construction that makes some language mere surplusage").

Defendants advance several arguments that they are entitled to summary judgment on Count III which do not go to its merits.  They argue, first, that the Court lacks subject matter jurisdiction over the claim because Sterigenics sued Dawe and Gobble for declaratory relief in their individual rather than official capacities.  The Court had already rejected this argument in its order on the motion to dismiss (Doc. 65 at 20), and it does so again now.  *See Lathrop v. Deal*, 801 S.E.2d 867, 886 (Ga. 2017) (holding that official immunity is no bar to claims against state officers in their individual capacities

for injunctive and declaratory relief that is prospective in nature).[14]
Defendants also argue that this claim is moot. Their contention is that because
the construction work that was the subject of the revoked building permit has
been completed, a declaratory judgment on this ordinance "would be pointless."
(Doc. 141-1 at 29.) This would be true if Sterigenics' claims were about the
building permit, but they are not. The question here is about the closure of
Sterigenics pending its acquisition of a new CO, pursuant to Section 54-51.
This question is not moot, for Sterigenics still has not acquired a new CO, and
thus, under the positions taken by Defendants, it remains prohibited from
operating. Sterigenics is entitled to summary judgment on Count III, as
described above.

### 3. Count IV

In Count IV, Sterigenics seeks a declaration that Section 54-51's
"substantial renovation" provision violates the Fourteenth Amendment on its
face, both because it is unconstitutionally vague and because it does not

---

[14] A 2020 amendment to the Georgia Constitution waiving sovereign immunity
for certain actions does not affect this analysis. *See* Ga. Const. Art. I § II, ¶
V(b)(1). For, as the Eleventh Circuit has observed, that amendment is limited
to "actions in the superior court," as well as to suits concerning acts that "occur
on or after January 1, 2021." *Id.*; *Crisp v. Georgia*, No. 21-14190, 2022 WL
3589673, at *3 (11th Cir. Aug. 23, 2022). Neither of those conditions applies
here.

"rationally relate to a legitimate public purpose." (Doc. 143-1 at 37.) The Court has, in other words, been asked both to determine that the ordinance does not apply to Sterigenics by its terms, and also that the ordinance is facially unconstitutional. Having found for Sterigenics on the former question, the Court has no occasion to reach the latter.

In cases involving both as-applied and facial challenges to a statute, the Supreme Court has "strong[ly] admon[ished] that a court should adjudicate the merits of an as-applied challenge before reaching a facial challenge to the same statute." *Commodity Trend Serv. v. CFTC*, 149 F.3d 679, 683 (7th Cir. 1998) (citing *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 484–86 (1989)); *see also Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 502 (1985) (refusing to facially invalidate statute because "a federal court should not extend its invalidation of a statute further than necessary to dispose of the case before it"); *United States v. Grace*, 461 U.S. 171, 175 (1983) (limiting review to the question of whether a statute was unconstitutional "as applied" in certain contexts, even though plaintiffs raised a facial challenge under the First Amendment). Here, the same principles compel the Court not to reach the facial challenge to the ordinance in question.

The Court's construction of the statute renders academic any question about the facial constitutionality of the statute. Where the ordinance did not

apply to Plaintiff under the facts of this case, no injury it sustained will be redressed by a decision on its constitutionality.  It is a "well-established rule of constitutional law" that "a party to whom application of a statute is constitutional will not be heard to attack the statute on the ground that impliedly it might also be taken as applying to other persons or other situations in which its application might be unconstitutional." *United States v. Di Pietro*, 615 F.3d 1369, 1371 (11th Cir. 2010) (citing *United States v. Raines*, 362 U.S. 17, 22 (1960)) (internal quotation marks omitted).  This rule follows from "the recognition that constitutional rights are personal in nature; that prudential concerns counsel for limiting the scope of constitutional adjudications; and that Article III of the Constitution limits the jurisdiction of federal courts to actual cases and controversies." *Id.* (citing *New York v. Ferber*, 458 U.S. 747, 767-68 & n. 20 (1982)).  Here, of course, the Court's conclusion has not been that the ordinance is constitutionally applied to Sterigenics, but rather that it did *not* apply to Sterigenics in the manner advocated by Defendants.  The result is, however, the same.   Whether the "substantial renovation" standard is unconstitutionally vague or "arbitrary and irrational" becomes a purely hypothetical question, since the ordinance does not have any effect in this case. *See id.*  Count IV will therefore be dismissed, as, in light of the Court's ruling on Count III, the Court has no occasion to reach it.

### 4. Count V

Count V meets the same fate as Count IV.  Here, Sterigenics seeks a declaration that Section 54-51 of the Cobb County Code was not enacted according to the procedures set forth under O.C.G.A. § 8-2-25(c) and is therefore unenforceable.[15]  But, in light of the Court's determination that the ordinance does not apply to Sterigenics under the circumstances at issue in this case, the Court has no more occasion to reach the validity of the ordinance under state law principles as it does its constitutionality.  *See, e.g., Bee's Auto, Inc. v. City of Clermont*, 8 F. Supp. 3d 1369 (M.D. Fla. 2014) ("[T]he Plaintiffs do not have standing to challenge provisions that have no applicability to them[.]"); *Aaron Rents, Inc. v. U.S.*, 462 F. Supp. 65, 69 (N.D. Ga. 1978) ("We need not determine the validity of the regulation because we agree that it is inapplicable.").  The issue becomes one of standing, and specifically redressability.  Since the Court declares that the ordinance does not give Defendants authority to require a new CO of Sterigenics on the facts of the case, declaring the ordinance invalidly enacted would not "significantly increase the likelihood  that [Sterigenics] would obtain relief that directly

---

[15] This statute provides procedures that must be followed if a local governing authority wishes to enact requirements that differ from the State Minimum Standard Codes, including the International Fire Code and International Building Code.  *See* O.C.G.A. § 8-2-25(c)(1).

redresses the injury that [it] claims to have suffered."  *Lewis v. Gov. of Alabama*, 944 F.3d 1287, 1301 (11th Cir. 2019) (cleaned up).  Count V is due to be dismissed for this reason.

### C. Vested Rights and Estoppel

### 1. Ripeness

The Court now turns to Plaintiff's vested rights and estoppel claims. These claims ask the Court to declare, under Georgia's vested rights doctrine and state-law estoppel principles, that

> Sterigenics has a vested right to use the Facility for its EO sterilization operations, and that Gobble and Dawe are precluded from obstructing Sterigenics' use of its Facility based on their claim that Sterigenics cannot continue its operations at the Facility without a new certificate of occupancy; [and]
> . . . that Gobble and Dawe are estoped from claiming that Sterigenics cannot continue its operations at the Facility without a new certificate of occupancy[.]

(Doc. 1 at 53.)

Georgia's vested rights doctrine "applies when a 'landowner, relying in good faith, upon some act or omission of the government, has made a substantial change in position or incurred such extensive obligation and expenses that it would be highly inequitable and unjust to destroy the rights he has acquired.'"  *Bickerstaff Clay Products Co., Inc. v. Harris County, Ga. By and Through Bd. of Com'rs*, 89 F.3d 1481, 1487-88 (11th Cir. 1996) (quoting

*Cohn Communities, Inc. v. Clayton County*, 359 S.E.2d 887, 889 (Ga. 1987)). In the most common application of the doctrine, a property owner's vested right in a particular use of his property protects the owner against the retroactive enforcement of land use ordinances that prohibit that use. *See Crown Media, LLC v. Gwinnett County, GA*, 380 F.3d 1317, 1325-26 (11th Cir. 2004) (stating that "[i]f a property owner obtains a valid sign or building permit authorizing a particular land use under an existing zoning ordinance, Georgia courts have concluded that property rights vest when a permit is actually issued for a particular land use and that a later, new zoning ordinance prohibiting that land use is not enforceable against the property owner," and collecting cases). "Once a building permit has issued, a landowner has the right to develop the property pursuant to that permit." *Id.* (quoting *WMM Props., Inc. v. Cobb County*, 339 S.E.2d 252, 254 (Ga. 1986)). "[T]he landowner retains its vested right to develop its property pursuant to an issued permit 'during its term or for a reasonable time after its issuance if no term is specified.'" *Id.* (quoting *WMM Props.*, 339 S.E.2d at 254).

The vested rights doctrine is "derived from the principle of equitable estoppel," *Cohn Cmtys., Inc. v. Clayton Cnty.*, 359 S.E.2d 887, 889 (Ga. 1987), although Sterigenics also seeks a separate declaration that Cobb County is estopped from requiring it to obtain a new CO to operate. *See also Bickerstaff,*

32

89 F.3d at 1488 ("The doctrine of vested rights that the district court applied in this case is derived from the principle of equitable estoppel.")  Sometimes Georgia courts have discussed estoppel in this context as an independent ground for relief for a landowner.  *See, e.g., City of Summerville v. Georgia Power Co.*, 55 S.E.2d 540, 543-44 (Ga. 1949); *H.G. Brown Fam. Ltd. Partn. v. City of Villa Rica*, 607 S.E.2d 883, 886 (Ga. 2005); *but see Cohn Cmtys., Inc.*, 359 S.E.2d at 889.  Here, however, the ripeness considerations for both counts are essentially the same, so the Court will discuss them together.[16]  Indeed, Sterigenics' arguments from both doctrines are also essentially the same: first, Cobb County issued various building permits, COs, and "other approvals" for use of the facility over the years, and did so with knowledge that it was an EO sterilization facility; second, Sterigenics relied on those approvals to invest in its business and incur obligations; therefore, Sterigenics has a vested right in continued operation of the facility as an EO sterilization facility, and Defendants are estopped from requiring it to acquire a new facility-wide CO to continue operating.

---

[16] The parties disagree over whether vested rights and estoppel really constitute separate grounds for declaratory relief, but the Court has no occasion to reach this question.

These claims present different ripeness considerations than those pertaining to Section 54-51. In contrast with the Section 54-51 claims, the factual development necessary for the vested rights and estoppel determinations was cut short when this lawsuit began. Unlike the Section 54-51-specific claims, the parties' disagreement about whether Sterigenics needed a new "C.O. for [its] consolidated tenant space" is not enough to ripen the vested rights or estoppel claims. This is so, in part, because Plaintiff seeks a broader declaratory judgment in these counts. It asks the Court to declare not just that Defendants were without authority to require a new CO on specific asserted legal grounds, but that they are simply precluded from requiring Sterigenics to acquire a new CO on any potential legal ground and under any future set of circumstances. Without sufficient grounding in the determinations actually reached and the positions actually taken by Plaintiff under such future circumstances, the Court would risk "rendering impermissible advisory opinions," *Club Madonna, Inc. v. City of Miami Beach*, 924 F.3d 1370, 1379-80 (11th Cir. 2019). Here, an advisory opinion of this sort might be useful to Plaintiff in the sense that it might shield Plaintiff in further dealings with the County on any number of grounds not raised in the parties' 2019-2020 dispute. But the ripeness doctrine imposes "prudential limitations on the kinds of cases that a court has power to decide," limitations that "counsel

judicial restraint," *Club Madonna, Inc.*, 924 F.3d at 1380, against deciding questions whose contours are insufficiently fixed.  That is the case with the vested rights and estoppel claims, which depend on matters—legal and factual—on which the Defendants' position has not yet ripened.  The Court explains below.

First, given the state of the dispute's factual development at the moment when it was brought into federal court, the vested rights and estoppel claims "rest[ ] upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted); *see also Midrash Sephardi, Inc. v. Town of Surfside*, 366 F.3d 1214, 1224 (11th Cir. 2004) (claims are unripe when they require "speculation about contingent future events").

The basic problem is that, despite the five or six months of wrangling between the parties, at the time of suit it remained undetermined what steps the Defendants would require Sterigenics to take for it to acquire a new CO, what classification this CO would carry, and what the practical effects of this classification would be for Sterigenics.  Any number of different possibilities appear in these recommendations, from the issuance of a new CO being simply an "administrative matter" (Doc. 129-2 at 31) to the implementation of various other facility changes being required to bring the facility into compliance (*e.g.*,

Doc. 9-4 at 10-11). Although it is not obvious from Sterigenics' papers, there is no argument that classification as a high-hazard facility would mean permanent closure—all of the formal, if non-final, indications in the record are that it would, at the most, entail various upgrades to the facility. And the record shows unambiguously that the County halted sterilization operations at Sterigenics pending the submission of additional documents, third-party review, and scrutiny of its compliance with applicable codes. (*See, e.g.*, Doc. 143-13 at 140-144; Doc. 159 at 43-44.) To be sure, Plaintiff argues that it submitted everything Defendants asked for, although Defendants insist otherwise. (*Compare* Doc. 159 at 43, *with* Doc. 159 at 68.) But that dispute only underscores the underlying issue, not genuinely disputed, that Defendants had not yet determined what to make of Plaintiff's submissions.

This matters profoundly, because the vested rights and estoppel doctrines on which Plaintiff relies do not create a right not to be regulated. They speak, rather, of a property owner's right to "initiate and continue a *use*," *Barker v. Forsyth County*, 281 S.E.2d 549, 552 (Ga. 1981) (emphasis added), a property right in the "proposed *use*," *Craig v. City of Lilburn*, 177 S.E.2d 75, 76 (Ga. 1970) (emphasis added), "the rights of a landowner to use its property for a given *use*," *WMM Properties, Inc. v. Cobb County*, 339 S.E.2d 252, 254 (Ga. 1986) (emphasis added), and so on. The cases generally arise out of factual

36

scenarios somewhat different than the present one—usually situations in which municipalities authorize the development of a property for a given use but subsequently attempt to rescind the authorization in one way or another, for example by amending the applicable zoning ordinance or passing new regulations. *See Craig v. City of Lilburn*, 177 S.E.2d 75, 76 (Ga. 1970); *WMM Properties, Inc. v. Cobb County*, 339 S.E.2d 252, 254-55 (Ga. 1986); *Jackson v. Delk*, 361 S.E.2d 370, 372 (Ga. 1987). The basic function of the doctrine is to protect property owners against the retroactive application of new laws that "destroy" their ability to continue the "use" they have initiated. *See Bickerstaff*, 89 F.3d at 1488; *Jackson*, 361 S.E.2d at 372; *Crown Media*, 380 F.3d at 1325-26. The same is true of estoppel, to whatever extent it is really a distinct doctrine in this context. *See, e.g.*, *City of Douglasville v. Willows, Inc.*, 224 S.E.2d 363, 364 (Ga. 1976). To issue the declaratory relief that Plaintiff seeks in Counts I and II, the Court would therefore have to anticipate the extent to which the requirements imposed by Defendants for the acquisition of a new CO would destroy Sterigenics' right to use the facility under its prior approvals, and thus run afoul of these rules.

But this sort of anticipation of "contingent future events" is precisely the sort of thing the ripeness doctrine counsels against. *Texas v. United States*, 523 U.S. 296, 300 (1998). At the core of the ripeness problem with the vested

rights and estoppel counts is that any declaratory judgment on these questions could not be sufficiently grounded in the actions that the Defendants have actually taken in this case.  Any such declaration would have to explore possible exceptions to the vested rights and estoppel doctrines, such as the effect under *Union County v. CGP, Inc.*, 589 S.E.2d 240 (Ga. 2003) and *Corey Outdoor Advert., Inc. v. Bd. of Zoning Adjustments of City of Atlanta*, 327 S.E.2d 178, 182 (Ga. 1985), of Defendants' recent contention that "every certificate of occupancy that the County has ever issued has been incorrect" and were "issued in violation of Cobb County law by incorrectly classifying the occupancy type of its facility."[17]  (Doc. 146 at 12.)  And, again, the Court would have to anticipate what sorts of requirements, if ultimately imposed, might amount to a destruction of Sterigenics' "use" of the property and which would not rise to that level.

This contingency is especially pronounced given the Court's ruling above that the Defendants lacked authority under Section 54-51 of the Cobb County Code to require a new CO because of Sterigenics' facility modifications. Without this justification, any number of possible paths forward for the parties'

---

[17] The fact that these new arguments have even arisen is a sign of the unripeness of these aspects of the dispute: Defendants have been able to search for new legal positions precisely because they had not yet come to a final position prior to the initiation of this case.

relationship becomes possible, including the assertion of alternative grounds for the requirement of a new CO (if they exist), the issuance of a new CO as a simple "administrative matter," continued negotiations over facility upgrades without closure of the facility, and so forth.  If the Court were to attempt to provide a declaratory judgment on the vested rights issue at this juncture, it would have to undertake what was essentially an advisory opinion on the scope of the vested rights doctrine in Georgia and its application to possible future conduct by the County.  This is precisely the sort of judicial intervention that the ripeness doctrine is designed to avoid.  This is, in other words, a situation in which the issues are not "sufficiently defined and concrete[ ] to permit effective decisionmaking by the court."  *Digital Properties*, 121 F.3d at 589 (citing *Cheffer v. Reno*, 55 F.3d 1517, 1524 (11th Cir.1995)).

Second, and relatedly, the fact that so much depends on contingent future events is a consequence of the fact that Defendants had not yet reached a "binding conclusive administrative decision" sufficient to concretize the dispute.  *Digital Properties, Inc. v. City of Plantation*, 121 F.3d 586, 590 (11th Cir. 1997).  Eleventh Circuit cases considering ripeness in disputes touching on land-use issues have emphasized the importance of a plaintiff's receiving a final determination from the relevant state officials, through appropriate state channels, before seeking federal court intervention.  *See Digital Properties*, 121

F.3d at 590 ("Without the presentation of a binding conclusive administrative decision, no tangible controversy exists and, thus, we have no authority to act."); *Nat'l Advert. Co. v. City of Miami*, 402 F.3d 1335, 1340 (11th Cir. 2005); ("National's claim is not ripe because it failed to obtain a final denial of its applications. Although National's initial request for a permit was not granted by the clerks in Miami's zoning department, National never received a final, written denial of their applications."). No doubt, the plaintiffs in both of the cited cases did less in pursuit of their claims than did Plaintiff here. But these were also cases raising First Amendment challenges, where ripeness doctrine is applied "most permissively." *Harrell v. The Fla. Bar*, 608 F.3d 1241, 1258 (11th Cir. 2010). These cases also involved much simpler administrative determinations than the one at issue here, which the record shows to be a matter of technical building and fire code compliance.

Comparing the posture of the instant case with that of other vested rights cases in federal court is also instructive. In *Crown Media, LLC v. Gwinnett County, GA*, 380 F.3d 1317 (11th Cir. 2004), for example, the plaintiff brought a vested rights challenge to the retroactive application of two Gwinnett County sign ordinances to their billboard. The issues in the case had thoroughly crystallized before being presented to the Court: the county had passed a new ordinance whose purported consequences for the plaintiff had

been finally and clearly determined: the County had instructed the plaintiff that it would be required to remove its sign. *Id.* at 1321. That posture is in stark contrast to that of the instant case, where discussions over what facility changes would be required for the issuance of a new CO were cut off by the start of this litigation, with the question left unanswered.

And despite what Sterigenics suggests was Defendants' aim to shut down the facility permanently, the Court is not free to assume that this is what would ultimately occur. Indeed, the Eleventh Circuit has considered and rejected similar arguments in the past:

> National has at various times (including during oral argument) claimed both that Miami's zoning ordinance is too vague for it to know what is required to get a permit and that it did not obtain a written denial because it was certain that its application would be denied. Conversely, the City has alleged that National could have pursued a number of administrative options to protest its denial or it could have merely fixed specific deficiencies in the applications they presented. It is precisely for this reason that without a "binding conclusive administrative decision, no tangible controversy exists." As this case currently stands, a court is incapable of determining if, let alone why, National's applications were denied. Without that crucial information, it would be impossible to determine if the City's zoning ordinance violates the constitution.

*Nat'l Advert.*, 402 F.3d at 1340-41 (internal citations omitted). There is certainly enough in the record to support the inference that Defendants could have rendered their determination with greater alacrity. But that in itself does

not make the vested rights or estoppel claims ripe, since it remains the case that the Court is yet "incapable of determining if, let alone why," Sterigenics' CO did not issue. *Id.*

Third, and perhaps most importantly, Sterigenics had a well-worn state remedy available to it to force the County to make a final determination on fixed legal grounds. Given Sterigenics' belief that it had provided Defendants with all the information required for the issuance of a CO—or for a determination that no new CO was required—a mandamus action in Georgia state court to compel issuance of any necessary permits would provide the appropriate means of developing the facts and the parties' positions. *See* O.C.G.A. § 9-6-20. This is the posture in which many, if not most, vested rights and estoppel cases enter the Georgia courts. *See, e.g., Union County v. CGP, Inc.,* 589 S.E.2d 240 (Ga. 2003); *Matheson v. DeKalb County*, 354 S.E.2d 121 (Ga. 1987); *WMM Properties, Inc. v. Cobb County*, 339 S.E.2d 252 (Ga. 1986) ("A landowner has a right, enforceable by mandamus, to be issued a building permit in accordance with zoning regulations as such regulations exist at the time a proper application for building permit is submitted to the proper authority."); *see also Boatman v. Town of Oakland, Fla.*, 76 F.3d 341, 346 (11th Cir. 1996) ("The state gave them the right to repair to the Orange County circuit court; there, as we point out . . . they could have sought an order

compelling the building inspector to do his job."). In its ripeness cases, the Eleventh Circuit has required plaintiffs—although they "can appropriately bring suit"—to seek administrative or state remedies that "could lend significantly more concreteness" to particular claims. *Harrell*, 608 F.3d at 1261. "[W]here the application of certain challenged rules is less than obvious, and the plaintiff has a ready means of determining how they will be applied, there are 'strong interests militating in favor of postponement.'" *Id.* at 1263 (quoting *AT&T Corp. v. FCC*, 349 F.3d 692, 700 (D.C. Cir. 2003)). These considerations are applicable here, and they too counsel against finding the claims to be ripe.

For these reasons—the claims' dependence on contingent future events, the absence of a "binding conclusive administrative decision," and the availability of state remedies to give "significantly more concreteness" to the claims—the court concludes that the vested rights and estoppel counts are not yet fit for judicial decision.

The Court therefore turns to the second part of the ripeness inquiry: "the hardship to the parties of withholding court consideration." *Nat'l Advert.*, 402 F.3d at 1341. To show hardship, "litigants must show that they are 'forced to choose between foregoing lawful activity and risking substantial legal sanctions.'" *Club Madonna*, 924 F.3d at 1380. If the Court found against

Sterigenics on its other claims, the Court could be compelled to find that Sterigenics had made a showing of hardship; it challenges an action that temporarily halted its business operations.  But, as already discussed, the Court has found that Sterigenics' other claims are ripe for decision, and it finds that Section 54-51 of the Cobb County Code did not authorize Defendants to require a new CO.  The County will not be able fall back on Section 54-51 as a grounds for requiring Sterigenics to acquire a new CO to operate.

There remains the possibility, of course, that Defendants will subsequently find a new set of authorities on which to ground their assertion that Sterigenics requires a new CO.  Indeed the Court's opinion does not foreclose Defendants from doing so.  But this possibility is just that—a possibility—and whether it threatens Plaintiff's vested rights or implicates estoppel principles will depend on how the Defendants proceed, if in fact they do proceed.  Vitally, Plaintiff will not be without remedies if Defendants raise new questions about its code compliance, including the mandamus remedy discussed above, or a return to federal court if subsequent actions of the Defendants crystallize the dispute into one that implicates Plaintiff's vested rights.  The Eleventh Circuit and the Supreme Court have made clear that "practical harm" of the sort that tips the hardship balance toward justiciability "is not likely to be present where a plaintiff 'will have ample opportunity later

to bring its legal challenge at a time when harm is more imminent and more certain.'" *Pittman v. Cole*, 267 F.3d 1269, 1281 (11th Cir. 2001) (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998)).  From Sterigenics' point of view, there are no doubt disadvantages here, for, in the extreme case, further litigation might be required.  But this a disadvantage inherent in the "case-by-case approach" that is the "traditional . . . mode of operation of the courts." *Lujan v. National Wildlife Federation*, 497 U.S. 871, 894 (1990); *see also Ohio Forestry Ass'n*, 523 U.S. at 735 ("The ripeness doctrine reflects a judgment that the disadvantages of a premature review that may prove too abstract or unnecessary ordinarily outweigh the additional costs of—even repetitive—postimplementation litigation.").  Such (potential) costs of future litigation do not amount to hardship in themselves.  *See Ohio Forestry Ass'n*, 523 U.S. at 735.  The Court concludes, therefore, that Sterigenics' vested rights and estoppel claims are unripe for adjudication.  They are due to be dismissed without prejudice.

### 2. Declaratory Judgment Act Discretion

Even if Sterigenics' vested rights and estoppel claims were ripe for adjudication, the Court would exercise its discretion under the Declaratory Judgment Act not to reach them.  "Since its inception, the Declaratory Judgment Act has been understood to confer on federal courts unique and

substantial discretion in deciding whether to declare the rights of litigants.  On its face, the statute provides that a court '*may* declare the rights and other legal relations of any interested party seeking such declaration.'"  *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (quoting 28 U.S.C. § 2201(a)) (emphasis in *Wilton*).  The Declaratory Judgment Act is an "enabling act" that "confers no 'absolute right upon the litigant' and imposes no duty on the district courts."  *Stevens v. Osuna*, 877 F.3d 1293, 1311 (11th Cir. 2017) (quoting *Wilton*, 515 U.S. at 287-88).  "In the declaratory judgment context, the normal principle that federal courts should adjudicate claims within their jurisdiction yields to considerations of practicality and wise judicial administration."  *Wilton*, 515 U.S. at 288.  "When all is said and done . . . the propriety of declaratory relief in a particular case will depend upon a circumspect sense of its fitness informed by the teachings and experience concerning the functions and extent of federal judicial power."  *Id.* at 287 (internal quotation marks omitted).

The Eleventh Circuit has set forth a multi-factor test "to aid district courts in balancing state and federal interests" in exercising their discretion under the Declaratory Judgment Act.  *See Ameritas Variable Life Ins. Co. v. Roach*, 411 F.3d 1328 (11th Cir. 2005).

Those factors are as follows:

(1) the strength of the state's interest in having the issues raised in the federal declaratory action decided in the state courts;
(2) whether the judgment in the federal declaratory action would settle the controversy;
(3) whether the federal declaratory action would serve a useful purpose in clarifying the legal relations at issue;
(4) whether the declaratory remedy is being used merely for the purpose of "procedural fencing"—that is, to provide an arena for a race for res judicata or to achieve a federal hearing in a case otherwise not removable;
(5) whether the use of a declaratory action would increase the friction between our federal and state courts and improperly encroach on state jurisdiction;
(6) whether there is an alternative remedy that is better or more effective;
(7) whether the underlying factual issues are important to an informed resolution of the case;
(8) whether the state trial court is in a better position to evaluate those factual issues than is the federal court; and
(9) whether there is a close nexus between the underlying factual and legal issues and state law and/or public policy, or whether federal common or statutory law dictates a resolution of the declaratory judgment action.

*Id.* at 1283. This "list is neither absolute nor is any one factor controlling[.]" *Ameritas Variable Life Ins. Co.*, 411 F.3d at 1331. Some of its language speaks to the more common case in which a district court's abstention from a declaratory action will be taken in favor of preexisting state court proceedings. But the Eleventh Circuit has recently clarified that "a district court may exercise its discretion and decline to adjudicate a claim under the Declaratory Judgment Act even in the absence of parallel proceedings." *Nat'l Tr. Ins. Co. v. S. Heating and Cooling Inc*, 12 F.4th 1278 (11th Cir. 2021). The existence

or nonexistence of a parallel proceeding is still one factor to be considered, but it is not dispositive.  *See id.*

Indeed, even where there are no *concurrent* state court proceedings at all, the Eleventh Circuit has affirmed the discretionary denial of relief under the Declaratory Judgment Act in some cases.  *See Stevens v. Osuna*, 877 F.3d 1293, 1311-13 (11th Cir. 2017); *Cambridge Christian Sch., Inc. v. Fla. High Sch. Athletic Assn., Inc.*, 942 F.3d 1215, 1250-52 (11th Cir. 2019).[18]  In *Stevens*, a plaintiff removed from a hearing before an immigration judge sought a declaratory judgment regarding the responsibilities of an immigration judge in closing an immigration hearing.  The district court declined to issue what it characterized as a broad, "amorphous and abstract" declaratory judgment. *Stevens*, 877 F.3d at 1312.  The Eleventh Circuit found no abuse of discretion, reasoning that a declaratory judgment should only be rendered in a controversy "definite and concrete," "admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising

---

[18] In *Fed. Reserve Bank of Atlanta v. Thomas*, 220 F.3d 1235, 1247 (11th Cir. 2000), the Circuit held that it was "an abuse of discretion . . . to dismiss a declaratory judgment action in favor of a state court proceeding that does not exist."  That case is distinguishable, however, because the case was one in which no state court action *could* exist, given that a federal statute guaranteed the Federal Reserve a federal forum.  *See id.*; *see also Nat'l Trust Ins. Co.*, 12 F.4th  at 1285 (discussing this case in these terms).

what the law would be upon a hypothetical set of facts." *Id.* at 1313 (quoting *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240-41 (1937)). It also emphasized that the declaration sought implicated "a sensitive point for the separation of powers among other things." *Id.*

In *Cambridge Christian School*, the plaintiff asserted a variety of claims arising out of a state athletic association's refusal to permit it to conduct a prayer over a loudspeaker prior to a football game. *See Cambridge Christian School*, 942 F.3d at 1222. Some of those claims sought declaratory judgments regarding the plaintiff's state and federal constitutional rights. The district court declined to grant declaratory relief on two claims—those raising Establishment Clause issues—reasoning that the plaintiff's claims "were more appropriately addressed" under the Free Speech and Free Exercise Clauses, and that there was "no actual controversy as to" the Establishment Clause claims. *Id.* at 1251. The Eleventh Circuit found no abuse of discretion, agreeing that the case was "better presented" under the other claims. *Id.* It concluded that "[i]t was not an abuse of discretion for the district court to view the declaratory judgment action as being largely hypothetical and lacking 'sufficient immediacy,' especially when it was presented alongside more straightforward claims that could yield the same result." *Id.* at 1252.

In neither this case nor *Stevens* were there any other proceedings to which the district court could defer. In both cases, the Eleventh Circuit affirmed the dismissal of a subset of the plaintiff's claims where the declaratory relief sought was broad and relatively abstract, and where the resolution of the plaintiff's other claims disposed of the actual controversy. The instant case presents an analogous situation. Here, Counts I and II seek broad and relatively amorphous relief, and the disposition of the claims based on Section 54-51 will address the concrete controversy between the parties.

Additionally, Counts I and II implicate the relevant "principles of wise judicial administration, federalism, comity" that structure the district court's discretion under the Declaratory Judgment Act in most cases. *Nat'l Trust Ins. Co.*, 12 F.4th at 1285. A discussion of the *Ameritas* factors is illustrative.

With respect to the first of the *Ameritas* factors, the Court finds that "the state's interest in having the [vested rights and estoppel] issues raised . . . in the state courts" is strong. *Nat'l Trust Ins. Co.*, 12 F.4th at 1285. For one thing, "[m]atters of land use planning are primarily of local concern." *Fields v. Rockdale County Georgia*, 785 F.2d 1558, 1561 (11th Cir. 1986) (citing *Louisiana Power & Light Co. v. City of Thibodaux*, 360 U.S. 25, 28 (1959)). For another, as discussed above, the application of the vested rights and estoppel doctrines to the undeveloped facts of this case—which, as noted, are also at

50

some remove from the facts of the leading vested rights cases—is far from clear. The state courts plainly have the strongest interest in charting the course in this respect. This factor thus weighs in favor of the exercise of discretion to deny declaratory relief. So, for the same reasons, does the ninth factor, not only given that the case is essentially a land use dispute, but also in light of its indirect entanglement with matters of state regulatory policy.

The fifth factor also weighs in favor of the discretionary denial of relief. As discussed in connection with the ripeness analysis, the moment at which the dispute was brought into court leaves crucial aspects of the vested rights and estoppel claims in a state of underdevelopment. Particularly where state remedies exist to advance the parties' dispute and concretize their positions, a declaratory judgment could only "increase the friction between our federal and state courts and improperly encroach on state jurisdiction." *Nat'l Trust Ins. Co.*, 12 F.4th at 1285. The existence of the state court mandamus remedy discussed above also satisfies the sixth factor. *See Nat'l Trust Ins. Co.*, 12 F.4th at 1285. Not only would that remedy likely have been more efficient, but it would have left the evaluation of the vested rights and estoppel questions in the hands of a state court with a much stronger interest in, and fluency with, the land-use issues at stake here. Something similar is true of the seventh and eighth factors. Again, as discussed above, the vested rights and estoppel

51

claims depend on a host of factual issues that were not resolved between the parties before the case was brought to federal court. *See Cambridge Christian Sch.*, 942 F.3d at 1252 (affirming the district court's exercise of discretion not to grant declaratory relief where it viewed the claims at issue "as being largely hypothetical and lacking 'sufficient immediacy,' especially when it was presented alongside more straightforward claims that could yield the same result").

The second through fourth factors, on the other hand, likely weigh against denying declaratory relief. Given the vast breadth of the relief Plaintiff seeks in its first and second counts, it is certainly possible that declaratory relief might put an end to any future disputes between the parties. At the same time, however, the breadth of this relief means that any "clarifying of the legal relations at issue" would come at significant expense to the state interests just discussed. It is also the case that such "clarification" may ultimately be sterile, since the Court's decision on Count III may lead the subsequent stages of the parties' relationship in a different direction.[19]

---

[19] The Court acknowledges Sterigenics' frustration with what it clearly perceives to be the Defendants' foot-dragging, even in the face of what Sterigenics has characterized as its own initial cooperation. From Sterigenics' perspective, many of the factors that make Counts I and II unsuitable for review may seem the product of Defendants' own actions. Even if that were so, however, it would not change the Court's analysis. The type of relief sought

On balance, the Court would exercise its "unique and substantial discretion" not to issue declaratory relief on Counts I and II of Plaintiff's complaint. *Nat'l Trust Ins. Co.*, 12 F.4th at 1284.

## IV.   Conclusion

For the foregoing reasons, the Court **GRANTS IN PART AND DENIES IN PART** both Defendants' Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment.  Defendants' Motion (Doc. 141) is **GRANTED** with respect to Counts I, II, IV, and V of Plaintiff's Complaint, which are **DISMISSED WITHOUT PREJUDICE**, and **DENIED** with respect to Count III.  Plaintiff's Motion (Doc. 143) is **GRANTED** with respect to Count III, consistent with the foregoing opinion, and **DENIED** with respect to all other claims.

The Clerk is **DIRECTED** to terminate this case.

**SO ORDERED** this 16th day of February, 2023.

SARAH E. GERAGHTY
United States District Judge

_____

in Counts I and II is not apt to push Defendants' regulatory process forward—it is apt to short-circuit it, both in this dispute and under other circumstances that might arise in the future.